IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


IN THE MATTER OF THE                              3:11-mc-9097-ST
EXTRADITION OF
RASEMA HANDANOVIĆ,                                OPINION AND ORDER

_____

STEWART, Magistrate Judge:

## **INTRODUCTION**

On April 11, 2011, the United States, acting on behalf of the Government of the Republic

of Bosnia and Herzegovina ("B&H"), commenced extradition proceedings against Rasema

Handanović, aka Zolja, aka Sammy Rasema Yetisen ("Handanović"). Handanović is a citizen of

1 - OPINION AND ORDER

B&H and the United States and currently resides in Beaverton, Oregon.  According to the

Request for Extradition dated July 7, 2010, B&H seeks Handanović:

> for the purpose of prosecution and trial before the Court of Bosnia
> for probable cause that she committed the offence of "war crimes
> against civilians" under Article 173(1)(a) and (b) of the Criminal
> Code of Bosnia and Herzegovina and for probable cause that she
> committed the offence of "war crimes against prisoners of war"
> under Article 175(1)(a) and (b) of the Criminal Code of Bosnia and
> Herzegovina, in combination with Articles 180(1) and 29 of the
> Criminal Code of Bosnia and Herzegovina.

Extradition of "fugitives from a foreign country" is governed by 18 USC § 3184.  Upon

presentation of a complaint that a person within its jurisdiction has committed a crime in a

foreign state covered by an existing treaty, the court may issue a warrant of apprehension for the

person.  *Id*.  The person then appears before the court at a hearing "to the end that the evidence of

criminality may be heard and considered."  *Id*.  Extradition proceedings may be conducted by a

magistrate judge.  *Id*.  At the hearing, the court must determine whether that evidence "is

sufficient to sustain the charge under the provisions of the proper treaty or convention."  *Id*.  The

court's authority is limited to "ascertaining whether a crime is an extraditable offense under the

relevant treaty and whether probable cause exists to sustain the charge."  *Vo v. Benov*, 447 F3d

1235, 1237 (9th Cir 2006) (citations omitted).  An extradition hearing does not decide guilt or

innocence, but is analogous to a preliminary hearing to determine the existence of probable cause

for a criminal charge.  *Mirchandani v. United States*, 836 F2d 1223, 1226 (9th Cir 1988).  If the

evidence is sufficient, then the court is required to certify the individual as extraditable to the

Secretary of State.  18 USC § 3184.  The Secretary of State ultimately decides whether to

2 - OPINION AND ORDER

surrender the fugitive to the requesting country.  18 USC §§ 3186, 3196.  A party can request a

stay of extradition pending any decision by the Secretary of State.

      Handanović opposes extradition on multiple grounds.  First, she argues that the

government has failed to carry its burden of proving that a valid treaty exists between the United

States and B&H.  Second, even if there is a valid treaty, she argues that B&H has not met its

obligations under the treaty to support its extradition request because:  (1) the warrant of arrest is

defective; (2) B&H has not officially "charged" Handanović as required under the treaty;

(3) B&H has not demonstrated that the alleged crimes fall within the statute of limitations as

required by the treaty; and (4) B&H has neither demonstrated compliance with the dual

criminality provisions of the treaty nor provided probable cause to believe that Handanović

committed each of the crimes charged.

      This court held an extradition hearing on September 29, 2011, at which it received

evidence in the form of documents and testimony offered by both parties.  Based on the evidence

and the arguments presented by the parties, this court concludes that Handanović is extraditable,

but only on the alleged offenses that resulted in death of the victims.

## DISCUSSION

## I.  Existence of Valid Extradition Treaty

      "The advice and consent of the Senate is a constitutional prerequisite to a valid treaty, and

the executive branch does not have the power to extradite alleged criminals absent a valid

extradition treaty."  *Then v. Melendez*, 92 F3d 851, 853 (9th Cir 1996) (citation omitted).  An

extradition treaty between the United States and the Kingdom of Servia (as Serbia was then

transliterated) was signed on October 25, 1901, and entered into on June 12, 1902 ("1902

3 - OPINION AND ORDER

Treaty"). Gov't Ex. 4 (Tab 1) (McDonough Decl.), ¶ 2 (P1).  Under the "state succession"

doctrine, a successor state may be bound by the treaty obligations of a prior state.  *See, e.g.,*

*Sabatier v. Dabrowski*, 586 F2d 866, 868 (1st Cir 1978); Bassiouni, M. Cherif, INTERNATIONAL

EXTRADITION:  UNITED STATES LAW AND PRACTICE (5th ed. 2007), pp. 154-61 ("a successor state

is bound by the treaty obligations undertaken by the legal entity called the prior state").

Handanović contends that B&H is not a successor state to the Kingdom of Servia and, therefore,

is not subject to the 1902 Treaty.

      In 1918, as a consequence of World War I, the Kingdom of Servia was expanded to form

the new Kingdom of Serbs, Croats and Slovenes which included the territory of what is now

B&H (formerly part of the Austro-Hungarian Empire).  Gov't Ex. 10 (Dean Decl.), ¶ 4.  In 1920,

the Kingdom of Serbs, Croats and Slovenes was renamed the Kingdom of Yugoslavia, and

renamed again in 1946 after the end of World War II as the Federal People's Republic of

Yugoslavia.  *Id*.  In 1963, the Federal People's Republic of Yugoslavia was renamed the Socialist

Federal Republic of Yugoslavia ("SFRY") consisting of six constituent republics:  Slovenia,

Croatia, Serbia, Bosnia-Herzegovina, Montenegro, and Macedonia.  *Id* at ¶ 6.  Beginning in

1991, the SFRY began to disintegrate as the result of civil wars, and B&H declared its

independence from the SFRY in 1992.  *Id*.

      In 1992, the United States recognized B&H as an independent State, and the two

countries established diplomatic relations.  *Id* at ¶ 7.  In a letter of April 19, 1992, relating to the

recognition of B&H, President Izetbegovic of B&H committed to the United States Secretary of

State that "Bosnia is ready to fulfill the treaty and other obligations of the former SFRY."  *Id*.

Since 1992, the United States and B&H have honored the 1902 Treaty by certifying extraditions on at least four occasions. *Id* at ¶ 8.

In 1954, before B&H's independence, the Ninth Circuit ruled that the 1902 Treaty was "a present, valid and effective treaty between the United States and the Federal People's Republic of Yugoslavia." *Ivancevic v. Artukovic*, 211 F2d 565, 575 (9th Cir 1954). Applying the successor state doctrine, it concluded that the new nation of Yugoslavia "was effected with Serbia as its nucleus" and its "political successor," even though the former and successor nations did not entirely overlap. *Id* at 572. As a result, the executive branch's opinion that the 1902 Treaty remained in force "should at least weigh very heavily" in favor of such a finding. *Id* at 574. *Also see Artukovic v. Rison*, 784 F2d 1354, 1355 (9th Cir 1986) ("We have long held that the 1902 Treaty is valid and effective now even though Yugoslavia did not exist as a political unit at the time the treaty was signed.").

More recently the Ninth Circuit applied the successor state doctrine by analyzing the "legal, geographical and historical continuity between British Singapore in 1931 and independent Singapore today." *Then*, 92 F3d at 853. Again it deferred to the executive branch that the valid treaty with the United Kingdom applies also to Singapore as a successor state.

Handanović argues that, unlike the situation in those cases, B&H shares no legal, geographic and historical unity with the Kingdom of Servia. When the 1902 Treaty went into effect, B&H was part of the Austro-Hungarian Empire, not part of the Kingdom of Servia. The 1902 Treaty does not expressly cover other territories that are or will later become part of the Kingdom of Servia. Because the Kingdom of Servia is "twice-removed" from B&H, she

contends that the ordinary justification for application of the successor state doctrine to B&H does not apply.

In support, she points to two United States government documents that do not acknowledge a valid treaty with B&H:  (1) a March 17, 2010 Congressional Research Report which lists B&H as a country with which the United States "has no Bilateral Extradition Treaty;" and (2) a 2010 State Department publication of Treaties in Force which does not list a treaty with B&H.  Handanović Exs. 1 & 2 (dockets #19-1 & #19-2).  She also observes that B&H is not among the countries listed in the Treaties of Extradition in the notes to 18 USC § 1381.

A close reading of the documents cited by Handanović shows that they do not support her position.  The Congressional Research Report contains a footnote acknowledging that the United States had an extradition treaty "with the former Yugoslavia prior to its breakup" and that "it has recognized at least some of the countries which were once part of Yugoslavia as successor nations," citing cases involving Croatia and B&H.  The Treaties in Force publication contains a similar note that B&H became an independent state on April 5, 1992, and refers the reader to Yugoslavia "[f]or agreements prior to the independent state of [B&H]."  Finally, the list of countries listed in 18 USC § 1381 includes Yugoslavia with a footnote stating:  "For the successor States of Yugoslavia, inquire of the Treaty Office of the United States Department of State."  Thus, the government has consistently taken the position that the 1902 Treaty with Yugoslavia applies to its successor states, including B&H.

Handanović also misses the key point that when the Kingdom of Serbs, Croats, and Slovenes (later renamed the SFRY) came into existence, B&H was part of that new nation.  It is undisputed that Yugoslavia succeeded  to the Kingdom of Servia's 1902 Treaty obligations and

that B&H was a part of Yugoslavia up to 1992.  Consequently, when B&H became an independent State in 1992 upon the collapse of Yugoslavia, it had ample legal, geographical and historical continuity with its predecessor (Yugoslavia) to be considered a successor state to the 1902 Treaty.  Nothing in the case law supports Handanović's theory that the successor state doctrine is limited to only one succession per country.

Other courts faced with a similar challenge to the 1902 Treaty have concluded that it is a valid extradition treaty between the United States and B&H.  *In re Extradition of Bilanovic*, No. 1:08-mj-74, 2008 WL 5111846, at *6 (WD Mich Dec. 3, 2008); *United States v. Avdic*, No. CR 07-M06, 2007 WL 185778, at *6 (DSD June 28, 2007); *In re Extradition of Sacirbegovic*, No. 03 CR Misc. 01, 2005 WL 107094 (SDNY Jan. 19, 2005), *rev'd on other grounds*, *Sacirbey v. Guccinone*, 589 F3d 52 (2nd Cir 2009); *see also Arambasic v. Ashcroft*, 403 F Supp2d 951, 954-55 (DSD 2005) (finding the 1902 Treaty valid as to the Republic of Croatia). That reasoning is equally applicable in this case.

Handanović complains with some justification that the 1902 Treaty is antiquated and not well-designed to deal with more modern offenses, such as war crimes.  Nonetheless, this court concludes that the 1902 Treaty remains a valid extradition treaty between the United States and B&H as a successor state to Yugoslavia.

## II.  Compliance with Treaty

### A.  Whether the Arrest Warrant is Defective

Article III of the 1902 Treaty requires the requesting government to provide "a duly authenticated copy of the warrant of arrest in the country where the crime has been committed, and of the depositions or other evidence upon which such warrant was issued."  Handanović was

born in 1972 in Sanski Most, Bosnia.  The original arrest warrant submitted by B&H as the requesting country (Gov't Ex. 12) did not contain Handanović's correct birth date, father's name or birth place.  However, the Corrigendum to that arrest warrant (Gov't Ex. 14) corrects that clerical error in Handanović's biographic information.  Based on the fingerprint analysis (Gov't Ex. 11), records in her United States immigration file (Gov't Ex. 12), B&H identity cards and vital records (Gov't Ex. 5 (Tab 5), P279-89), and photographic lineups shown to eyewitnesses (*id* at (Tab 5 - Protected Witness A) P122, P128, P143, P145-46; (Tab 13 - Protected Witness B) P344, P346, P361; (Tab 5 - Protected Witness D) P192, P210; (Tab 5 - Protected Witness O) P259, P261, P273), there is no question that the person named in the corrected arrest warrant is Handanović.  Accordingly, the arrest warrant, as corrected by the Corrigendum, correctly describes Handanović and is not defective.

## B.  Whether Handanović is "Charged"

Pursuant to Article I of the 1902 Treaty, the United States agrees to "deliver up persons who, having been charged with or convicted of any of [certain specified offenses], are found within its territory."  Handanović argues that she cannot be extradited because she has not been "charged with or convicted of" any crime, but is merely a suspect wanted for investigation.

No indictment has been issued by B&H formally charging Handanović with any crime. According to B&H law, "[n]o indictment shall be issued if the suspect has not been questioned." Gov't Ex. 5 (Tab 5 - Budimir Decl. ¶ 5), P32.  Based on evidence obtained during an investigation initiated in December 2008 (*id* at P26, P42-44), the B&H Prosecutor's Office issued an arrest warrant for Handanović on September 21, 2009.  Gov't Ex. 7 (Tab 12), P331. Because Handanović could not be found in B&H, the Deputy Chief Prosecutor filed a Motion for

Custody to order her into custody for one month and to issue an International Warrant against her. Gov't Ex. 5 (Tab 5), P71-80. On December 21, 2009, a Preliminary Proceedings Judge issued a Decision granting that motion and an Order authorizing the Ministry of Security of B&H to issue an International Warrant. *Id* at P84-86, P89-90. The Request for Extradition was then issued on July 7, 2010 (*id* at P11-12), supported by a declaration of the Deputy Chief Prosecutor summarizing the evidence. *Id* at P26-35.

Contrary to Handanović's argument, the 1902 Treaty does not make extradition conditional on the filing of formal charges. Instead, a valid arrest warrant and an intention to prosecute will suffice. *Emami v. U. S. Dist. Court for the N. Dist. of Cal.*, 834 F2d 1444 (9th Cir 1987).

In *Emami*, the Ninth Circuit construed a treaty with Germany applicable to persons "who have been charged with an offense or are wanted by the other Contracting Party for the enforcement of a judicially pronounced penalty or detention order." It upheld the extradition request from Germany although no formal public charge had been filed. Similar to the extradition request in this case, Germany submitted only the affidavit of a prosecutor summarizing the evidence against Emami and an arrest warrant. In finding Emami subject to extradition, the court fully adopted the reasoning of *In Re Assarsson*, 635 F2d 1237, 1240, 41 (7th Cir 1980) "that grafting such a requirement as Emami proposes on to the treaty . . . is inadvisable." *Emami*, 834 F2d at 1448.

Although the relevant language of the German treaty in *Emami* differs from the 1902 Treaty, *Assarsson* interpreted a Swedish treaty containing the same "charged with or convicted of any of the [specified] offenses" language found in Article I of the 1902 Treaty. It "reasoned that

9 - OPINION AND ORDER

the word 'charged,' used as a verb in the generic sense only to indicate 'accused,' could not be transmuted into a requirement that 'charges,' a noun, be filed." *Emami*, 834 F2d at 1448, quoting *Assarson*, 635 F2d at 1242-43. By adopting this interpretation by the Seventh Circuit, *Emami* binds this court when interpreting the same language in the 1902 Treaty.

The Ninth Circuit also found persuasive the reasoning in *Assarson* "that the treaty required certain certified documents to accompany an extradition request" and did not include formal charges. *Id*. By not specifically including such a requirement, it "reasoned that the parties had not intended to require" a formal charging document. *Id*. Similar to the treaties in both *Emami* and *Assarson*, Article III of the 1902 Treaty does not list formal charges among the documents required to be produced by the requesting country.

Finally, for the same reasons as *Assarsson*, the Ninth Circuit refused "to entangle itself in the present parties' arguments concerning the procedural requirements of German law . . . both out of respect for German sovereignty and . . . the chance of erroneous interpretation." *Id* at 1489. The same rationale applies with equal force here to avoid interpreting the nuances of criminal procedure in B&H as urged by Handanović.

*Emami* and *Assarson* are not isolated decisions. "Every court that has addressed this issue has concluded that a formal charging document is not required" as a condition precedent for extradition. *Kaiser v. Rutherford*, 827 F Supp 832, 834 (DDC 1993) (arrest warrant and detailed explanation of evidence by German prosecutor held sufficient) (citations omitted); *see also Borodin v. Ashcroft*, 136 F Supp2d 125, 130 (EDNY 2001) (arrest warrant and detailed explanation of evidence by Swiss prosecutor held sufficient).

To bar extradition based on the lack of an indictment by B&H would lead to an unwarranted result. A B&H fugitive who managed to flee to the United States pre-indictment, beyond the jurisdiction of B&H authorities to officially question the suspect, could never be extradited because he or she could never be indicted. *See Borodin*, 136 F Supp2d at 130 ("It would be absurd to hold that the Swiss cannot extradite Borodin to appear before their courts to be formally charged because they have not already formally charged him."). Such an immunization from prosecution would effectively eviscerate the 1902 Treaty and render the United States an attractive haven for B&H fugitives. That result would violate the requirement that extradition treaties "be construed more liberally than a criminal statute or the technical requirements of criminal procedure" in favor of carrying out a treaty obligation. *Factor v. Laubenheimer*, 290 US 276, 293 (1933).

Here the extradition request reveals that B&H fully intends to prosecute Handanović "for the purpose of prosecution and trial before the Court of Bosnia for probable cause that she committed" the specified offenses. Gov't Ex. 5 (Tab 5), P11. After examining the evidence presented, the Preliminary Proceedings Judge found "grounded suspicion"[1] that Handanović committed the offenses alleged. *Id* at P86. Together with the arrest warrant, the formal Request for Extradition fulfills the requirement of Article I of the 1902 Treaty.

### C.  Whether the Offenses are Extraditable

Article I of the 1902 Treaty provides for the return of fugitives "charged with or convicted of any of the crimes or offenses specified" in Article II.  Article II states that

---

[1]  The "[t]erm grounded suspicion is used in [B&H] as an equivalent of probable cause."  Gov't Ex. 5 (Tab 5 - Budimir Decl.,¶ 3 n1), P26.

"[e]xtradition shall be granted" for the listed crimes and offenses, as well as for "participation in any of the crimes and offenses mentioned in this Treaty, provided such participation may be punished in the United States as a felony and in Servia as crime or offense as before specified." The list of extraditable offenses includes "[m]urder, comprehending assassination, parricide, infanticide, and poisoning; attempt to commit murder; manslaughter, when voluntary."

Admittedly, the documents are somewhat inconsistent as to the specified offenses for which B&H seeks extradition of Handanović. The earliest document, the arrest warrant, refers to Article 173(1)(c) and Article 175(1)(a)[2] of the Criminal Code of B&H (Gov't Ex. 7 (Tab 12), P331), whereas the motion, decision and order of custody all refer to Article 173(1)(a) and (b) and Article 175(1)(a) (Gov't Ex. 5 (Tab 5), P72, P84-86, P90), as does the prosecutor's declaration supporting the Request for Extradition. *Id* at P27. The Request for Extradition adds Article 175(1)(b) to the list of offenses. *Id* at P11. However, the government confirmed at the hearing that extradition was not being sought under Article 175(1)(b), and a simple comparison of the English translation (*id* at P11) with the original Request (*id* at P13) reveals that the Request does not include Article 175(1)(b). Therefore, despite the discrepancy in the arrest warrant, extradition is sought for the specified offenses of war crimes set forth in Article 173(1)(a) and (b) and Article 175(1)(a).

Article 173(1)(a) and (b) of B&H's criminal code, War Crimes Against Civilians, provides as follows:

---

[2] It is not clear whether Article 175 contains a subsection (1). *See* Gov't Ex. 5 (Tab 3), P94. However, it does contain subsections (a) and (b).

(1) Whoever in violation of rules of international law in time of
war, armed conflicts or occupation, orders or perpetrates any of the
following acts:
a)  Attack on civilian population, settlement, individual civilians or
persons unable to fight, which results in the death, grave bodily
injuries or serious damages of people's health;
b)  Attack without selecting a target, by which civilian population
is harmed; . . .
shall be punished by imprisonment for a term not less than ten
years or long-term imprisonment.

*Id* at P92.

Article 175(1)(a), War Crimes Against Prisoners of War, provides as follows:

Whoever, in violation of the rules of international law, orders or
perpetrates in regard to prisoners of war any of the following acts:
a)  Depriving another persons [*sic*] of their life (murders),
intentional infliction of severe physical or mental pain or suffering
upon person (tortures), inhuman treatment, including therein
biological, medical or other scientific experiments, taking of tissue
or organs for the purpose of tranplantation; . . .
shall be punished by imprisonment for a term not less than ten
years or long-term imprisonment.

*Id* at P94.

Handanović argues that because war crimes are not listed in the 1902 Treaty, the

government has not charged her with an extraditable offense, and the inquiry should end there.

The government responds that the underlying conduct for which B&H seeks to extradite

Handanović constitutes the crimes of murder or attempted murder and, therefore, falls within the

list of extraditable offenses in Article II of the 1902 Treaty.

It is a fundamental requirement that the crime for which extradition is sought also be one

provided for by the applicable treaty.  *Quinn v. Robinson*, 783 F2d 776, 791 (9th Cir 1986).

Courts often consider the extraditable offense inquiry together with the "dual criminality"

requirement, which requires that the conduct underlying the offense must be criminal under the laws of both the requesting and requested nations. *Id.* Indeed, most all of the cases cited by the parties discuss whether an offense is extraditable with reference to principles of dual criminality, which have focused the inquiry on the substance of the offenses, namely the underlying conduct, rather than the name of the offense. *See Collins v. Loisel*, 259 US 309, 312 (1922) ("an offense is extraditable only if the acts charged are criminal by the laws of both countries."); *Clarey v. Gregg*, 138 F3d 764, 765-66 (9th Cir 1998) (finding that Mexico's homicide statute and the United States' felony murder statute in both punish the same acts underlying the charge, thereby satisfying the dual criminality requirement with no mention of the extraditable offense requirement).

Because Article II of the 1902 Treaty lists the extraditable offenses, the parties agree that any requirement of dual criminality is met as to those offenses.[3] The issue of dual criminality arises under the 1902 Treaty only as to "participation in any of the" listed crimes and offenses, which presumably encompasses crimes based upon liability as an aider and abettor or co-conspirator.

Handanović's argument is based on an overly constrained interpretation of the 1902 Treaty. When determining whether crimes not included in a list treaty by name are nonetheless extraditable, courts have followed the well-established rule that treaties are to be construed liberally to favor the obligation to surrender fugitives. *Factor*, 290 US at 293-94. Extradition for

---

[3] Handanović initially argued that the language in Article I of the 1902 Treaty imposes a dual criminality requirement. However, that argument is foreclosed by the Supreme Court's interpretation of an identical provision in *Factor*, 290 US at 290. The Court explained that this provision refers to the "quantum of proof – the 'evidence'" required to establish that the fugitive has committed the charged offense. *Id*.

war crimes may be permissible even though the treaty does not specifically designate those crimes in the list of extraditable offenses, as long as the underlying conduct constitutes an extraditable offense. *See Artukovic v. Rison*, 784 F2d 1354, 1356 (9th Cir 1986) (rejecting argument that charge for "war crimes" falls outside the treaty between Yugoslavia and the United States as "absurd and offensive"); *Demjanjuk v. Petrovsky*, 776 F2d 571, 579 (6th Cir 1985) (finding that charge of "mass murder of Jews" was within offense of "murder," an extraditable offense).

The *Arambasic* case cited by the government is particularly instructive. There, the government of Croatia, a successor state to Yugoslavia, made an extradition request pursuant to the same 1902 Treaty at issue here for "criminal acts against civil population" and "war crimes against prisoners of war." *Arambasic*, 403 F Supp2d at 952-53. Arambasic had been convicted of those crimes based on his conduct as a commander in a "border police unit" in which he took part in torching and pillaging villages, and torturing, disfiguring, and killing imprisoned Croatian police officers. *Id* at 953. He was certified as extraditable even though "[t]he charges of conviction are not identical to those listed in the treaty, [because] it is the substance of the offense, not the name of the offense, which is controlling." *United States v. Arambasic*, No. Cr. 03-M10, p. 3 (DSD July 8, 2003) (Gov't Resp. Memo (docket #34), Ex. E). Because the underlying conduct constituted murder, arson, and robbery, which are listed as extraditable offenses in the 1902 Treaty, the court found that the war crimes offenses were extraditable. *Id*. In Arambasic's subsequent habeas petition challenging his certification of extradition, he did not challenge the finding that the offenses were extraditable, but instead contended that he was not

extraditable because the treaty was not valid and the political offense exception applied.  403 F

Supp2d at 953.  His habeas petition was denied.

Here, Handanović is accused of War Crimes against Civilians and War Crimes against

Prisoners of War.  The most closely analogous offenses in the United States for the acts allegedly

committed by Handanović are first degree murder, 18 USC § 1111(a), and attempted murder,

18 USC § 1113, both of which are listed as extraditable offenses in the 1902 Treaty.  As with

both of those crimes, war crimes under B&H law "can be committed only with intent."  Gov't

Ex. 5 (Tab 5 - Budimir Decl., ¶ 6), P32.

Handanović asserts that the most analogous offense is conspiracy to commit murder,

18 USC § 1117, which is not specifically listed as an extraditable offense.  However, Handanović

is accused of personally taking part "in the execution by shooting of [three named] members of

the Croat Defense Council and [four named] civilians."  Gov't Ex. 7 (Tab 12), P331.  The phrase

"execution by shooting" is consistent with an intentional killing of another by means of a firearm

or first degree murder.  She may not be directly responsible for other deaths, but at least was an

aider an abettor, making her "punishable as a principal" under United States law.  18 USC § 2.

Even if Handanović only conspired to commit murder, as she contends, she would be

criminally liable for the foreseeable substantive crimes, including murder, committed by her co-

conspirators in furtherance of the conspiracy.  *Pinkerton v. United States*, 328 US 640, 641

(1946); *United States v. Matta-Ballesteros*, 71 F3d 754, 765 (9th Cir 1997).  As a co-conspirator,

Handanović could be held personally liable under United States law for all killings committed,

whether she personally fired the shot that caused the death of an individual victim or one of her

16 - OPINION AND ORDER

co-conspirators did.  Accordingly, the war crimes charged against Handanović are extraditable
offenses under the terms of the 1902 Treaty.

Handanović's primary concern is that the specified offenses in the extradition request are
broader than the crimes of murder or attempted murder.  A review of the specified offenses of
war crimes at issue reveals that they are directed toward causing or attempting to cause the death
of another person with one exception, namely part of Article 175(1)(a) which includes
"intentional infliction of severe physical or mental pain or suffering upon person (tortures),
inhuman treatment, including therein biological, medical or other scientific experiments, taking
of tissue or organs for the purpose of tranplantation."  However, none of the evidence submitted
by B&H pertains in any way to that portion of Article 175(a).  Instead, as discussed below, all of
the evidence is directed at conduct constituting murder or attempted murder by Handanović.

### D.  <u>Whether the Rule of Specialty Applies</u>

Handanović contends that under the Rule of Speciality, each charge alleged under B&H
law must match a specific crime under United States law.  Her reliance on the Rule of Specialty
is misplaced.  This rule "prohibits the requesting nation from prosecuting the extradited
individual for any offense other than that for which the surrendering state agreed to extradite."
*Quinn v. Robinson*, 783 F2d 776, 783 (9th Cir), *cert denied*, 479 US 882 (1986); *see also United
States v. Rauscher*, 119 US 407, 430 (1886) (an extradited defendant can "only be tried for one
of the offenses described in that [extradition] treaty.").  It is incorporated in Article VIII of the
1902 Treaty which provides as follows:

> No person surrendered by either of the high contracting parties to
> the other shall, without his consent, freely granted and publicly
> declared by him, be triable or tried or be punished for any crime or

> offense committed prior to his extradition, other than that for
> which he was delivered up, until he shall have had the opportunity
> of returning to the country from which he was surrendered.

Although the circuits disagree as to whether an individual has standing to assert a breach

of the rule of speciality, the Ninth Circuit has concluded that "[a] person extradited may raise

whatever objections the extraditing country would have been entitled to raise." *United States v.*

*Cuevas*, 847 F2d 1417, 1426 (9th Cir 1988), *cert denied*, 489 US 1012 (1989) (citation omitted).

However, Handanović has not yet been extradited. Therefore, she has no standing to raise this

issue now. If any purported violation of Article VIII were to occur following Handanović's

extradition, the Secretary of State would be responsible for enforcing the 1902 Treaty based on

the Rule of Speciality. *See United States v. Najohn*, 785 F2d 1420, 1422 (9th Cir 1986).

## III.  Statutes of Limitation Bar

Handanović also argues that she cannot be extradited because the specified offenses are

barred by the statutes of limitation. Article VII of the 1902 Treaty provides that extradition shall

not be granted if the crime "has become barred by limitation, according to the laws of the country

to which the requisition is addressed." "In determining what United States statute of limitations

is applicable, this court looks to the substantive offense under United States law which is most

closely analogous to the charged offenses, and applies the statute of limitations applicable to that

offense." *Sainez v. Venables*, 588 F3d 713, 716 (9th Cir 2009). As noted above, the most closely

analogous offenses under United States law are first degree murder, 18 USC § 1111(a), or

attempted murder, 18 USC § 1113. There is no statute of limitations for murder (a capital

offense). 18 USC § 3281. The statute of limitations for attempted murder (a noncapital offense)

is five years. 18 USC § 3282. Because the alleged war crimes were committed in 1993, this five-

year period expired in 1998.  However, statutes of limitations may be tolled if the accused is a

fugitive "fleeing from justice."  18 USC § 3290.

     To toll the statute of limitations, the government must show that Handanović concealed

herself with the intent to avoid arrest or prosecution.  *United States v. Wazney*, 529 F2d 1287,

1288-89 (9th Cir 1976).  To meet this burden, the government must show that "the defendant

knew that [she] was wanted by the police and [she] failed to submit to arrest." *United States v.*

*Ballesteros-Cordova*, 586 F2d 1321, 1323 (9th Cir 1978).  Prosecution need not have actually

begun at the time of flight.  *Id*, citing *Streep v. United States*, 160 US 128, 133 (1895).  The

government's burden of proof is by preponderance of the evidence.  *United States v. Gonsalves*,

675 F2d 1050, 1054 (9th Cir 1982).

     The government contends that any applicable statute of limitations was tolled when

Handanović left B&H in 1995, because her actions, combined with the events occurring in B&H

at the time she fled, lead to the inference that she fled with an intent to avoid prosecution.  In

May 1993, two years before Handanović left the country, the International Criminal Tribunal for

the former Yugoslavia ("ICTY") was formed "by the United Nations in response to mass

atrocities then taking place in Croatia and Bosnia and Herzegovina" with the key objective "to try

those individuals most responsible for appalling acts such as murder, torture, rape, enslavement,

destruction of property and other crimes."  http://www.icty.org/sections/AbouttheICTY (last

visited September 29, 2011).  In November 1994, the ICTY issued its first indictment against a

death camp commander.  http://www.icty.org/action/timeline/254 (last visited September 29,

2011).

19 - OPINION AND ORDER

On February 13, 1995, three months before Handanović separated from the Bosnian army, the ICTY publicly announced its indictment of 21 individuals for atrocities committed at a death camp in Omarska, Bosnia, which had been run by Bosnian Serbs.  http://www.icty.org/sid/7250 (last visited September 29, 2011).  The indictments were brought against camp commanders, guards, and visitors, for killings and other crimes committed inside the Omarska camp.  *Id*.  One person was charged only with killings of prisoners outside the camp.  *Id*. According to the government, the investigation would have created a "stir" in the area surrounding Omarska, which included Handanović's hometown, and that having taken an active part in similar war atrocities, Handanović likely would have heard about witnesses being interviewed and the resulting indictment.

On July 25, 1995, the ICTY announced indictments for another additional 24 accused war criminals, bringing the total of indicted individuals up to 46 for the first year of operation. http://www.icty.org/action/timeline/254 (last visited September 29, 2011).  Those indictments included high ranking officials, paramillitary unit commanders, local politicians, and commanders, guards, interrogators, and visitors of two "death camps," and alleged their involvement in running death camps, firing cluster bombs into Zagreb, sniping civilians in Sarajevo, and taking UN peacekeepers as hostages and human shields.  http://www.icty.org/sid/7237 (last visited September 29, 2011).  Handanović left the Bosnian army in May 1995 and left B&H shortly thereafter in August 1995.  The government contends that given ICTY's public indictments and investigation in the year prior to her departure, Handanović must have been fearful that she would eventually be indicted, so fled B&H shortly after she left military service.

In response, Handanović asserts that rather than concealing herself, she had open contacts with various governments and their officials after leaving B&H, including B&H itself.  In 1995 when she left B&H for Vienna, Austria, she registered with the International Rescue Committee under her true name and admitted her participation in the Bosnian army from September 3, 1992, until May 12, 1995.  Gov't Ex. 12, D-1, p. 1.  In October 1995, while living in Austria, she applied for refugee status with the United States, noting in her application materials that she left the army and she had a half-sister living in Portland, Oregon.  *Id* at 1-2.  In May 1996, she entered the United States after having been granted refugee status and was granted permanent resident status in March 1998.  *Id* at D-3, p. 1.  She was married in May 1998 and changed her surname to "Yetisen," though the marriage certificate also reflects her given surname.  *Id* at D-4. When she applied for naturalization in 2001, she used her married surname but also indicated her true previous name.  *Id* at D-5, p. 1.  When she became a naturalized citizen in May 2002, Handanović changed her name from her married name of "Rasema Yetisen" to "Sammy Rasema Yetisen."  *Id* at D-6.

Handanović has returned to the region twice since she left in 1995.  The first time, she flew to Croatia to visit family for two months from November 4, 1997, to January 6, 1998.  *Id* at D-5, p. 1; Handanović Exs. 104-105.  She received permission from the Immigration and Naturalization Service ("INS") in advance, as was required since she was still a refugee.  *Id*. When she returned to Sanski Most during this visit, she obtained an identification card from the B&H government.  Gov't Ex. 5 (Tab 5), P283-84.  During the extradition hearing, Handanović's sister, Mirsada Guild ("Guild"), testified that in 2003, Handanović again returned to Sanski Most to attend Guild's wedding.

21 - OPINION AND ORDER

According to Handanović, none of these acts could be considered volitional acts of concealment.  However, the Ninth Circuit has found that despite living openly in the United States, operating a business under his true name, and applying for citizenship, the accused was still considered to have "fled from justice" because he secretly left the country two months after being questioned by the Korean authorities and having his passport confiscated.  *Man-Seok Choe v. Torres*, 525 F3d 733, 741 (9th Cir 2008).  This secret flight from Korea was enough to be considered a "significant affirmative step" to avoid prosecution.  *Id.*

Here, in contrast, the government has failed to prove that any of the actions taken by Handanović could be considered volitional acts of concealment taken to avoid prosecution.  There is no evidence that she left B&H secretly or otherwise took action to conceal her identity or affiliation with the Bosnian army.  The undisputed facts suggest the opposite, namely that immediately after leaving B&H, she sought refugee status, disclosing her true identity and army affiliation.  According to her sister, most all of Handanović's family had left B&H in September 1992, shortly after Handanović had been taken away in a convoy.  Memorandum in Support of Release (docket #41), Ex. 2.[4]  She did not see Handanović again until November 1994, when she visited the family in Germany while on medical leave from the army for two months.  *Id.*  When Handanović left the army in May 1995, Germany was no longer accepting Bosnian refugees, so she went to Austria and began the process to reunite with their half-sister in the United States, who was living in Portland, Oregon.  *Id.*  Between 1992-1995, over a million refugees from B&H were recorded in over 100 countries around the world.  Handanović Ex. 102, p. 2.  Handanović

---

[4] Handanović also has a pending motion for release, which includes additional evidence that is relevant to the circumstances surrounding her departure from B&H in 1995.

22 - OPINION AND ORDER

was reunited with her family for the first time at their family home in Sanski Most, in November

1997, when she returned to the region for two months.  Handanović's Memorandum in Support

of Release, Ex. 2.  During this visit, which was well within the statute of limitations, she

obtained an identification card from the Bosnian government.  Gov't Ex. 5 (Tab 5), P283-84.

Such evidence tends to support Handanović's argument that she was also a victim of military

violence and sought asylum, not that she was taking affirmative actions to conceal her identity

and wrongdoing.

      Even if Handanović's actions could be considered acts of concealment, the government

has failed to sustain its burden of proof that Handanović acted with the intent to avoid arrest or

prosecution because it has not established that she was aware, or even should have known, that

she was wanted by the authorities and failed to submit to arrest.  When Handanović left B&H for

Austria in August 1995, she was 22 years old and had been a low-level member of the Bosnian

army for approximately three years.  There is no evidence that she was questioned by authorities

or that anyone with whom she had been associated in the army were questioned by authorities.

The fact that ICTY announced the indictment of mostly higher level officials for their conduct in

operating death camps and engaging in high profile war activities, such as firing cluster bombs

into the city, organizing sniping campaigns against civilians, and taking UN-peacekeepers

hostage, does not necessarily impart knowledge that she would be investigated.  Without more,

the government has failed to establish that Handanović was "fleeing from justice" because it has

not proven that she concealed herself with the intent to avoid arrest or prosecution.

23 - OPINION AND ORDER

Consequently, the statute of limitations for attempted murder has not been tolled, and Handanović may be extradited only for war crimes that constitute murder for which there is no statute of limitations.

## IV.  Existence of Probable Cause

Handanović argues that before the court can assess the government's showing of probable cause, the government must identify each extraditable offense with specificity, and that because the charges do not adequately specify each individual murder and attempted murder, the court cannot properly certify her for extradition.  Specifically, Handanović contends that the September 2009 arrest warrant is flawed because it fails to name the 19 murdered Croat civilians in Trusina and the four other injured survivors of that attack.  In support of her position, Handanović cites *Artukovic*, where the court determined that the government presented sufficient evidence for only one specific murder and certified extradition on this single charge.

The court is not persuaded by Handanović's argument.  The *Artukovic* case was somewhat unique in that the government initially sought extradition in 1959 to prosecute war crimes, but the magistrate judge declined to find probable cause due to a lack of evidence that Artukovic committed any murders.  628 F Supp at 1375, citing *Karadzole v. Artukovic*, 170 F Supp 383, 389-393 (SD Cal 1959).  Nearly 25 years later, the government refiled for extradition based on much of the same information, which the court again largely rejected, allowing extradition on a single murder charge.  *Id* at 1377-78.   Handanović focuses only on this part of the decision, ignoring the fact that the court found probable cause for several hundred more murders, but noted that those allegations did not appear in  the charging document.  *Id* at 1378. The court then stayed the effect of the certificate of extradition in order to allow the government

to present an amended "indictment, complaint, warrant, or other charging document" alleging the additional murders which were supported by probable cause. *Id*. Ultimately, the court filed an amended certificate that included many hundreds of additional murder charges without naming each victim. *Id* at 1379.

Article III of the 1902 Treaty only requires "a duly authenticated copy of the warrant . . . and of the depositions or other evidence upon which such warrant was issued." As discussed above, the arrest warrant is not defective. In support of extradition, the government also has furnished: (1) the names of all the alleged victims; (2) statements from five witnesses with personal knowledge of Handanović's participation in the attack on Croat civilians in the village of Trusina, and in the execution of both Croat soldiers and civilians in the hamlet of Gaj; (3) a form establishing that she was a member of the Zulfikar Special Purposes Detachment of the Army of the Republic of B&H when the attack on Trusina occurred; (4) copies of daily combat and situation reports summarizing actions taken by the Zulfikar and other army units in Konjic in the period between April 14 and 17, 1993; and (5) death certificates, autopsy reports, and permits for burial for various individuals. Gov't Exs. 5 (Tab 5) & 7 (Tab 13). This information is sufficient to provide Handanović specific notice of the charges against her, as required by the terms of the 1902 Treaty. Handanović has not presented any persuasive authority that more is required. The court must next examine whether the government has established probable cause for those charges.

The final function of the extradition court "is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction." *Collins*, 259 US at 316. Probable cause must be satisfied in

accordance with the law of the United States and applicable case law.  *Id*.  Neither the Federal

Rules of Criminal Procedure nor the Federal Rules of Evidence are applicable.  FRE 1101(d)(3);

FRCP 54(b).  Hearsay evidence, therefore, can be considered.  In making a finding that probable

cause exists, the court must determine whether probable cause exists for each charge that forms

the basis for the extradition request.  *Caplan v. Vokes*, 649 F2d 1336, 1343–44 (9th Cir 1981);

*Matter of Extradition of Demjanjuk*, 612 F Supp 544, 563-64 (DC Ohio 1985).  The extradition

record must demonstrate "coherent legal connections between the factual allegations and

extraditable offenses."  *Caplan*, 649 F 2d at 1344.  The government must satisfy the probable

cause standard on the question of identity as well as the sufficiency of the evidence.

   The court has already determined that Handanović  is the person accused and named in

the warrant and that she is not extraditable for charges constituting attempted murder which are

barred by the statute of limitations.  Therefore, the court will review the evidence to determine

whether the facts alleged constitute the charge of murder.  Under United States law, commission

of murder requires proof of premeditated "killing of a human being with malice aforethought."

18 USC § 1111(a).

   B&H seeks to extradite Handanović for the murder of civilians and prisoners of war in

the village of Trusina and the hamlet of Gaj on April 16, 1993.  The Request for Extradition

issued July 7, 2010, alleges that on the morning of April 16, 1993, as a member of the Bosnian

army, Handanović participated in a "well-planned attack against the Croat civilians of the village

of Trusina," killing the following 16 civilians: Tomo Drljo (born in 1926, son of Andrija),

Andrija Drljo (born in 1947, son if Ilija), Kata Drljo (born in 1937, daughter of Ivan), Kata Drljo

(born in 1918, daughter of Mićo), Ivan Drljo (born in 1939, son of Pero), Branko Mlikota (born

26 - OPINION AND ORDER

in 1925, son of Andrija), Smiljko Krešo (born in 1940, son of Mirko), Velimir Krešo (born in

1934, son of Andrija), Ivica Krešo (born in 1935, son of Jure), Ilija Ivanković (born in 1926, son

of Ante), Anđa Krešo (born in 1936, daughter of Jure), Jure Anđelić (born in 1926, son of Ante),

Stipo Mandić (born in 1928), Anto Drljo (born in 1936), Milenko Mandić (born in 1961, son of

Stipe), Stipo Ljubić (born in 1961, son of Pero).  Gov't Ex. 5 (Tab 5 - Budimir Decl., ¶ 3), P27.

In addition, four persons were wounded (two adults and two children).  *Id.*  Also on the morning

of April 16, 1993, Handanović, as a member of the Bosnian army, followed an order issued by

Nedžad Hodžić ("Hodžić") to line up and execute HVO soldiers in Gaj, a hamlet in Trusina,

killing three HVO soldiers (Ivan Drljo (born in 1971, son of Andrija), Nedeljko Krešo (born in

1953, son of Marinko), Pero Krešo (born in 1961, son of Cmiljko)), and three civilians (Zdravko

Drljo (born in 1963, son of Ivan), Željko Blažević (born in 1965, son of Slavko), and Franjo

Drljo (born in 1942, son of Ilija)).  *Id.*  This totals 19 civilians and three HVO soldiers killed and

four civilians injured during the attacks on April 16, 1993.  The arrest warrant refers to three

soldiers and four civilians killed at Gaj and 19 civilians killed and four persons injured in

Trusina.  Gov't Ex. 7 (Tab 12), P331.[5]

---

[5]  A comparison of the victims' names in the three documents explains some of the confusion regarding the differing
counts.  The names of the victims are consistent across the documents, but two victims, Stipo Ljubić, and Franjo Drljo, alternate
between being classified as victims of the Gaj firing squad or the attack on Trusina, and Stipo Ljubić is sometimes classified as a
civilian and sometimes as a HVO soldier.  The first document that contains victims names, the Order to conduct investigation,
dated September 21, 2008 (Gov't Ex. 5 (Tab 5), P43), asserts that there were four HVO soldiers, including Stipo Ljubić that
surrendered to the army, along with two civilians, Zdravko Drljo and Željko Blažević.  These people, with the exception of Stipo
Ljubić, were lined up and killed by the firing squad.  Stipo Ljubić was killed in a house elsewhere in Trusina.  This document
names Franjo Drljo as a civilian killed during the attack on Trusina.  However, the original arrest warrant, dated September 21,
2009 (Gov't Ex. 7 (Tab 12), P331), classifies Stipo Ljubić and Franjo Drljo as civilians killed during the Gaj firing squad.
Finally, the most recent document, the Request for Extradition dated July 7, 2010 (Gov't Ex. 5 (Tab 5 - Budimir Decl., ¶ 3),
P27), includes Stipo Ljubić as a civilian killed in Trusina and Franjo Drljo as a civilian killed during the Gaj firing squad.  It
seems as though as the investigation progressed, the prosecutor was able to ascertain who was killed where and to identify them
as civilians or soldiers. Despite this confusion, the names of the victims are consistent across all documents.

In support of these allegations, the government has provided the sworn statements of five protected witnesses. Protected witnesses A, B, D, and O each identified Handanović out of a photographic lineup and described her involvement in the attacks. Gov't Ex. 5 (Tab 5) (Protected Witness A) P122, P128, P143, P145-46; (Protected Witness D) P192, P208, P210; (Protected Witness O) P259, P261, P273; Ex. 7 (Tab 13) (Protected Witness B), P344, P346, P361. Protected Witness E described Handanović's involvement in the attack in Trusina and gave Handanović's physical description, but was not asked to identify her from a photographic lineup because he was unsure if he would recognize her. Gov't Ex. 5 (Tab 5), P240, P242.

With regard to the attack in Trusina, the evidence is as follows: (1) Witnesses A and O identified Handanović as part of the military unit that attached Trusina (*id* at P203, P267); (2) Witness B testified that Handanović personally shot two Croat civilians approximately age 65-70 (Gov't Ex.7 (Tab 13), P360); and (3) Witness E stated that Handanović shot a young Croatian woman three times in the chest as she tried to move toward a fence, killing her (Gov't Ex. 5 (Tab 5), P240). In addition, Witnesses A and O described pre-attack comments made by members of Handanović's unit that "in the attack on the village of Trusina, we should not leave a single hen alive"(*id* at P136) and that "not a single ear must stay there" (*id* at P267).

With regard to the firing squad in Gaj, the witnesses testified as follows: (1) Witness A described that Handanović personally participated in the firing squad and afterwards stood over at least three victims who still demonstrated signs of life and shot them in the head. Witness A also claimed that the motive for the firing squad was revenge for the death of "Samko," a member of Handanović's unit who had been killed earlier that day (*id* at P140-41); (2) Witness B corroborates Witness A's account of Handanović's participation in the firing squad which was

28 - OPINION AND ORDER

motivated by revenge for Samko's death (*id* at P177-78); (3) Witness D corroborated the account of Handanović's personal involvement in the firing squad, adding that Handanović stated that "all Croats that are captured should be killed" prior to the firing squad and that the killings were motivated by the death of Samko who was Handanović's boyfriend at the time (*id* at P206-08); and (4) Witness O described Handanović's personal involvement in the firing squad and shooting of the fallen victims in the head to ensure their deaths (*id* at P271).

Handanović argues that the evidence falls short of proving that she actually killed anyone or was even personally involved in this attack because all the statements include contradictory information. However, the court need not decide whether the evidence is sufficient to justify a conviction, only whether the evidence establishes probable cause to detain Handanović to await trial on the crimes charged. The evidence places Handanović in Trusina and Gaj on April 16, 1993, the date of the alleged crimes. It also identifies the acts which she allegedly committed on that date, namely shooting at least three civilians in Trusina and at least three individuals during the firing squad in Gaj. There is also evidence that both attacks were premeditated and committed with the requisite malice aforethought. Prior to the attack in Trusina, a member of Handanović's unit stated that they should leave not even a single "hen" alive, and another member laughed and stated that "not a single ear must stay there." Regardless of whether Handanović actually heard these statements, there is no dispute that the attack on Trusina was well-coordinated and intended to kill persons living there. Three witnesses have provided a motive for the firing squad in Gaj, thereby providing evidence of premeditation of malice aforethought for that attack. Moreover, there is ample evidence that Handanović personally shot

three civilians in Trusina for apparently no reason and afterwards shot in the head any victims who still showed signs of life.

As noted above, there is some discrepancy among the various documents regarding how many victims were killed in each place and whether they were civilians or prisoners of war.  The court need not sort that out at this juncture because the evidence provides "coherent legal connections between the factual allegations and extraditable offenses" of murder of civilians and prisoners of war, which form the basis of the two charges for which extradition is sought. *Caplan*, 649 F2d at 1344.  The court finds that the evidence establishes probable cause that Handanović personally committed murder of civilians and prisoners of war during the attacks on Trusina and Gaj on April 16, 1993.  Consequently, she may be certified for extradition for War Crimes against Civilians (Article 173(1)(a) and (b)) and War Crimes against Prisoners of War (Article 175(1)(a)) that resulted in the death of the victims.

## ORDER

For the reasons stated above, there is probable cause to warrant a finding of extradition against Handanović to which she has failed to establish any defense.  Therefore, the United States' request for a certificate of extraditability is granted.  The United States shall prepare and submit the form of certificate to the court for signature.

DATED this 7th day of October, 2011.


s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge



30 - OPINION AND ORDER