1      IN THE UNITED STATES DISTRICT COURT

2         FOR THE DISTRICT OF OREGON

3            Portland Division

4

5  IN THE MATTER OF THE              )
   EXTRADITION OF                    )
6                                    ) Case No. 11-MC-09097-ST
                                     )
7  RASEMA HANDANOVIC,                ) September 29, 2011
   aka "ZOLJA,"                      )
8  aka SAMMY RASEMA YETISEN,         ) Portland, Oregon
   _____)

9

10

11

12         TRANSCRIPT OF PROCEEDINGS

13      THE HONORABLE JANICE M. STEWART

14      UNITED STATES MAGISTRATE JUDGE

15          EXTRADITION HEARING

16

17

18

19

20

21

22

23

24

25

APPEARANCES OF COUNSEL

FOR THE MOVANT:

Mr. David L. Atkinson
United States Attorney's Office
1000 SW Third Avenue
Suite 600
Portland, OR 97204

Ms. Frances Chang
U.S. Department of Justice
1301 New York Avenue, NW
8th Floor
Washington, DC 20005


FOR THE RESPONDENT:

Ms. Lisa Hay
Assistant Federal Public Defender
101 SW Main Street, Suite 1700
Portland, OR 97204


COURT REPORTER:

Jill L. Erwin, RPR, CSR, CRR
United States District Courthouse
1000 SW Third Avenue
Room 301
Portland, OR 97204
(503)326-8191

                              *  *  *

Proceedings – 9/29/11

3

```
 1                           INDEX
 2   MOVANT'S WITNESSES:
 3   THEODORE WEIMANN
 4   Direct Examination by Mr. Atkinson              10
 5   Cross-Examination by Ms. Hay                    17
 6   RESPONDENT'S WITNESSES:
 7   MIRSADA GUILD
 8   Direct Examination by Ms. Hay                   22
 9   Cross-Examination by Mr. Atkinson               24
10   MOVANT'S EXHIBITS:              OFFERED:   RECEIVED:
11          1                          12         12
12          2                          13         13
13          3                          13         13
14          4                                     14
15          5                                     14
16          6                                     14
17          7                                     14
18          8                                     14
19          9                                     14
20         10                          15         15
21         11                          17         17
22         12                          17         18
23   RESPONDENT'S EXHIBITS
24        101                          21         22
25        102                          21         22
```

| | RESPONDENT'S EXHIBITS: | OFFERED: | RECEIVED: |
|---|---|---|---|
| 1 | | | |
| 2 | 103 | 21 | 22 |
| 3 | 104 | 19 | 20 |
| 4 | 105 | 19 | 20 |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

1          (September, September 29, 2011)

2              TRANSCRIPT OF PROCEEDINGS

3                  (In open court:)

4          DEPUTY COURTROOM CLERK:  All rise.  The United

5    States District Court for the District of Oregon is now in

6    session.  The Honorable Janice M. Stewart presiding.  Please

7    be seated.

8          MR. ATKINSON:  Good morning, Judge Stewart.  David

9    Atkinson on behalf of the United States.  This is:  In the

10   Matter of the Extradition of Rasema Handanovic under

11   Miscellaneous Case No. 11-MC-0907.

12          With me at counsel table is Frances Chang from the

13   Office of International Affairs, a component of the

14   Department of Justice.  And the case agent assigned to this

15   case is Theodore Weimann of Immigration and Customs

16   Enforcement.

17          I would like to introduce you to Ms. Chang.  And

18   she's appeared in this case formally and is on the various

19   pleadings for the Government.

20          The defendant is in custody and with counsel,

21   Lisa Hay, of the Federal Defender's Office.  This is the

22   date and time set for the extradition hearing in this case.

23   The United States is ready.

24          THE COURT:  Ms. Hay.

25          MS. HAY:  Good morning, Your Honor.

6

1          THE COURT:  Good morning.

2          MS. HAY:  Your Honor, we've all submitted a great

3     number of briefs in this case already.  I don't know if the

4     Court has a proposed order of how we should go through some

5     of the various arguments.

6          THE COURT:  Well, I will start with the

7     Government, since the Government has the burden here on its

8     request for extradition.

9          Before we get started on the issues concerning

10    extradition, I notice that you have filed a new motion for

11    release of your client.  Because it was just filed yesterday

12    or the day before, it was not clear to me that it should be

13    addressed today, because I was not aware of how long the

14    Government might request in order to respond to that, so I

15    suggested that you bring your calendars with you today so we

16    can set a hearing date.

17         What's your position on whether we should get --

18    can or should address that today, Mr. Atkinson, or whether

19    you would like to do that on a later date?

20         MR. ATKINSON:  Counsel and I conferred,

21    Judge Stewart, and Counsel suggests the hearing date be set

22    for October 20th.

23         THE COURT:  Okay.  So you both agree that works

24    for your calendars?

25         MR. ATKINSON:  Yes.

1          THE COURT:  All right.

2          MR. ATKINSON:  I'd ask to be given until close of

3     business next Wednesday, the 5th, to file a written

4     response.  It will give the Court essentially two weeks for

5     the Government's response.  A little longer.

6          THE COURT:  That's fine.  I'll set a date, then,

7     of October 5 for the Government's response to a renewed

8     motion for release.  October 20 is available for me for a

9     hearing date.  Do you want to set this at 1:30, or would you

10    like to have an earlier time?  I'm available all day, so

11    whatever works best for counsel is fine with me.

12         MS. HAY:  I think the morning is probably better

13    if I bring an expert, Your Honor, just thinking of their

14    schedule, so I would ask in the morning, at 9:30.

15         THE COURT:  Mr. Atkinson?

16         MR. ATKINSON:  That's satisfactory.

17         THE COURT:  I'll set the release hearing on

18    Thursday, October 20, at 9:30 a.m.  I'll keep the entire

19    morning available for that if you intend to call witnesses.

20         All right.  And do you anticipate, Ms. Hay, that

21    you would want to file a reply to the Government's response

22    before the hearing?

23         MS. HAY:  Yes, Your Honor.  In my motion I filed

24    now, I just repeated the same law that we had used earlier,

25    because I recognized the Government wouldn't have a chance

1  to respond to that, so I would like a chance to update that

2  law.

3            In addition, I most likely will have some

4  additional witness statements that I can provide in advance

5  so that the Government and the Court could read those by

6  the -- before the hearing.

7            THE COURT:  We'd like to have that done at least a

8  couple of days before the hearing.  The Government's

9  response is coming in on October 5.  How about -- would

10  Friday the 14th be too soon for you?

11            MS. HAY:  No, that would be fine, Your Honor.

12            THE COURT:  All right.  We'll do any reply by

13  Ms. Handanovic by Friday, October 14.  Okay.  All right.

14            All right.  That takes us, then, to the

15  Government's request for extradition.  As I say, it's the

16  Government's request.  I have, of course, received

17  substantial briefing from both sides in advance of this

18  hearing, which has been, of course, very helpful.  I've

19  reviewed all that and have read the cases that you cited,

20  and, obviously, there are a number of issues that we need to

21  address at this morning's hearing.

22            So since it is the Government's request,

23  Mr. Atkinson, I'll hear from you first.

24            MR. ATKINSON:  Thank you.

25            THE COURT:  And, as I say, I have -- I'm familiar

Proceedings - 9/29/11

1    with the issues, so if there's some that you don't think you

2    need to argue at this point because you think you've briefed

3    it well enough, that's certainly fine with me.

4            MR. ATKINSON:  Sure.  Judge Stewart, I'm going to

5    attempt to be as efficient as I can.

6            THE COURT:  Okay.

7            MR. ATKINSON:  And, to begin with, let me explain

8    to you the Government's exhibits.  We will call a witness to

9    sponsor in a few of the exhibits.

10           THE COURT:  Okay.

11           MR. ATKINSON:  I've provided the Court and Counsel

12   with a copy of a witness list and the exhibits that the

13   Court may -- well, that we'll be offering in other than the

14   original extradition request and supplements which were

15   certified by the Ambassador in one instance and the

16   principal counselor office officer in the other four or five

17   instances.

18           Those are bound documents that were filed with the

19   Court in support of the complaint.  And a couple of

20   additional documents from the Embassy came in.  I filed

21   those with the Court, as well.  I made sure that Counsel had

22   copies.

23           If you look at the exhibit list, you'll see that

24   Exhibits 4 through 9 make reference in -- parenthetical

25   reference to the tab numbers in the notebook that I've

1    supplied to the Court and Counsel.  I haven't included

2    copies of those in the manila folder containing the exhibits

3    because both the Court and Counsel already have copies.

4            THE COURT:  Those originals have already been

5    filed?

6            MR. ATKINSON:  They'll be filed, and I'll be

7    offering them here shortly.

8            THE COURT:  Okay.

9            MR. ATKINSON:  I'll waive an opening statement and

10   I'll proceed to call my first witness.

11           THE COURT:  Very well.

12           Then, Ms. Hay, do you have anything you want to

13   put on the record before we begin receiving evidence?

14           MS. HAY:  No, Your Honor.

15           THE COURT:  All right.  Mr. Atkinson?

16           MR. ATKINSON:  Theodore Weimann.

17

18                 THEODORE HARRISON WEIMANN

19   called as a witness in behalf of the Movant, being first

20   duly sworn, is examined and testified as follows:

21

22           DEPUTY COURTROOM CLERK:  Please be seated and

23   please state your name and spell your last name for the

24   record.

25           THE WITNESS:  Theodore Harrison Weimann,

1   W-E-I-M-A-N-N.

2        DEPUTY COURTROOM CLERK:   Thank you.

3

4                    DIRECT EXAMINATION

5   BY MR. ATKINSON:

6   Q.   Provide us with a very brief background, if you would,

7   Mr. Weimann, of your educational background, in a sentence

8   or two, and your current employment.

9   A.   I have a bachelor of science degree and followed by

10  quite a bit of training by the Government.  And my

11  employment with the Government has been as a special agent

12  with the Immigration Naturalization Service in 1987 until

13  the merger with the U.S. Custom Service in 2003.

14        Since then I've been a special agent with ICE,

15  Immigration and Customs Enforcement.

16  Q.   Are you the case agent assigned to this case?

17  A.   Yes, I am.

18  Q.   I want to draw your attention to Government's Exhibit

19  No. 1.  I'm going to ask you if you recognize that exhibit.

20  A.   Yes, I do.

21  Q.   What is it?

22  A.   It's a printout from the Department of State's website

23  about the key officers of our embassy in Bosnia.

24  Q.   Is our Embassy in Bosnia a single-post embassy?

25  A.   Yes, it is.

1    Q.   And you checked and researched that and affirmed that?

2    Is that correct?

3    A.   Yes, it is.

4             MR. ATKINSON:  Government offers Exhibit No. 1.

5             THE COURT:  Any objection?

6             MS. HAY:  No, Your Honor.

7             THE COURT:  Exhibit No. 1 is received.

8             MR. ATKINSON:  I'll ask the Court to note that

9    about halfway down on the first page that Anne-Marie Casella

10   is counsel -- or consul, I should say -- C-O-N-S-U-L -- at

11   that single-post embassy.  This website lists the key

12   employees in the Embassy and she is the only one listed as

13   consul.

14            THE COURT:  So noted.

15   BY MR. ATKINSON (Continuing)

16   Q.   Government's Exhibit No. 2.  Please identify that.

17   A.   That's a string of emails from myself to a Department

18   of State employee in Seattle, forwarded on to Ms. Casella

19   and our Embassy in Bosnia.

20   Q.   Anne-Marie Casella, whose name is mentioned in the

21   previous exhibit?

22   A.   Same one.

23   Q.   So this is your personal correspondence with her, is

24   that correct, through a Department of State employee?

25   A.   Yes, it is.

1          MR. ATKINSON:  Government offers 2.

2          THE COURT:  Any objection?

3          MS. HAY:  No, Your Honor.

4          THE COURT:  Exhibit 2 is received.

5          MR. ATKINSON:  I'd ask the Court to note the text

6    of the email from Ms. Casella through the Department of

7    State employee in Seattle to Agent Weimann confirming that

8    she's the principal counselor officer in the Embassy at

9    Sarajevo, Bosnia.

10         THE COURT:  So noted.

11   BY MR. ATKINSON (Continuing)

12   Q.   Now, was there an attachment that she submitted to the

13   email?

14   A.   Yes.  The attachment was part of the email.  That's

15   correct.

16   Q.   Has what been marked as Exhibit 3?

17   A.   Yes, it has.

18   Q.   And that's an excerpt from the Foreign Affairs Manual,

19   essentially authoritative text or source for Department of

20   State employees; is that correct?

21   A.   Yes, it is.

22         MR. ATKINSON:  Government offers 3.

23         THE COURT:  Any objection?

24         MS. HAY:  No.

25         THE COURT:  Exhibit 3 is received.

1     MR. ATKINSON:  I'd ask the Court to note,

2  specifically on page 3 and 4, starting at paragraph E, at

3  the bottom of page 3, the procedures that are used for the

4  certification of documents in connection with extraditions.

5     THE COURT:  All right.  So noted.

6     MR. ATKINSON:  And F, on the next page, as well.

7     THE COURT:  Yes, I see that.

8     MR. ATKINSON:  All right.  The Government offers

9  its Exhibit 3.

10     THE COURT:  That's been received.

11     MR. ATKINSON:  4, 5, 6, 7, 8, and 9.

12     THE COURT:  Okay.  And Exhibits 4 through 9, as

13  you previously indicated, were also provided to the Court

14  and opposing counsel in tabs 1 through 15?

15     MS. HAY:  Right.  I don't object to those, 4

16  through 9, Your Honor.

17     THE COURT:  Very well.  I will receive -- in

18  addition to Exhibits 1 through 3, I will receive Exhibits 4

19  through 9.

20  BY MR. ATKINSON (Continuing)

21  Q.   Would you take a look at Exhibit 10, please.  Is that

22  what we refer to in the pleadings as the Dean affidavit?

23  A.   Yes, it is.

24  Q.   Did you personally speak with Paul Dean about Exhibit

25  10?

1    A.    Yes, I did.

2    Q.    Did he confirm for you that he was an assistant legal

3    advisor for Treaty Affairs for the United States in the

4    Office of Treaty Affairs and the Department of State?

5    A.    Yes, he did.

6    Q.    Did he reaffirm to you over the telephone each and

7    every one of the provisions in his affidavit?

8    A.    Yes, he did.

9              MR. ATKINSON:  Government offers 10.

10             THE COURT:  Do you have any objection?

11             MS. HAY:  Well, Your Honor, this is the one that I

12   objected to in my last brief as not actually being an

13   affidavit.  This is a declaration.  But an affidavit is

14   required to be sworn to be true under the pains and

15   penalties of perjury.  I made that objection.  I'll continue

16   that objection; that it's not an affidavit, for what it's

17   worth, and it should not be considered submitted for that

18   purpose.

19             THE COURT:  I agree with you that it is not sworn

20   as an affidavit.  It is technically a declaration.  It also

21   doesn't say it's sworn to under the penalty of perjury.

22             As you know, in an extradition hearing hearsay

23   evidence is admissible because it's in the nature of a

24   probable cause hearing, so I will receive Exhibit 10, but

25   we'll note that it is not sworn under oath.

1   BY MR. ATKINSON (Continuing)

2   Q.   Exhibit 11.  Would you identify that, please.

3   A.   This is the conclusion by the ICE forensic fingerprint

4   examiner.

5   Q.   Okay.  Did you submit to the fingerprint examiner,

6   Mr. Roan, rolled fingerprints taken from the defendant -- or

7   the fugitive in this case, Ms. Handanovic, upon her arrest,

8   by the U.S. Marshal Service?

9   A.   Yes, I did.

10   Q.   Did you also submit to the fingerprint examiner rolled

11   prints that had been -- that were contained within her

12   immigration file?

13   A.   Yes, I did.

14   Q.   And that immigration file corresponds to the defendant

15   in this case, does it not?

16   A.   Yes, it does.

17   Q.   Or the fugitive, I should say, in this case,

18   Ms. Handanovic.  Is that correct?

19   A.   Yes.

20   Q.   Were you present when she was arrested?

21   A.   I was.

22   Q.   Was she arrested and residing, at the time of her

23   arrest, here in the District of Oregon?

24   A.   Yes, she was.

25   Q.   What can you state about fingerprints of an immigrant

1    that are maintained in the -- the agency's -- your agency's,

2    immigration file?

3    A.    Well, fingerprints are taken at different stages of

4    processing, depending on, for instance, how the person -- or

5    what's the purpose of that immigration file.   In

6    Ms. Handanovic's example, she was -- had applied for refugee

7    status and then for lawful permanent resident status, and,

8    as a result of that, fingerprints were taken, and they're

9    maintained permanently in her immigration file.

10   Q.    And that's routinely kept in connection with the file;

11   is that correct?

12   A.    Yes.

13            MR. ATKINSON:  Government offers 11.

14            THE COURT:  Any objection?

15            MS. HAY:  No objection.

16            THE COURT:  Received.

17            MR. ATKINSON:  And with respect to Exhibit 12 -- I

18   contend Exhibit 12 is self-authenticating, Your Honor.   It

19   is a public record, and you have a certificate of the

20   custodian of records, Ms. Sierakowski.

21            THE COURT:  All right.  These are records of the

22   Citizen and Immigration Service file concerning

23   Ms. Handanovic; is that correct?

24            MR. ATKINSON:  Yes.

25            THE COURT:  Any objection to Exhibit 12?

1          MS. HAY:  No objection.

2          THE COURT:  All right.  It's received.

3          MR. ATKINSON:  You may inquire.

4

5                    CROSS-EXAMINATION

6    BY MS. HAY:

7    Q.   Mr. Weimann, you also provided to the defense a copy of

8    Ms. Handanovic's immigration file; is that correct?

9    A.   Yes, it is.

10   Q.   Do you recall that one of the documents in there was a

11   travel -- refugee travel document?

12   A.   Yes, I did.

13          MS. HAY:  Your Honor, may I approach the witness?

14          THE COURT:  Yes.

15   BY MS. HAY (Continuing)

16   Q.   I'll show you what's been marked Defendant's

17   Exhibit 104 and 105 for identification.

18          Do those appear to be some of the documents from

19   the immigration file that you provided to the defense?

20   A.   Yes.  I've seen both of these in her file.

21   Q.   Defendant's Exhibit 104, is that a document showing

22   that Ms. Handanovic applied for travel authorization in

23   1997?

24   A.   Yes, it does.

25   Q.   And she applied to go to Croatia; is that correct?

1    A.    That's correct.

2    Q.    In Defendant's Exhibit 105, does that show that --

3    plane tickets of Ms. Handanovic showing her flight to

4    Zagreb?

5    A.    Yes.

6    Q.    In 1997?

7    A.    1998.  Oh, excuse me.  Return in '98.

8    Q.    So left in 1997; returned two months later, in 1998?

9    A.    That's correct.

10   Q.    And those are both part of the official file kept by

11   U.S. Immigration?

12   A.    Yes, they are.

13   Q.    And that's because she was required to report to the

14   Government when she wanted to travel?

15   A.    Overseas, correct.

16             MS. HAY:  Your Honor, I would offer for admission

17   Defendant's 104 and 105.

18             THE COURT:  Okay.  These are documents that are

19   not contained in Exhibit 12; is that correct?

20             MS. HAY:  I was just scanning Exhibit 12 and

21   didn't see them in here.  So I can't say for certain they're

22   not there, but they would have been part of that same file

23   if it were not an excerpt.

24             THE COURT:  All right.  Does the Government have

25   any objection?

1          MR. ATKINSON:  No, Your Honor.

2          THE COURT:  Exhibits 104 and 105 are received.

3          MS. HAY:  No further questions, Your Honor.

4          THE COURT:  All right.  Any --

5          MR. ATKINSON:  No further questions.

6          THE COURT:  Thank you.  You may step down.

7          MR. ATKINSON:  The Government rests.

8          THE COURT:  All right.  Ms. Hay, do you have any

9  evidence you wish to submit?

10          MS. HAY:  Your Honor, on the question of the

11  Government's proof that Ms. Handanovic intended to flee

12  Bosnia in order to flee an indictment or investigation, the

13  Government's rested without presenting any evidence of that.

14  I believe, given the evidence I've just put in, that

15  Ms. Handanovic, in fact, returned to her home country in

16  1997, before the statute of limitations would have passed,

17  tolled the Government she was doing that, and then returned,

18  the Government has not met its burden of showing that the

19  statute of limitations was tolled under the fugitive -- the

20  fugitive doctrine.

21          In this case, I do have some additional evidence

22  that I could just present.  These are reports -- one from

23  the Subcommittee on International Operation of Human Rights

24  about refugees.  It shows that in 1995 and in 1997 there

25  were approximately a million refugees from Bosnia leaving

1    that country and going to other countries.  That -- the

2    numbers are different.  One document, which is marked as

3    Defendant's Exhibit 102, says there's 1.2 million refugees

4    in 1995 leaving Bosnia.  The Subcommittee on International

5    Operations on Human Rights, which I've marked as Defendant's

6    Exhibit 103, reports the numbers in different ways.  But

7    they have approximately 800,000 refugees that they mention.

8         And then a document from the United Nations I've

9    marked as Defendant's Exhibit 101.  They -- it reports that

10   by the end of 1997 more than 800,000 Bosnians remained

11   internally displaced; more than 600,000 were without durable

12   solutions outside the country.

13        Your Honor, I would offer all of theses in the

14   same extent that the Government has offered in their

15   pleadings.  Just to show that many, many people fled from

16   Bosnia as a result of the war and that Ms. Handanovic's

17   decision to leave Bosnia in 1995 had no bearing at all on a

18   thought that she was fleeing from any kind of investigation

19   or possible prosecution.

20        So I'd offer these documents, Your Honor, as

21   just -- I think the Court can take notice of the --

22   especially the hearing in front of the Senate Subcommittee

23   on Refugees; that there were certainly hundreds of thousands

24   of refugees leaving Bosnia at the same time.

25        THE COURT:  Does the Government have any objection

```
 1   to Exhibits 101, 102 and 103?
 2              MR. ATKINSON:  No, Your Honor.
 3              THE COURT:  All right.  I will receive those.
 4              We can leave for argument with sufficiency of the
 5   evidence on this particular point.
 6              MS. HAY:  I don't have any further witnesses to
 7   present then, Your Honor.
 8              THE COURT:  All right.  So do we now have in the
 9   record all of the written documentation and testimony that
10   both parties intend to present at today's hearing?
11   Mr. Atkinson, on behalf of the Government?
12              MR. ATKINSON:  Yes, Your Honor.
13              THE COURT:  Ms. Hay?
14              MR. ATKINSON:  I will ask the Court to note
15   certain additional matters, but we will do that in the
16   course of argument.
17              THE COURT:  All right.
18              MS. HAY:  Actually, Your Honor, it occurs to me
19   that maybe I ought to call one witness, just further, about
20   this trip to Zagreb.  If I could call Mirsada Guild for
21   brief testimony.
22              THE COURT:  Very well.
23              DEPUTY COURTROOM CLERK:  Please raise your right
24   hand.
25
```

<u>MIRSADA GUILD</u>

called as a witness in behalf of the Respondent, being first

duly sworn, is examined and testified as follows:


DEPUTY COURTROOM CLERK:  Please be seated.  Please

state your name and spell your name for the record.

THE WITNESS:  My name is Mirsada Guild.  First

name is Mirsada, M-I-R-S-A-D-A.  Guild, G-U-I-L-D.

DEPUTY COURTROOM CLERK:  Thank you.


<u>DIRECT EXAMINATION</u>

BY MS. HAY:

Q.   Ms. Guild, how are you related to the defendant in this

case, Rasema Handanovic?

A.   I'm her sister.

Q.   Did you provide a statement that was submitted to the

Court as Exhibit 2, a letter about your past with

Ms. Handanovic?

A.   Yes, I did.

MS. HAY:  Your Honor, I'm referring to Exhibit 2

to the defendant's motion for release from custody.

THE COURT:  All right.

BY MS. HAY (Continuing)

Q.   And are the statements in that letter true?

A.   They're true.

1   Q.   Ms. Guild, after the -- during the war in Bosnia,

2   where -- where did you go when you left Bosnia?

3   A.   We fled first to Croatia.  And since it wasn't safe for

4   me, we moved further, to Germany.

5   Q.   In 1997 did you have a chance to see your sister again?

6   A.   Yes.

7   Q.   Okay.  Tell us, where did you meet up with your sister

8   in 1997?

9   A.   We met back at our parents' house.  The whole family

10  met for first time since after September 2nd, 1992.

11  Q.   So September 2nd, 1992, you were separated?

12  A.   Yes.

13  Q.   And then the next time you got to meet was in 1997?

14  A.   We met in Germany, actually, in '94.  It was, I think,

15  November of '94.

16  Q.   Okay.

17  A.   It was when she was sent for recovery and -- for two

18  months from -- she was released by Bosnian Army for two

19  months.  And she went back.  And then we met again, whole

20  family -- whole family get together in November of 1997.

21  Q.   And what town did you get together in?

22  A.   Sanki Most.

23  Q.   And that's your hometown in Bosnia?

24  A.   Yes.

25  Q.   How did you get to Sanki Most?

1   A.   I drove in my car.

2   Q.   And do you know how your sister got there?

3   A.   She flew to Zagreb.  Zagreb was the closest airline --

4   airport to our town.

5   Q.   And then went from Zagreb to Sanki Most?

6   A.   Yes.  My brother picked her up from airport.

7   Q.   Have you been back in Bosnia with your sister again at

8   any other time?

9   A.   We went back to 2003 when I got married.

10  Q.   Did you get married in your hometown?

11  A.   Yes.

12  Q.   And your sister was back there for your wedding?

13  A.   She came for my wedding.

14          MS. HAY:  No further questions.  Your Honor.

15          THE COURT:  Any cross-examination?

16

17                  CROSS-EXAMINATION

18  BY MR. ATKINSON:

19  Q.   Did you -- after you were separated from your sister in

20  1992, did you stay in touch with her?

21  A.   We -- I saw her back when she came to Germany, and it

22  is when I --

23  Q.   That was in '94; right?

24  A.   '94, yes.

25  Q.   Pardon me for interrupting.

Guild - X

1  A.   Yeah.

2  Q.   Other than that, were you able to stay in touch with

3  her?  How were the two of you able to communicate so that

4  you could meet in Germany in '94?

5  A.   Well, it was through my parents.  She -- it is how she

6  got in touch with my parents.  I had separated in Germany

7  from my parents, so I was separated from my parents in

8  Germany.

9  Q.   She was a member of the Bosnian Army during the

10  hostilities in Bosnia from '92 to '95, was she not?

11  A.   She was military.

12  Q.   Yeah.  She was discharged from the Army in May of 1995,

13  wasn't she?

14  A.   It was in '95 sometime.  I cannot --

15  Q.   She fled to Austria in August of '95, didn't she?

16        MS. HAY:  Objection to the word "fled,"

17  Your Honor.

18        THE COURT:  Sustained.

19  BY MR. ATKINSON (Continuing)

20  Q.   She moved to Austria in August of 1995, didn't she?

21  A.   She was on her way to family, to Germany, and at that

22  time Germany closed the borders, and it is where she ended

23  up staying, in Austria.

24  Q.   In Austria?

25  A.   Yeah.

1   Q.   Were you aware that she sought refugee status in the

2   United States in October of 1995?

3   A.   I don't understand.

4   Q.   Did she seek to become a refugee and immigrate to the

5   United States in October of 1995?

6   A.   Did she seek -- what do you mean by --

7   Q.   Did she apply to become a -- to come to the United

8   States as a refugee in October of '95?

9   A.   She was -- yeah, she came to -- because we have a -- we

10   have another sister that lives in Portland, and it is the

11   only family that she could be reunited --

12   Q.   And she actually moved to the United States as a

13   refugee in May of '96, didn't she?

14   A.   I think so.

15   Q.   She currently goes by the first name Sammy; is that

16   right?

17   A.   She always went by -- it is like name we always call

18   her, Sammy.

19   Q.   She didn't call her Zolja?

20   A.   I don't know what this is.

21   Q.   You never heard of the nickname Zolja?

22   A.   Zolja?  No.

23   Q.   She had her name legally changed to Sammy by order of a

24   judge in this court, here, in this courthouse, didn't she?

25   A.   When you become citizen, anybody has the right to

1  change name.  It is common that immigrants change into name,

2  but she just made official the name that she used in the

3  past.

4  Q.   And her last name changed by marriage --

5  A.   That's correct.

6  Q.   -- did it not?

7       Yes, okay.

8       MR. ATKINSON:  I'll save the rest for argument,

9  Your Honor.  No further questions.

10      THE COURT:  All right.

11      MS. HAY:  No follow-up.

12      Thank you, Your Honor.

13      THE COURT:  Very good.  You may step down.

14      Any other witnesses on behalf of Ms. Handanovic?

15      MS. HAY:  No, Your Honor.

16      THE COURT:  All right.  I think that then

17  concludes the evidence, so let's hear argument on the

18  various issues raised in the memoranda.

19      So, Mr. Atkinson, you first.

20      MR. ATKINSON:  Thank you.

21      THE COURT:  Let me say, initially, that I know one

22  of the challenges raised is to the validity of the treaty.

23  I think, based on the cases that you've cited, I am

24  persuaded by your position, so I don't need to hear any more

25  argument from you on that particular issue.

1          So if you want to address your argument primarily

2     to the other issues, that would be helpful.

3          MR. ATKINSON:  All right.  Your Honor, I'm going

4     to start at a fairly basic level, but I'll move through this

5     fairly quickly, and I'll try not into waste the Court's time

6     or Counsel's time.

7          In the original memoranda that we filed back just

8     before the defendant was arrested, a copy of which was made

9     available to counsel upon her arrest, we set out the five

10    matters that we need to prove in order to sustain a

11    certification to the Secretary of State for extradition.

12         Those are as follows:  Number one, that the

13    judicial officer handling the case has the authority to

14    conduct the proceedings.  And you have that authority

15    pursuant to 18 U.S.C. §3184.  I don't think there's any

16    serious contention to the contrary.

17         Secondly, we need to prove you have jurisdiction

18    over the fugitive.  And the same statute, 18 U.S.C. §3184,

19    provides that you have jurisdiction over alleged fugitives

20    residing in this district or arrested in this district.

21    Hence, my question to Agent Weimann about where

22    Ms. Handanovic was arrested.

23         The third is a matter no longer in dispute;

24    whether the treaty is in effect.

25         Four, which is probably the matter in most

1    dispute, is whether the crimes charged in the requesting

2    jurisdiction are covered by the applicable treaty.

3            And the final matter we need to prove is that

4    there's probable cause as to the crime charged in the

5    requesting jurisdiction.  In this case, Bosnia.

6            The argument following the validity of the treaty

7    argument raised by the defendant, or the fugitive in this

8    case, contends that she is not charged in the requesting

9    state.  And in her initial memorandum that argument had two

10   facets.  The first was that there was a technical defect in

11   the warrant; that there was essentially a scrivener's error.

12   And Exhibits 8 and 9 constitute the amended warrant that

13   we've offered into evidence, that are now received, that

14   have corrected those errors.

15           I want to point out for the Court that there are

16   multiple references to the defendant's biographical data in

17   the extradition request -- in a formal extradition request

18   from Bosnia.

19           I've listed all of those out on pages 15 and 16 of

20   our original response.  There are eight or nine different

21   places where her date of birth is referenced, her birthplace

22   is referenced, name of her father is referenced.  There are

23   multiple affirmations of that in documents here in the

24   United States, as well; her marriage certificate, her

25   naturalization certificate.  The fingerprints clearly

1    establish that she is the person who's wanted in Bosnia,

2    despite the fact that the fingerprint examiner wasn't able

3    to complete an exact match of the roll prints taken upon her

4    arrest here in Oregon with the prints that were taken in

5    Bosnia while she was in Bosnia.

6           But given her immigration file and the fact that

7    the examiner was able to make the match to the prints

8    contained in her immigration file and given the fact that

9    the immigration file is replete in multiple locations, as

10   detailed in our memoranda, with references to her date of

11   birth, her lineage, the -- all of her biographical data, and

12   that matches exactly the person wanted by Bosnia, I submit

13   that the validity of the warrant is just not an issue

14   anymore.

15          I didn't see Ms. Handanovic raise that in her

16   reply document.  I don't know whether she's abandoned it or

17   not.  I'll save any further argument on that for rebuttal.

18   But our contention is that we presented a valid warrant.

19          And, moreover, that there are two warrants within

20   the extradition paperwork.  One issued by Judge Jukic behind

21   one of the tabs, a judicial -- an independent judicial

22   determination of probable cause and an order for her arrest,

23   which independently satisfies the warrant requirement of

24   Article -- I believe it's Article IV of the treaty.

25          I'm sorry.  Article I of the treaty.

1        The more -- the argument that Ms. Handanovic has

2   continued or persisted to press is that because she has not

3   been formally charged in Bosnia -- that is indicted -- the

4   requirement of Article I of the treaty, that as a condition

5   precedent to extradition the fugitive be charged with or

6   convicted of a listed offense hasn't been met.

7        In response to that argument, I contend as

8   follows:  Number one, that *Emami* -- E-M-A-M-I, for the

9   benefit for the reporter -- case is binding Ninth Circuit

10  precedent that directly applies to this case.

11       Emami, in turn, quotes extensively from and relies

12  extensively upon a companion Seventh Circuit case that had

13  been previously cited, the *Assarsson* case.

14  A-S-S-A-R-S-S-O-N.  Also cited in the memoranda.

15       The effect of those cases is that formal charges

16  or indictments are not -- simply not required in order to

17  satisfy the "charge with" element of Article I of the

18  treaty.  If there's been a warrant issued for someone's

19  arrest, that will suffice to predicate an extradition

20  without requiring the requesting state to submit formal

21  charges.

22       The treaty in *Assarsson*, the *Assarsson* case, a

23  Seventh Circuit case, had language, Judge Stewart, that was

24  absolutely identical to Article I of our treaty.  That

25  condition precedent extradition be that the person charged

1    with or convicted of a listed offense.

2           The *Assarsson* court interpreted that to mean that

3    the person be accused but not formally charged.  We quoted

4    in both of our memoranda about the transmutation of "charge

5    with" from a verb to a noun and how the Court should not

6    utilize that sort of interpretation.  And I'd submit that to

7    the Court again.

8           More importantly, in Article -- in another article

9    of the treaty, the documents that the requesting

10   jurisdiction are required to submit to support an

11   extradition are listed out.  There is a requirement that a

12   valid warrant be submitted, but there's absolutely no

13   requirement that there -- that any formal charges be filed.

14          Both the *Emami* opinion and the *Assarsson* opinion

15   make note of that and conclude that had the parties intended

16   that formal charges be filed as a condition precedent to

17   extradition, the requirement for formal charges would have

18   been contained in the list that's in Article III, I'm

19   reminded by Ms. Chang, detailing out documents that would

20   have to support an extradition request.

21          The fact that formal charges are absent from that

22   list leads inescapably to the conclusion that that wasn't

23   intended by the parties.

24          Counsel attempts to distinguish the *Emami* decision

25   on the basis that the -- there was a slight difference in

1    the German treaty in *Emami* and that it authorized

2    extradition on a judicially enforceable detention order.

3    While there is a passing reference to that language in the

4    *Emami* opinion, nowhere in the underlying rationale is that

5    mentioned.  It's completely and totally absent.

6            Rather, the Court points to the transmutation of

7    the word "charged" from a verb into a noun from the

8    *Assarsson* case, and it particularly notes the absence of any

9    requirement that formal charges be filed in Article III of

10   the treaty.

11           I particularly commend to the Court the quotation

12   from the *Kaiser versus Rutherford* case, which is from

13   another circuit, admittedly, indicating that at the time

14   that it was decided, in the early '90s, as I recall, every

15   court to have considered the issue had found that formal

16   charges are not required in order to predicate an

17   extradition.

18           We have found no authority since the *Kaiser*

19   decision to the contrary and Counsel has cited that.

20           I think the Court can rely upon that citation or

21   that quotation still being valid and applicable law.

22           Counsel invites the Court to delve into the

23   slippery slope of interpreting Bosnian law.  In her final

24   reply, she points to a distinction under Bosnian law between

25   suspect and an accused.  That is precisely the analysis that

Proceedings - 9/29/11

1    the *Emami* court cautions us not to engage in.

2         To do that would fly in the face of binding

3    circuit precedent, I would submit, and I ask the Court not

4    to do that.

5         But this main point that I want to make is that

6    every court gets -- that's considered this issue has -- has

7    found that formal charges aren't required.

8         THE COURT:  There is some reference to some

9    procedures to Bosnia charging defendants in absentia before

10   extradition, citing something from *Veletic*.  I couldn't find

11   the *Veletic* decision anywhere.

12        Do you know anything further about that?

13        MR. ATKINSON:  No, Your Honor.  My understanding

14   of the law in Bosnia is just to the contrary that an

15   individual can't be charged in Bosnia until they're

16   questioned.  And that's why -- if you read the declaration

17   of Ms. Budimir, the Bosnian prosecutor -- that's behind Tab

18   5 -- if I'm not mistaken, she makes reference to the fact

19   that under Bosnian law they're unable to seek an indictment

20   until the defendant's there.  That's one additional reason,

21   very logical reason, why the Court should interpret this

22   part of the treaty in the way that they're -- the United

23   States suggests.

24        If you were to -- to require formal charges, it

25   would essentially set up the United States to be a haven for

1    Bosnian fugitives who manage to slip out of the country

2    before they could be indicted, and they could never be

3    returned to Bosnia absent their being questioned.

4            So, you know, it'd be -- it would create,

5    essentially, an absurd result.

6            Indeed, our memoranda contains a case from a

7    sister circuit where in interpreting the Swiss treaty, Which

8    had identical provisions about forbidding indictments while

9    a defendant is outside of the country, it characterizes it

10   as absurd an argument made by a fugitive that there should

11   be a requirement of formal charges.

12           I'm ready to move to the next issue unless the

13   Court has additional questions on this one.

14           THE COURT:  No.  That's fine.

15           MR. ATKINSON:  The next issue I would like to

16   address is Ms. Handanovic's contention that because War

17   Crimes Against Civilians and War Crimes Against Prisoners of

18   War is not specifically listed in the treaty, that she

19   cannot be a -- she can't be extradited in connection with

20   those offenses.

21           The first point that I would like to make is that

22   Supreme Court precedent has long held from the time that the

23   *Factor* case was cited, which is cited extensively in the

24   memoranda, that the analysis of whether a foreign crime is

25   listed in a treaty such as this -- parties agree that this

1    is a list treaty -- is not to be controlled by the name of

2    the crime.  It's not to be controlled by a rigorous, rigid

3    element-by-element comparison between the definition of the

4    crime in the requesting state and the definition of the

5    crime here in the United States.

6            Rather, the Court should look at the proscribed

7    conduct and -- and make the determination.  And that's what

8    I'd ask the Court to do here.

9            The crime of War Crimes Against Prisoners of War,

10   specifically includes, in its definition, a parenthetical --

11   parenthetic reference to murder.  It goes on to include

12   offenses broader than murder.  It includes a parenthetical

13   reference to murder.  And it is clear, from the documents

14   that Bosnia submitted in its witness statements, that Bosnia

15   wants her for the homicidal crimes that she committed in

16   Trusina and Gaj in April of 1993.

17           They don't want her for arson or some other

18   offense not listed in the treaty.  They want her for murder

19   and for attempted murder.

20           This is a case where there were 22 deaths caused

21   by -- directly caused by the defendant and her unit mates

22   and four serious injuries.

23           So our point is that when one looks at the -- at

24   the elements of the two offenses for which it -- the

25   defendant is sought in the requesting state and compares

1   those with the elements of murder, either federally or under

2   state law, the Court will find substantial analogies that

3   pass muster under Supreme Court precedent.

4           I also would remind the Court that the affidavit

5   of Ms. Budimir, the Bosnian prosecutor, makes clear that

6   Bosnian law requires that both of these offenses be

7   committed intentionally.  There's not some lesser culpable

8   mental state that would suffice to sustain a conviction

9   in -- in the demanding jurisdiction.

10          THE COURT:  Which particular exhibit is that?

11          MR. ATKINSON:  I believe that is Exhibit 5 and

12  tab -- or, I'm sorry, tab 5, and -- you know, I have it in

13  my memoranda.

14          THE COURT:  Yes, I think you did.

15          MR. ATKINSON:  I do.  I can't put my finger on it

16  immediately.

17          THE COURT:  All right.

18          MR. ATKINSON:  I may be able to here if you just

19  give me a moment.

20          Do you know, Frances?  I'd be happy to find that

21  and present them to the Court rather than --

22          THE COURT:  That's fine.  You can look for it, and

23  if you find it before the end of the hearing, let me know.

24          MR. ATKINSON:  So the name of the offense isn't

25  dispositive.  The cases, including Supreme Court precedent,

1    make it clear that the Court should look to the conduct

2    criminalized by the -- by the statute in the demanding state

3    or the requesting state and make a -- make a general

4    comparison.

5              THE COURT:  Let me ask you for some clarification

6    on the relationship between listed offenses in the treaty

7    and extrinsical dual criminality.  The cases seem to, as I

8    read them, sometimes place it to where both are required.  I

9    know you make the argument that if the crime is listed or

10   the offense is listed in the treaty you don't need to also

11   comply with dual criminality.  Are we in a situation here --

12   or actually the offense listed war crimes is not listed in

13   the treaty.

14             MR. ATKINSON:  I struggle with that, as well,

15   Judge Stewart, and thankfully I have Ms. Chang to set me

16   straight.

17             And, indeed, my original draft she edited

18   substantially to correct me and to correct my

19   misimpressions, to be quite candid with you.

20             Let me answer that question in this way:  The

21   answer depends upon the treaty.  Some treaties are list

22   treaties and provide for dual criminality as well.

23             In other words, if a treaty were to say

24   extradition on the listed offense is authorized and

25   extradition on any offenses that are criminal in both

1    countries -- criminalized by statutes in both countries,

2    then that would be a -- both a list treaty and a dual

3    criminality treaty.

4            THE COURT:  All right.  Well, from that

5    perspective, if you look at Article II, it does list crimes.

6    At the end it has some language of extraditions also to take

7    place in anticipation of any of the offenses and crimes

8    mentioned, provided that such participation may be punished

9    in the United States as a felony and in Serbia as a crime.

10           So it appears that it does impose, perhaps, dual

11   criminality for participation in crimes, which I don't know

12   how to interpret that.  Perhaps that means aider and abettor

13   liability or conspiracy liability.  You look at dual

14   criminality.  So I acknowledge your point that there are

15   different kind of treaties with different kinds of language.

16           What kind of treaty is this?

17           So that's -- that's the question.

18           If you would like Ms. Chang to make this argument

19   directly, that's fine with me, Mr. Atkinson.

20           MR. ATKINSON:  Okay.

21           MS. CHANG:  As Your Honor noted, the Supreme Court

22   has -- in some of the older precedents -- has seemed to

23   muddy the waters a little bit about dual criminality and

24   list treaty, and there are specific cases where the Court

25   seems to read into particular treaties that have no dual

1    criminality language, the dual criminality requirement, and

2    I think that point is made very clear by the Court in

3    *Factor*.

4           The Court in *Factor* points out that in previous

5    cases the Court seemed -- itself seemed to be a little bit

6    confused with what was going on there.

7           But, Your Honor, the Government's contention is

8    that in a list treaty the offenses that are listed were

9    listed because at that time they were already determined to

10   be dually criminal.  They were denominated.  They were

11   listed as extraditable crimes, because these were crimes

12   that both parties to the treaty believed were severe enough

13   to warrant extradition.  And, thus, the dual criminality

14   analysis is basically collapsed in a list treaty because

15   those offenses list -- listed are there because they're

16   already dually criminal.

17          And so in a list treaty, such as the one we have

18   here, the 1901 treaty with Serbia, the Court's task is to

19   look at the conduct that is proscribed by the foreign

20   country statute and see whether that conduct constitutes one

21   of the listed offenses -- one or more of the listed offenses

22   in the treaty and if the conduct proscribed by the foreign

23   statute comprises or is analogous to one of the crimes that

24   are listed, then the -- the crime charged by the foreign

25   country is an extraditable offense.

1      THE COURT:  And where can you actually find that

2  stated clearly in any case?

3      MS. CHANG:  Your Honor, we believe that *Factor* is

4  the case that most supports this contention.  And in reading

5  the previous -- the previous precedent from the Court, in

6  terms of *Collins* and *Benson*, those were a couple of cases

7  that seemed to muddy, sort of, the boundaries.

8      *Factor* is the one case that really sits back and

9  tries to delineate, again, the difference between a list

10 treaty and a dual criminality treaty.

11      As we stated in our briefing, Your Honor, we do

12 believe that it is our position that dual criminality is not

13 required in this treaty pursuant to Supreme Court precedent.

14      But even if this Court were to find that dual

15 criminality is required, we would propose that dual

16 criminality is, in fact, satisfied in this case.

17      The conduct charged against Ms. Handanovic could

18 be charged in the United States not only as murder,

19 attempted murder, various theories of liability for murder,

20 aiding and abetting and conspiracy, but also as war crimes

21 under the U.S. War Crimes statute.

22      So --

23      THE COURT:  That is one thing that was not clear

24 to me from your briefing.  You are also relying on a U.S.

25 statute for war crimes to show that they are substantially

1   analogous?

2              MS. CHANG:  Your Honor, we are relying on the

3   murder statutes.

4              THE COURT:  That's what I thought.

5              MS. CHANG:  Right.  But if the -- if it's believed

6   that dual criminality as a separate -- is a separate

7   requirement outside of just being the -- an offense on the

8   list of offenses, Your Honor, the Government would contend

9   that her conduct would be dually criminal under U.S. War

10  Crimes statute.

11             THE COURT:  All right.  So could you answer my

12  question as to how to interpret that last paragraph of

13  Article II regarding participation?  That sounds like

14  perhaps the dual criminality requirement, at least, for some

15  category called participation.

16             MS. CHANG:  Your Honor, I believe that that is my

17  understanding of that provision as well.  Although, I am not

18  aware of any -- any case that has construed that particular

19  provision, I would think that that provision does apply to

20  what Your Honor was saying in terms of perhaps aiding and

21  abetting.

22             In that case, the -- it would require that it be

23  punished as a felony, as opposed to, presumably, a

24  misdemeanor in the United States, and then punishable in

25  Serbia as a war crime offense.

1        THE COURT:  If you're taking the position that

2    this is a list treaty and you're relying on the listed crime

3    of murder and possibly also attempt to commit murder in that

4    Paragraph 1, Article II, what does that mean -- or what --

5    what does -- what do we do about the fact that the offenses

6    charged in the request for extradition under war crimes

7    against civilians or war crimes against prisoners of war,

8    even if you look at the subparagraphs (a) and (b), include

9    broader offenses than just murder and attempted murder?

10        MS. CHANG:  Your Honor, the -- the facts submitted

11    by the requesting government here in Bosnia make clear that

12    the conduct they seek to charge Ms. Handanovic with

13    constitutes those lists offenses.

14        And the fact that their statute may be broader and

15    cover a broader array of conduct should not leave the Court

16    to automatically assume or be -- or be concerned that the

17    foreign country will, in fact, charge her with conduct that

18    is not presented by the Court -- to the Court here.

19        There are numerous offenses under U.S. law, for

20    example, that do cover various permutations.  For example,

21    drug trafficking.  A particular type of drug trafficking may

22    or may not be criminalized overseas.  And, yet, there's

23    no -- there is no -- little concern from -- from us, when we

24    make our extradition request, that we need to make clear

25    that we will not be presenting evidence of conduct that is

1   not presented to the foreign country.

2           THE COURT:  Well, here Ms. Handanovic seems

3   particularly concerned about the fact that there are some

4   victims named in the request documents but she is also being

5   charged with war crimes for killings of persons or victims

6   who are not specifically named and that that would go beyond

7   murder or attempted murder; that that's -- you know, that's

8   something different.

9           Now, this may overlap into the rule of speciality.

10  I'm not sure.  But what is your response to that; that here,

11  if we're relying simply on murder and attempted murder, does

12  that limit the victims for which extradition is appropriate?

13          MS. CHANG:  Well, first of all, Your Honor, the --

14  Ms. Handanovic has pointed to the names listed on the arrest

15  warrant as being incomplete in terms of listing the names of

16  the victims.

17          However, Your Honor, if you -- if -- in

18  Ms. Budimir's affidavit, she lists the names of every single

19  individual who had died from the attack on Trusina as well

20  as from the firing squad in Gaj.

21          THE COURT:  The affidavit's name again?

22  Prosecutor's affidavit?

23          MS. CHANG:  Yes.  Ms. Budimir's affidavit, which

24  is in your binder.

25          MS. HAY:  At page 7.

1          MS. CHANG:  Thank you.

2          Your Honor, I believe, as well, the Court in

3    Bosnia, in some of their -- in some of the Court's orders,

4    has also listed the names of those particular victims.

5          So if the names of the victims is the particular

6    issue of concern, the Government contends that that concern

7    is not present.

8          However, the Government would argue that the names

9    of the victims is not -- the lack of the names of the

10   victims, if you will, Your Honor, is not a reason to -- to

11   deny a certificate of extradition.

12         Your Honor, the Government points to the case of

13   *Artukovic*, which is cited by Counsel, where the Court

14   certified, in its amended certificate, the extradition of

15   Andrija Artukovic for numerous murders.

16         And that's in the opinion *In Re: Extradition of*

17   *Artukovic* 628 F. Supp 1370 at 1379.

18         And in that amended certificate the Court, among

19   other things, certified him for extradition for the murders

20   of between 4- and 500 persons.  Again, also the entire

21   civilian population of several villages.  Another event,

22   approximately 5,000 persons murdered by rifle fire in

23   another area and also several hundred persons captured in

24   Zumberg region.

25         That court -- I -- I don't have the actual request

1    from the foreign country, and I have not seen it, but the

2    Government contends that in this case, because of the way

3    that the certificate was -- was worded, is that the Court

4    did not require, in fact, the names of every single one of

5    the victims that Mr. Artukovic was supposed to have murdered

6    in that case.

7            So based on this -- on this case, on this example,

8    the Government contends that even the lack of names of

9    specific individuals is not a reason to deny a certificate

10   of extradition.

11           MS. HAY:  Your Honor, I realize the Government

12   probably has a lot of different arguments, but maybe it

13   would be helpful to just engage on this.  This is obviously

14   one of the key issues in the case.  And maybe if I responded

15   to some of those, we can try to clarify this some more.

16           Unless you want to hear the rest of the

17   Government's presentation.  I -- I can go either way.  I

18   thought in the moment when they were talking about these

19   cases, I thought there might be things we could clarify,

20   but --

21           THE COURT:  Let me get through the Government's

22   argument, and then I'll get to you on this.

23           MS. HAY:  Okay.

24           MR. ATKINSON:  Judge, we commend to you the

25   *Arambasic* case that was amended to our initial responses in

48

1    exhibit at -- and we commit it to you for these reasons:  It

2    involves the same treaty, and it involves virtually

3    identical statutes involving war crimes.

4            And there the -- the fact that the war crime

5    statutes charged were not on the list did not deter the

6    Court from issuing its extradition certificate.

7            In that decision, there's an extensive analysis of

8    the similarity or the analogy between the Bosnian war crimes

9    statute and murder.

10           THE COURT:  I could go on dual criminality

11   analysis, which obviously you're disagreeing with.  You're

12   saying it wasn't really necessary.

13           MR. ATKINSON:  Well, the -- the *Arambasic* case

14   essentially looks at this rather broad war crimes statute

15   and compares it to the murder statute and essentially

16   concludes that there's sufficient analogies to warrant

17   extradition.  And there's not a requirement that the

18   offenses in the requesting state and the generic offense

19   compare element for element or that they even go by the same

20   name.

21           The fact that the offense in the demanding state

22   is broader than the listed offense is at no moment when it's

23   clear that the facts predicate the demand for the fugitive

24   based upon a homicidal offense or an attempted homicide.

25           Ms. Handanovic attempts to distinguish the

1    *Arambasic* case on the basis that in *Arambasic* the defendant

2    had already been convicted in absentia in -- I believe it

3    was Croatia, if I'm not mistaken -- and that that somehow

4    changes the analysis.

5              That's a distinction without a difference,

6    Judge Stewart.

7              The same analysis must be -- must be made in

8    either instance.  And that is whether the war crimes offense

9    is sufficiently analogous to murder or other listed offenses

10   even though it's admittedly broader to warrant extradition.

11             So we commend the Court to *Arambasic*.  That is the

12   most analogous case we were able to find.

13             Again, Ms. Handanovic is asking the Court to

14   conduct individual probable cause analysis for each of the

15   22 homicide victims and each of the four victims who were

16   seriously injured and whom the Government contends were

17   victims of attempted murder essentially.  She would ask the

18   Court to produce 26 separate certifications.

19             Our position is that the -- these two offenses are

20   unitary crimes that -- they're unitary crimes with multiple

21   victims.  They're a single offense that involves, you know,

22   any number of different victims.  All of whom are named in

23   the Bosnian extradition request if you drill down into --

24   into the niceties of the request.

25             Probable cause has been established that the

50

1  defendant committed this offense.  And there's really no

2  serious argument to the contrary.  I just remind the Court

3  that on pages 28 and 29 of Bosnian's extradition request --

4  actually pages 28 and 29 of your notebook, you'll see a

5  description of what the pseudonymous witnesses talk about

6  with respect to -- to the execution firing squad style in

7  Gaj.

8          Pages 29 to 32 provide corroborative evidence

9  consisting of military reports, death certificates,

10  autopsies, things of that nature.  They're building blocks

11  of a homicide case.

12          Pages 92 and 94 set out the war crime statutes at

13  issue here, and I'd specifically commend to you the fact

14  that war crimes against prisoners of war mentions murder.

15          So the fact that it's analogous to generic murder

16  offenses is undeniable.

17          I commend the Court to pages 140 -- excuse me,

18  136, where, while the fugitive was present, her squad-mates

19  talked about their raid -- upcoming raid on Trusina and

20  talked about their intent to kill all of the Croatians who

21  were present in that village.  And she was present during

22  that conversation.

23          I commend the Court to pages 140 to 142, where

24  pseudonymous witness A describes, in detail, the firing

25  squad and execution of the victims in Gaj.  He establishes

1     that the motive for this, among others, was in revenge for

2     the death of one of their members, Samko, during the course

3     of these events.

4               So there can be little doubt but that this was

5     premeditated.

6               This witness describes, in detail,

7     Ms. Handanovic's participation in the initial execution of

8     the -- of the civilians and prisoners of war who were

9     present in Gaj and recounts how she stood over any surviving

10    victims who showed signs of life and put bullets in their

11    head, essentially.

12              This witness describes how Ms. Handanovic and

13    her -- and her unit-mates used women who weren't executed as

14    human shields.  This witness identifies her from a photo

15    lineup at pages 122, 128, and 143.

16              That, in itself, constitutes probable cause, I'd

17    submit.

18              It goes on.  Pseudonymous witness B, at page 177

19    and 178, describes the firing squad at Gaj similarly to

20    pseudonymous witness A.  She talks about the fugitive's

21    participation, about her shooting those on the ground who

22    showed signs of life.  And this witness makes it clear that

23    the motive for the firing squad at Gaj was in revenge for

24    one of their members having been killed.

25              Witness B, at page 360, Judge Stewart, talks about

1    having witnessed Ms. Handanovic execute two civilians in

2    Trusina before the massacre at Gaj occurred and described

3    them as being somewhere between 65 and 70 years of age.

4         At pages 344, 346, and 361 she identifies

5    Ms. Handanovic from a photo lineup.

6         Witness D describes Ms. Handanovic urging her

7    unit-mates to kill the prisoners who had been taken at Gaj.

8    Pages 206 to 208, Judge Stewart.

9         She describes her participation in the firing

10   squad as witnesses A and B did.

11        Witness D indicated that he or she knew

12   Ms. Handanovic very well and was able to identify her in a

13   photo lineup at page 210.

14        Witness E describes Ms. Handanovic's participation

15   back in Trusina before the events later that day in Gaj and

16   the killing of a civilian woman and having -- Ms. Handanovic

17   having put two or three bullets into the chest of that

18   woman.

19        Witness E hadn't seen Ms. Handanovic in some

20   period of time.  As I recall, she wasn't asked to see a

21   photo lineup, but she remembered her and her participation

22   in great detail.

23        Witness O identifies Ms. Handanovic at page 273

24   from the photo lineup and at pages 270 and 271 also

25   describes, consistently with the other witnesses,

1    Ms. Handanovic having participated in the firing squad and

2    having stood over the survivors, or at least those still

3    showing signs of life after the firing squad, and pumping

4    additional bullets into them to ensure that they were

5    deceased.

6          So our suggestion is that there's just no question

7    about probable cause and that these crimes are analogous to

8    murder.

9          We're -- we ask that the certification should be

10   for these unitary crimes with multiple victims.

11         And if the Court is concerned about the breadth of

12   the Bosnian war crimes statute, the Court could qualify the

13   certification to include homicidal -- cases in which persons

14   were -- were killed, but that's certainly not required and

15   the cases are replete with examples of certifications being

16   made and being affirmed on appeal and on habeas where the

17   Court simply said that it's not going to presume that a

18   requesting state will, as Ms. Chang just mentioned, include

19   offenses that are broader than those that are included in

20   the request.  And principles of comity require that.

21         I had in my notes to point out to you the very

22   broad certification involving the 4- to 500 murders in

23   *Artukovic*; the entire civilian population of villages.  In

24   other words, what you just heard from the *Artukovic* case and

25   the certification there where there was not an

1    individualized analysis of probable cause and the way that

2    Ms. Handanovic contends that the Court has to approach this

3    case.

4            Rather, this makes clear -- these are my words, my

5    analysis, I suppose -- that these offenses are -- are

6    unitary offenses involving multiple victims, and the Court

7    need not concern itself with conducting 26 individualized

8    probable cause analysis.

9            Again, with respect to the dual criminality

10   analysis, you've heard Ms. Chang on that.  I'm not going to

11   repeat the points she made other than to indicate that even

12   if a dual criminality analysis were required, it's clear

13   that Ms. Handanovic's acts would be criminal both here in

14   the United States and in Bosnia.

15           I want to move to the statute of limitations

16   argument.  And that's probably the most intensive --

17   factually intensive argument with respect to the offenses of

18   attempted murder.

19           But let me begin by making this point:  In her

20   original opposition to extradition, Ms. Handanovic made the

21   argument that the Court should be confined to what appeared

22   in the warrant and its understanding of the facts and that

23   those facts were more analogous to conspiracy to commit

24   murder, an inchoate offense, than to the completed crime of

25   murder or attempted murder.  And she pointed out that the

55

1  statute of limitations for conspiracy to commit murder is

2  only five years and that that statute has long run.

3        Ms. Handanovic would have the Court ignore all of

4  the facts that I've just gone through from all of the

5  witnesses of the -- she would have the Court ignore the

6  prosecutor's affidavit summarizing those facts and including

7  the corroborative evidence from the military records and the

8  autopsies, and the like, in conducting its analysis of which

9  U.S. offense is -- dictates the applicable statute of

10  limitations.

11        The parties agree, I might add, that the unit of

12  analysis here for your statute of limitations concerns is

13  U.S. law; what the statute of limitations under U.S. law is.

14        Arguing that all Ms. Handanovic is guilty of is

15  conspiracy to commit murder is analogous to arguing that

16  Bonnie and Clyde were only guilty of committing conspiracy

17  to commit robbery.

18        Of course Ms. Handanovic is guilty of conspiracy

19  to commit murder, but her criminal liability goes much

20  greater -- is much broader than that, as evidenced by the

21  facts that I've just recounted and briefed to the Court.

22  And those facts are replete in the Bosnian extradition

23  request, as we pointed out in our first responsive

24  memorandum, even if one were to approach this case in the

25  way that Ms. Handanovic asks and look at it as a conspiracy

1   to commit murder for an aiding and abetting case, because
2   there is a conspiracy, coconspirators are liable under the
3   Pinkerton rule and under principles of vicarious liability
4   for the acts of their coconspirators or acts of their aiders
5   and abettors as substantive crimes.
6        So what she asks you to do, which I'd ask the
7   Court not to take seriously, in the first instance, but even
8   if the Court were to take it seriously, doesn't offer her
9   any help whatsoever, because, under a conspiracy analysis,
10  she's liable for the acts of her coconspirators as a
11  substantive crime, which gets us to the same place; that is,
12  she's chargeable for the completed crimes of murder and for
13  attempted murder.
14       The parties agree that there's no statute of
15  limitations under U.S. law for -- for murder.  The parties
16  agree, at least under federal law, that the statute of
17  limitations for attempted murder is five years.  The
18  question, given the fact that admittedly more than five
19  years has expired since these crimes were committed in April
20  of 1993, is whether the statute's tolled and what the legal
21  principles and factual matters the Court ought to take into
22  consideration are that would guide the Court's analysis in
23  that regard.
24       We contend that the statute was tolled when
25  Ms. Handanovic fled or moved from Bosnia to Austria in

1    August of 1995; three months after she had been discharged

2    from the Army.

3           We submit that the inferences that one can draw

4    from the facts on the ground in Bosnia and her actions

5    support your finding that she was -- that her movements were

6    done in anticipation of a possibility that she might be

7    charged ultimately.

8           Though the case law is clear that the Government

9    need not show an existing warrant or an existing

10   investigative process in which the fugitive is actively

11   sought; but, rather, an anticipatory fleeing is sufficient.

12   That is, fleeing in hopes that by doing so the fugitive will

13   avoid apprehension if and when a warrant is obtained.

14          Just to go through the facts once again,

15   admittedly, there was undoubtedly substantial chaos in

16   Bosnia following the Bosnian war.  There were scores --

17   hundreds of thousands -- of refugees who were displaced due

18   to the ethnic cleansing and ethnic strike that occurred as a

19   result of that war, but I'd like to point out that

20   Ms. Handanovic was discharged from the Army in May of 1995.

21   She moved to Austria in August of '95 and sought refugee

22   status in the United States in October of '95 and actually

23   immigrated to the United States in May of '96.  She's

24   changed her name twice, as I've indicated; once by marriage

25   and once by an actual name change.  The facts on the ground

1   help us interpret what the motivation behind those moves
2   might have been.
3            The International Criminal Tribunal for the former
4   Yugoslavia commenced in 1993, a couple of years before.  One
5   has to take in mind that the acts that Ms. Handanovic
6   committed in April of 1993.  She knew that she had committed
7   those acts.  It had to have affected her.  She had to have
8   been worried about whether war crimes investigators and
9   prosecutors would ultimately get around to her.
10           And what happened in Trusina and Gaj, to deny that
11  is to close one's eyes to basic human nature.  Those crimes
12  are to abhorrent and so egregious that any human being that
13  had committed them must have been worried about having been
14  ultimately held to answer to those crimes, Judge Stewart.
15           That's our point.  When one looks at what happens
16  following the convocation of what I call the ICTY -- the
17  International Criminal Tribunal for the former Yugoslavia --
18  in The Hague, in Holland, one can see that in -- by July of
19  1995, a month before Ms. Handanovic fled -- I will say
20  "fled" -- Bosnia to Austria, there had been wide public
21  announcement.  I'd ask the Court to note a wide public
22  announcement of, by that time, 46 indictments for war
23  crimes.
24           THE COURT:  Were any of these indictments against
25  lower-level Army members?

1        MR. ATKINSON:  Yes.  Yes, they were.

2        Two of them were against high-level personnel and

3   there were lower-level individuals who were indicted as

4   well.

5        Judge Stewart, that's a very good question, and

6   our memorandum makes reference to the precise rank or

7   position of some of those individuals.

8        MS. HAY:  Could you just tell us what page you're

9   looking at?

10        MR. ATKINSON:  Page 30 in our -- in our initial

11   response.

12        Some of the individuals had engaged in conduct

13   very similar to Ms. Handanovic's.  Some were guards and

14   interrogators at prison camps.  And also in our surrebuttal

15   memorandum there's mention of that as well.  And if you'd

16   like me to find that after the hearing and provide you with

17   the precise information, I'd be happy to do that.

18        MS. HAY:  Can I clarify?  The Government is saying

19   that the guards and interrogators are the equivalent of

20   Ms. Handanovic?  Is that the argument?

21        MR. ATKINSON:  No.  That there are -- in our

22   surrebuttal argument there's additional examples of

23   individuals who are the equivalent of Ms. Handanovic that

24   I'll supply to the Court.

25        Some of the individuals had engaged in conduct

1  quite similar to Ms. Handanovic's.  And the supporting

2  citations to authoritative material and websites run by the

3  ICTY are all contained in the memorandum.

4       THE COURT:  Are you primarily relying on that

5  website for your information?

6       MR. ATKINSON:  I'm sorry, Judge Stewart?

7       THE COURT:  Are you primarily relying on that

8  website for your information?

9       MR. ATKINSON:  Yes.

10      THE COURT:  Okay.

11      MR. ATKINSON:  I point out that Bosnia entered

12 into a memorandum of understanding with the ICTY in 1994,

13 not long before Ms. Handanovic fled, but after she committed

14 the war crimes that are at issue in this case.  And the MOU

15 essentially provided that the Bosnian authorities would

16 assist in the -- with the investigators from the ICTY.

17 That's on page 21 of our surrebuttal -- surreply argument.

18      I'd point out that in February of 1995 -- that's

19 noted on the next page, page 22, of our memorandum -- there

20 was a -- an indictment was issued relating to a death camp

21 run by Serbs, Bosnian Serbs.  Not the same ethnicity as the

22 defendant; but, nevertheless, an indictment in which 21

23 separate people were charged.  And the locus, the activity

24 of this indictment, was about 10 miles from Sanski Most,

25 Ms. Handanovic's home.

1      It was a lengthy investigation involving a number

2  of personnel.  I think that the website indicates 20

3  separate investigators were out interviewing witnesses in

4  that area.  I'd submit to you that word of the investigators

5  interviewing witnesses at a site 10 miles from

6  Ms. Handanovic's home in Sanski Most had to have been

7  conveyed to her and had to have had some effect on her,

8  given the acts she committed here.

9      I'd submit that that inference we're asking the

10  Court to draw is not a difficult one to make at all.  I'd

11  submit that it's -- that the most likely explanation for

12  Ms. Handanovic leaving was her anticipation and fear that

13  she might ultimately be called to account for her conduct in

14  April of 1993.

15      There may have been other factors at play.  She

16  may have sought a better economic life, she may have wanted

17  to avoid persecution or being victimized herself.  The

18  Government can readily acknowledge those additional motives.

19  But if a motive was to get out of Bosnia, that area, in

20  order to reduce the chances that she'd ultimately be called

21  to account for -- for her actions, the Government suggests

22  that's sufficient for the Court to find that the statutes

23  should be tolled.

24      THE COURT:  Well, you can see you don't have any

25  case to rely on that's quite like this.  In the other cases,

1    you have someone aware of a warrant being issued or imminent

2    or you have attempts to conceal the name.  You don't have

3    any of that here in this case.

4         MR. ATKINSON:  Well, there are cases where

5    warrants hadn't existed; where there weren't active

6    investigations going on.  But I will concede, Judge Stewart,

7    that I know of no case where the constellation of all of

8    these circumstances exist in a single case; but, then again,

9    there's very few cases where a fugitive's conduct is as

10   egregious as one has here, where it strikes one so clearly

11   that the fugitive must have been fearful of being held to

12   account for the conduct.  Because most of the other cases

13   involve frauds or economic crimes and not multi-victim

14   homicide, such as we have here.

15        Even if you were uncomfortable in drawing that

16   inference, even if you find that the statute of limitations

17   hadn't tolled as to the attempted murder offenses, you

18   should still certify the two unitary offenses that -- for

19   which Bosnia seeks Ms. Handanovic's return.

20        These are single crimes with multiple victims, as

21   I indicated.  And if you find that the statute hasn't tolled

22   as to the four individuals listed in the request as having

23   survived and having been the victims of attempted murder,

24   rather than murder, then your certification should require

25   that a conviction may not be had solely on the basis of

1    victims who were injured but survived.

2            In other words, this is a single crime, and your

3    certification should specify that a conviction must include

4    a homicide victim, and it cannot rest exclusively on victims

5    of attempted murder or victims who survived, because their

6    prosecution would be barred by her -- or her extradition and

7    ultimate prosecution would be barred by U.S. statute of

8    limitations.

9            Stated differently -- and we'd be happy to draft a

10   certification that would accomplish this -- the

11   certification should require -- I'm just going to turn it

12   upside down -- should require at least one homicide victim

13   be the basis for any conviction in Bosnia.

14           That's my presentation.  I would be happy to

15   answer any more questions the Court has.

16           THE COURT:  No.  That -- just one other question.

17   On the rule of speciality, I gather your main argument there

18   is it's just not applicable here because there's been no

19   extradition yet, and that's only properly raised after

20   there's been an extradition?

21           MR. ATKINSON:  Yes, Your Honor.  We can find

22   absolutely no cases where the rule of speciality affects a

23   proceeding at this stage.  Simply -- simply said.

24           If Bosnia were to somehow breach the rule of

25   specialty, then the Secretary of State could -- could

1    enforce it.

2              THE COURT:  Okay.  All right.  Anyone need to take

3    a quick break?

4              Court reporter okay?  Okay.  Very good.

5              All right.  Ms. Hay.

6              MS. HAY:  Thank you, Your Honor.

7              Your Honor, obviously, this is a difficult case,

8    because these are serious allegations, and I want to make

9    clear that no one is in favor of war crimes or torture or

10   crimes against civilians; but Ms. Handanovic is entitled to

11   be treated fairly here.  She's a U.S. citizen.  She's a

12   mother.  She's a human being.  No matter what the

13   allegations, she should get a fair hearing in this Court

14   based on the law.  And that's really not what's happening.

15             The Government seeks to extradite her, force her

16   to leave this country, but they're not willing to follow the

17   law, as I see it, to do that.  And I don't think the Court

18   should allow that.

19             The Government asserts that they can rely on this

20   1902 treaty to extradite her.  I've written extensively on

21   that -- why the treaty should not be followed -- and we can

22   review that for a moment.  But even if that treaty were

23   followed, Your Honor, then if the Court were to allow that

24   treaty to be used, then they should follow the terms of that

25   treaty.  And I think that's where we're having a -- kind of

1    a shell game here.  They want you to use a treaty which is

2    obviously an antiquated, centuries-old treaty at this point

3    and they want to use that old treaty and say, well, let's

4    use modern cases and modern ways of understanding it in

5    other to extradite her on this modern crime.

6           War crimes were not in existence.  They were not a

7    crime when this treaty was created.  So they want to use an

8    old treaty and change it for their purposes now.  That's

9    just not allowed.

10          And so, first, I don't think they should be able

11   to use the treaty at all.  I'll just briefly -- Your Honor,

12   we briefed this, of course, but there are cases that allow

13   this Court to apply the rule of successor state doctrine

14   when -- where it's twice removed from the country that

15   actually signed the treaty.

16          Clearly, there's a Successor State Doctrine that's

17   been acknowledged in the courts where if one country

18   dissolves or expands or something changes, the countries

19   that emerge from it can succeed to the same treaties.

20          But we're now beyond that.  We're now trying to

21   take a treaty that was written in 1902, or signed --

22   ratified with the Senate in 1902, with a different country.

23   Bosnia was not a part of that country at that time.  It

24   became part of what was the confederation of different

25   countries that became Yugoslavia.  That -- Yugoslavia

1    succeeded to the treaty, but now we're trying to go one step

2    further.

3            None of the cases that the Government cites allow

4    the Court to do that.   There are -- of course there are

5    cases that have been cited where no one has raised this

6    argument exactly about Senate ratification.   So this Court,

7    though, has an obligation to look at that.

8            And I guess the question is if -- if not now,

9    when?

10           Does the Government continue this treaty as long

11   as they want?   Another century goes by?   What is the limit

12   for the Executive Branch to decide that a treaty is going to

13   just continue on and on?

14           At some point -- we have a Constitution that

15   requires that the Senate ratify treaties, and this Court is

16   given the explicit role under the statute to say whether

17   there's a treaty in force and effect.

18           Your Honor, I don't see any basis in the law to

19   say that this treaty should be in force and in effect with

20   the country of Bosnia when the Senate has not ratified it.

21           I'll tell you two points.   One is in the statute.

22   I -- I ripped my pages out of the statue book.   But if you

23   look at the statute, Extradition Statue 3181, they list the

24   treaties in which we have extradition treaties.   Bosnia is

25   not listed in the very statute that we're using.

1        In addition, in the authoritative treaties in

2   force, the document created by the State Department, where

3   they list treaties that are in effect, Bosnia is not listed

4   as having an extradition treaty with the United States.

5        Now, if it were true that the Government has

6   decided definitively that Bosnia has a treaty with the

7   United States, why haven't we updated this document?  Since

8   1992 we have recognized Bosnia as a country.

9        There's obviously a -- I think a decision to just

10  push it off, to not address it; just let the courts continue

11  to follow this.  Somebody should decide what the

12  Constitution means and apply the law.

13        So, Your Honor, there's plenty of argument about

14  that.  And, in the end, I think the Court should just rule

15  that the 1902 treaty can't be used.  The result would be, of

16  course, an appeal by the Government.  Maybe the Senate would

17  take an action.  Maybe somebody would step up and say "Well,

18  this should happen."  But if the courts don't do anything,

19  when does the Senate get to have its say?  When does

20  somebody get to say this is going too far?

21        Your Honor, if you were to apply this 1902 treaty,

22  then the fair thing to do is to actually apply the treaty;

23  to not apply something new, not apply something modern.  And

24  this 1902 treaty does not allow extradition for war crimes.

25  And the government has acknowledged it's a list treaty.  It

1    doesn't have in it a dual criminality provision that says,

2    "You can extradite somebody for an offense that's a felony

3    in both countries."

4         So many of the cases that have been cited,

5    especially in their initial briefs, are cases where the

6    treaty allows for extradition based on a felony in both

7    countries.  This treaty doesn't allow that, so we shouldn't

8    use those cases.

9         The Ninth Circuit and the Supreme Court cases that

10   talk about extradition from the 1920s and 1906 I discuss in

11   my reply to their extradition memo.  And that would be

12   *Collins*, *Factor*, *Benson* -- there's a number of them -- that

13   look at whether you have to actually have the listed crime

14   or whether it could be something close.

15        And I guess the Government was making the point

16   that if the conduct is there, then it doesn't matter if the

17   name is different.  And I would say that the Supreme Court

18   cases that make that point are in a different context.

19        Those were fraud cases.  And if you look at the

20   treaties, a lot of those treaties say that if it's -- it's a

21   fraud if it's a crime in both countries.

22        So, although there's a list of offenses, the

23   actual definition of fraud refers to fraud in both

24   countries.

25        So the Supreme Court is not saying that for any of

1    the offenses that are listed you can compare the crime in

2    both countries.  They're looking at the specifics and

3    especially fraud cases.  I think the definitions of fraud

4    vary a little bit, but it's more evident what the crime is.

5         In this case, the treaty allows extradition for

6    murder and attempted murder, for arson, for a number of

7    other crimes, but it doesn't -- it doesn't allow extradition

8    for just war crimes.

9         And, Your Honor, it's an important point, because

10   there's a statute of limitations in the treaty.  And the

11   treaty says you can't extradite somebody for an offense if

12   the time for punishing that offense in this country has

13   passed.

14        So we -- we need to have the offense.  We need to

15   define the offense so that we can know whether the statute

16   of limitations has passed, so we can know what she's being

17   allowed to be sent out of this country for.

18        I guess the Government's point is just extradite

19   her for war crimes generally and let them figure it out in

20   Bosnia, and that's really not fair.  The treaty doesn't

21   allow that.

22        I think what should be required here is the

23   Government should try to identify what murders or conspiracy

24   to murder, if that's what they're arguing, or attempt to

25   murder, she should being extradited for, and they should

1    prove probable cause for those.

2          THE COURT:  Well, doesn't the request, though,

3    have quite a bit of factual supporting information as to

4    what murders or attempted murders are at issue here?  I

5    mean, this isn't a case where we're saying, you know, war

6    crimes for killing everyone in several villages during a

7    time period over several years.  That's not what is being

8    described in the extradition papers.

9          MS. HAY:  Well, Your Honor, I think what they've

10   done is combined a number of different events that all

11   happen in this one town, in Trusina and Gaj, and essentially

12   they're charging Ms. Handanovic as if she did all of that.

13         What I believe the Government has the burden of

14   doing is to sit down and say, "Now here's what she did.

15   Here's the people that she did this to," or "Here's who she

16   conspired with and here's who was killed."

17         They've given you pages and pages and pages of

18   names, dates, et cetera.  But, in fact, most of that does

19   not -- I mean, they don't add up to 22 people.  For example,

20   we can -- I can tell you that the arrest warrant says three

21   HVO, or Croat defense counsel, individuals were executed and

22   five civilians were executed.  And then 19 Croat civilians

23   were killed and four injured.  Okay.  So that's 27 killed.

24         The prosecutor says 16 civilians killed, and she

25   lists them.  Four civilians injured.  And then three HVO

1    executed and three civilians executed.

2          First, the numbers don't match together.  The

3    investigator, who's report was submitted at page 277, she

4    lists -- or he lists -- 17 civilians, five HVO members, and

5    two persons wounded.

6          So there's a lot of facts here, but when I went

7    through this -- and I believe this was the Government's

8    burden, and they just have not done this, so I went through

9    to figure out, well, what are witnesses saying that

10   Ms. Handanovic actually did?

11         And I think from all these witnesses is what you

12   can conclude is there are witnesses who say she was part of

13   a firing squad who, upon the order of a commander, fired her

14   rifle.

15         There are few witnesses who say that she, after

16   that firing squad, walked up to people on the ground and

17   fired additional shots.

18         So if we take those allegations, which I can -- I

19   can go through this and tell you which witnesses said that,

20   that's only five or six people, Your Honor.

21         There's one witness who claimed there might be 10

22   or 12 people who were in the firing squad.  But then he said

23   he actually heard that number on TV, but he wasn't -- he

24   didn't remember how many.

25         Other witnesses said four or five people in this

1    execution-style firing squad.  So that's four or five

2    people.

3             I went through to find where are the other

4    civilians that are listed.  Where are these people?  What

5    you have are a lot of different statements that civilians

6    were found in a house, guns were shot, but Ms. Handanovic

7    was not said to be near there.

8             There are a few other individual moments.  There's

9    a woman with blond hair that one witness says was shot three

10   times in the chest.  We don't know if that was the person

11   who was injured or the person who was killed.  It doesn't

12   say.  So I don't know if that's one of the civilians who was

13   harmed, which I contend is past the statute of limitations,

14   or if that was somebody who was killed.

15            There's another incident where somebody says she

16   shot an elderly couple.  Another one of the Government's

17   witnesses says two different people shot the elderly couple.

18   So I think you have contradictory witnesses there.  And

19   given that the Government has the burden of probable cause

20   when they have contradictory witnesses, I'd say they didn't

21   meet their probable cause burden.

22            In the end, the Government argues, "Well, we have

23   proof of motive, because Ms. Handanovic clearly wanted to do

24   all of this based on Samko being killed.

25            The witnesses were pretty consistent that nobody

1   actually knew he was dead.  He had just been injured.  And

2   that injury occurred right before the alleged firing squad.

3           So that would be a motive and some witnesses

4   attributed that motive to the firing squad, who were about

5   five people that were killed.

6           If he was killed or injured right about the firing

7   squad, then that motive has nothing to do with the civilians

8   who supposedly were injured or killed earlier.

9           So, Your Honor, what I see here is Ms. Handanovic

10  was part of an army, and the witnesses all consistently say

11  that this army unit was used in a number of places.  This

12  was not a rogue army unit.  Nobody was saying this was a

13  unit intending to go out and commit war crimes.

14          This is a unit that had a task of freeing an area

15  where the HVO were blocking their -- the Republic of BIH

16  Army from its role in a war.  This is a war going on.

17          This unit was sent into a town.  They were woken

18  up in the morning at a school and given their positions.

19  The unit was joined by two other units.  And during the

20  course of that morning -- and some witnesses say this was

21  about an hour and a half, some witnesses made it a little

22  bit longer.  But in the course of that short time, and one

23  day in a war, there's an allegation that there was a firing

24  squad and five or six people were shot that Ms. Handanovic

25  was allegedly part of.

1          This is not -- this is not, as the Government is

2     trying to say, an atrocity of unbelievable proportions.

3     This is not the most egregious crime you can find.  The

4     crimes that they refer to that the War Crimes Council was

5     prosecuting were crimes at a death camp where people were

6     being tortured.  So I think the point, Your Honor, is that

7     there are a lot of facts here, but it's not fair for the

8     Government to take a series of facts that involved a whole

9     lot of people and charge Ms. Handanovic as if she's involved

10    in all 22.

11         That's really not -- that's not fair, especially

12    when the treaty doesn't say "extradite on generalized war

13    crimes."  The treaty says "extradite for murder."

14         So the fair thing to do, and what's required under

15    the law, is to see if there's probable cause to believe that

16    she committed first degree murder of any -- of any of the

17    people that they've listed here.

18         Now, I -- you know, I recognize that they have

19    witnesses who will say there was a firing squad.  And a

20    firing squad, even based on an order, would be considered an

21    intentional event.  But the rest of these, Your Honor, I

22    don't see that they've met probable cause at all.

23         So it wouldn't be fair just to extradite her and

24    say go ahead and extradite her for all of these names when

25    the Government hasn't tied the names to the actions.

1          That's their burden to do, and they haven't met

2     that burden.  I can sit down and write out a certificate and

3     put in the names, but I don't think that should be my

4     burden.  I think the Court should say the Government has not

5     met its burden.  It can't simply take a document that's

6     several hundred pages long, filled with events that are not

7     related to Ms. Handanovic, from witnesses who are not

8     describing her, and -- and ask the Court to just certify a

9     full crime.

10          The case that the Government refers to, I think,

11     assists in that.

12          The cases under this -- this treaty, most of them

13     that I found were extraditions for murder, for robbery, for

14     specific crimes.

15          The *Artukovic* case that the Government refers to

16     and that I write about, the Court did not extradite for war

17     crimes.  That was what probably the offense in Yugoslavia or

18     Bosnia, or wherever he was going, was going to be; but the

19     Court actually listed murder.  They listed murder of 400

20     people, murder within a certain town, and we don't know what

21     evidence was submitted to the Court to help the Court to

22     write that kind of statement.

23          But it's clear that the Court listed murders and

24     identified, to the extent possible, the number and the place

25     of the murders.

1          That's what I believe the Government should do

2     here.  And we have -- I could write it.  I mean, we have the

3     list of the places where execution-style murders

4     apparently -- or supposedly took place.  We have a few

5     witnesses who have alleged that Ms. Handanovic specifically

6     fired a gun.  Some of those are not known to be murders,

7     from what I can tell here.

8          But the events that the Government is essentially

9     saying that because somebody in some of these units

10    somewhere killed people, Ms. Handanovic should be held

11    accountable.  That's really not what the law requires.

12         Your Honor, the Government urged you to follow

13    that *Arambasic* case.  That's from the Southern District of

14    South Dakota.  And they provided a copy of that.  I agree

15    the Court there went through a very detailed analysis.  They

16    did a dual criminality analysis.  The difference between

17    that case and this case is that Mr. Arambasic had already

18    been convicted.  He had been convicted in absentia, and he

19    was being extradited to go back and face the sentence for

20    that.

21         The Government says, "Well, the legal analysis is

22    the same."  But there is a difference.  In this case, we're

23    arguing the statute of limitations has passed for some of

24    these crimes, that she wasn't involved in some of these

25    crimes, and that the treaty doesn't allow her to be

1    extradited for them.

2              So we do need to analyze what -- what she did that

3    the Government has shown probable cause to believe so that

4    we can know what she could go get prosecuted for.

5              In the case in South Dakota, it was already a

6    fait accompli.  He had already been convicted.  The Court

7    said, okay, he was convicted of events that constituted

8    murder and arson.  And so there's no information there that

9    there was a statue of limitations problem.

10             So I think the Court was very careful there to

11   make sure that the evidence actually matched what he could

12   be charged with.  But it is a different posture, because

13   it's already been done.  So he's -- there's no danger that

14   he was going to go back and be charged with the things he

15   couldn't be convicted of under the statute, because he had

16   already been convicted.

17             I want to go back briefly on a few of the points

18   that the Government made earlier on the fact -- the question

19   of whether this defendant has actually been charged and

20   whether that question has been met.  I do think the *Emami*

21   case that the Government cited is distinguishable and I did

22   what I could to distinguish that in my brief.

23             What is noteworthy there is the -- the Court

24   mentions, "Well, the defendant gets the documents listed in

25   the treaty and so that's how you know what you're going to

1   be charged with."

2           As you know, I filed a motion for discovery to get

3   the rest of the documents that might have been used for the

4   arrest warrant.  The government denied that motion.  The

5   Government agrees they haven't given us all the documents

6   that might exist to support these charges.  So we're left

7   with the five witnesses that the Government gave us, a

8   summary by the prosecutor, and I think it's unfair to have

9   this defendant simply go face the possibility of being

10  charged in Bosnia with crimes that are not covered by the

11  treaty, when we didn't even get all the documents that the

12  treaty says -- I believe the treaty says we should get.  We

13  should get all of the warrants and depositions that were

14  used -- all the evidence and depositions that were used to

15  get this arrest warrant.

16          The Government also says, "Well, this would be

17  ridiculous.  Bosnia would be a -- the United States would

18  become a haven for people from Bosnia.  They could never get

19  sent back there."

20          Really, what would occur, Your Honor -- or what

21  could occur, Your Honor -- is the Government could enter a

22  new extradition treaty with Bosnia and other countries so

23  that this old 1902 treaty wasn't any longer hampering them.

24          There's nothing that prevents the Government from

25  getting a treaty that has more modern provisions, which

1    would be that they can extradite people based just on
2    warrants and not indictments.
3              But most of that is in the brief already,
4    Your Honor.
5              You asked about the *Veletic* case, and I can give
6    you a copy of that.  It is a case where the defendant was
7    convicted in absentia and --
8              THE COURT:  I think you should supplement the
9    record, since you referred to it and I couldn't find it in
10   there.
11             MS. HAY:  I can make this Defendant's Exhibit --
12             THE COURT:  Well, you can simply file it later.
13   You don't need to do it today.
14             MS. HAY:  Okay.  It's from the District of
15   Minnesota.
16             So what -- I think what the Government and I
17   agreed on in -- in understanding what kind of crimes could
18   be extraditable is that this is not a treaty that includes
19   dual criminality as part of the main offenses for which you
20   can extradite somebody.  It's a list treaty, and so you have
21   to extradite somebody for a crime listed there.
22             I hadn't actually analyzed Your Honor's question,
23   which was what about dual criminality for that second point
24   of participation, and we can certainly go back and look at
25   that.

1    The Government says they didn't find any cases
2    addressing that.  I don't think it alters the analysis very
3    far, because it still has to be participation in one of the
4    listed offenses.
5        So we still get back to the fact that there's a
6    list.
7        As I pointed out in my brief, there's a way to
8    change that list.  It's not by simply determining, well,
9    maybe a new crime that we've invented now should be
10   considered there.  It's to amend the treaty.  And I gave an
11   example.  Great Britain amended their treaty.  They had a
12   similar list of murder, arson, rape, and they amended their
13   treaty to include abortion.  Some people might argue, well,
14   abortion is another form of murder, so you could just
15   extradite somebody for that.  They didn't allow that to
16   happen in that case.  The -- Great Britain just amended
17   their treaty to include a new crime.
18       That's equivalent to what the Government is trying
19   to do here.  They're trying to say, "Well, war crimes are
20   just really the same as murder, so let's just extradite for
21   war crimes."
22       I believe what the case is saying is it doesn't
23   have to have the same name.  You have to extradite for
24   murder.
25       THE COURT:  Well, you agree that war crimes, the

1  statutes in Bosnia, includes, as part of the description, at

2  least as to prisoners of war, murder -- and as to civilians,

3  I think it says "resulting in death and attack on civilian

4  population resulting in death" -- that those descriptions

5  certainly are analogous to murder.  Even, though, the name

6  "war crime" is not specifically listed, is your argument

7  because it's called "war crime," and "war crimes" aren't

8  listed, she can't be extradited at all?  Or is your argument

9  if there's going to be extradition it can only be for

10  murder?

11            MS. HAY:  Your Honor, I'm making both arguments.

12            THE COURT:  Both arguments, okay.

13            MS. HAY:  First, she shouldn't be extradited at

14  all, because the statute requires that the Government

15  provide a complaint which covers a crime provided for in the

16  treaty that's in 18 U.S.C. §3184 which says they have to

17  have a complaint for a crime provided in the treaty.  My

18  argument is this isn't a crime provided for in the treaty.

19            If the Court were to disagree with that, then I

20  think the -- the next step is to say, "Well, if you're going

21  to look at the elements of this and not just the name, then

22  she can only be extradited for the portions which, in fact,

23  are murder.  They're attempting to extradite her for attack

24  on civilian populations, settlement, civilians, or persons

25  unable to fight, which results in death, bodily injury, or

1    serious damaging of health.

2              I believe that the grave bodily injury and

3    damaging of health would be too far under this treaty.

4              THE COURT:  Could be attempted murder, couldn't

5    it?

6              MS. HAY:  Yes, Your Honor.  I guess my argument

7    there is the statute of limitations has passed for that.  So

8    I guess we'll have to address that in a moment.

9              In addition, attack on civilian population, that

10   doesn't necessarily include the mens rea of first degree

11   murder.  It has to be intention to kill someone.

12             So the extent that could be war crime -- I mean,

13   war time activity where somebody is fighting a battle and

14   you're attacking a settlement and it results in death, there

15   could be a recklessness involved there that's not the mens

16   rea that the Government has to prove.

17             So, to the extent that they have evidence -- and

18   Your Honor, I believe they have set forth some evidence here

19   that the Government could list for us to try to show which

20   of this meets the mens rea for first degree murder.  I

21   pointed out the execution-style section as one example.

22             But to just -- just extradite her for the war

23   crimes when they include so many -- so many offenses that

24   are not in the treaty, I don't think would be right.

25             Second part of that is to attack without selecting

1    a target by which a civilian population is harmed.  Again,

2    that's just too broad.

3            The third part is depriving another person of

4    their life, intentional infliction of severe physical or

5    mental pain or suffering, inhumane treatment or et cetera.

6    So that's --

7            THE COURT:  Well, they're only charging in (a) and

8    (b).

9            MS. HAY:  It's (a) and (b) of War Crimes Against

10    Civilians.

11            THE COURT:  Right.  And same under the Prisoners

12    of War?

13            MS. HAY:  It's (a) under War Crimes Against

14    Prisoners of War.  I'm reading from page 15 of their

15    surreply.  Not actually from the statutes.  I believe

16    they're charging her with War Crimes Against Prisoners of

17    War under (a).

18            THE COURT:  Now, I think -- I was actually going

19    to ask that question, because I think that they're charging

20    under (a) and (b), under both statutes.  So I need to --

21            MS. CHANG:  Your Honor, if I may, I sought

22    clarification from the Bosnian prosecutor's office about

23    this discrepancy.  And the Bosnian prosecutor confirmed that

24    Ms. Handanovic is charged only under 175(a).  That's War

25    Crimes Against Prisoners of War Article 175(a) and not (b).

1              There was a -- it was a typographical error in the

2      first -- that first document.  But in the -- in the

3      documents from the Court, from the Bosnian Court, you'll see

4      that the Court mentions that she is charged only under

5      175(a) and not (b).

6              THE COURT:  How do we deal with that?  The warrant

7      lists both.  You're saying that the warrant is inaccurate?

8              MS. CHANG:  Your Honor, our position is that the

9      warrant, as we mentioned in our briefing, is not the

10     charging document.  It just basically authorizes her to be

11     brought into custody.

12             THE COURT:  So you're saying that according to the

13     charging document, which is the Court's order, it's only

14     subsection (a)?

15             MS. CHANG:  Correct, Your Honor.

16             THE COURT:  Okay.  Okay.  Sorry.  Ms. Hay, go

17     ahead.

18             MS. HAY:  Your Honor, I hadn't heard, perhaps, the

19     Government's statement that they're not relying on the

20     warrant, they're relying on the Court's charging document or

21     the Court's order taking her into custody.  I would argue

22     that under *Sacirbey* that's not really sufficient; that, in

23     fact, they have to have a warrant for arrest and that the

24     Court's order taking her into custody is a limited order.

25     It's not actually a warrant of arrest.

1      I don't know any cases that say that the Court's

2  order itself is sufficient.  So as another argument about

3  the sufficiency of their evidence, I would keep that there.

4      MS. CHANG:  Your Honor, if I may clarify?

5      The arrest warrant from the -- the Government's

6  position is that the arrest warrant as a requirement of the

7  treaty has been supplied.  The arrest warrant is a writ that

8  authorizes law enforcement officers to take Ms. Handanovic

9  into custody.

10      That is all that the treaty requires.

11      THE COURT:  I understand your position.

12      MS. CHANG:  Thank you.

13      MS. HAY:  Your Honor, there's so many different

14  cases we've all cited.  I think the one case that I pulled

15  out recently to just try to figure out what -- what would be

16  the right model is one we cited earlier called *Man-Seok*

17  *Choe* -- M-A-N, hyphen, S-E-O-K, second word, C-H-O-E --

18  versus *Torres*.  It's 525 F. 3d 733.  It's a Ninth Circuit

19  case from 2008.  It's not addressing this treaty, but I

20  found it had a number of the same issues in it that I

21  thought might be useful.

22      One, it addresses the statute of limitations in

23  tolling.  The defendant in that case had left his -- left

24  the country, and the Court found that the statute of

25  limitations was tolled.

1    In that case the defendant was stopped at the

2  airport, questioned about the crime, was released, and then

3  slipped out of the country without his passport.  And the

4  Ninth Circuit ruled that that was enough evidence of flight.

5    In this case, Your Honor, the Government has the

6  burden of proving the defendant fled Bosnia with the intent

7  of concealing herself and evading indictment, and I don't

8  believe Government has met that burden in any way.

9    As pointed out, hundreds of thousands of people

10  left Bosnia in 1995 in that time period because it was a

11  war-torn country.  She was 23 years old.  Her sister

12  testified that she was trying to go to Germany to meet up

13  with her sister, but Germany at that time was not accepting

14  refugees.  She went to Austria, applied for refugee status

15  in the United States, and the Government submitted the

16  document that shows she came mere.

17    THE COURT:  I'm sorry to interrupt you.  A

18  question just came to my mind.  It was not clear to me, from

19  what I read, whether her entire family was in the U.S. or

20  has come to the U.S., or whether she still has family in

21  Bosnia.

22    MS. HAY:  Your Honor, her parents still have a

23  house in Bosnia.  Her parents are still there and her

24  brother is there.

25    THE COURT:  Okay.

Proceedings - 9/29/11

1    MS. HAY:  If I could find the page number in

2   the -- in the Government's submissions, they mentioned

3   speaking with her brother, talking with him, to find out

4   where she was in the United States.

5    THE COURT:  Right.  That's true.

6    MS. HAY:  Your Honor, it's further evidence she

7   wasn't fleeing from Bosnia.  We heard testimony from her

8   sister, and submitted it as one of my exhibits, the refugee

9   travel document, which shows that during the time the

10   statute of limitations had not tolled she returned to

11   Bosnia.

12    So the Government is arguing that as of 1995 she

13   had fled; but, yet, she was back in Bosnia.

14    And Government's Exhibit C -- well, Government's

15   Exhibit 11 has in it a number of pages, at which page 6 is a

16   1997 license that Ms. Handanovic obtained back in Sanski

17   Most, in her country, when she returned during that period

18   where we submitted the travel documents.  She returned back

19   to her own town.  She got an identity document there under

20   her own name.  And this was for business purposes or other

21   purposes because her family still had a house there.

22    So during the time the Government is saying she

23   fled, she's, in fact, right back in her own town, talking to

24   the Government, and even has an identity document created.

25    So there's not only no evidence that she fled

1    Bosnia with an intent to avoid indictment, she clearly went

2    back to Bosnia during the time of the statute of

3    limitations.   She returned again in 200 -- I think it was

4    3 -- for her sister's wedding.

5            The Government mentioned something about name

6    changes.   She officially changed her name upon citizenship,

7    as one's allowed to do, so that her nickname Sammy, short

8    for Rasema, became her first name, and Rasema became her

9    second name.   That's on the documents.   And then her last

10   name, of course, changed when she was married.   None of

11   those are evidence of hiding identity.

12           And, in fact, the Government's file, as we noted

13   in our brief, has a number of documents in her official

14   record that show each one of those name changes.   So these

15   weren't hidden changes.   These were official changes.

16           For that reason, Your Honor, and because the

17   Government didn't put in any evidence that Ms. Handanovic

18   had any awareness at all of the prosecutions that were

19   beginning in Bosnia when she left the country or that she

20   would have reason to know about them, I submit the

21   Government failed to meet its burden of showing that she

22   fled the country with intent to -- of avoiding the

23   indictment.

24           The Government says this is a mass murder and

25   everyone should know that they would likely be prosecuted.

1    I think that's an unfair characterization of a wartime event

2    over a single day when a soldier follows the orders of a

3    commander, as all of these witnesses said.

4           So this isn't the same as somebody who went to a

5    school with a rifle and mowed people down and wouldn't know

6    they would be prosecuted.  This is an entirely different

7    matter as that of a foot soldier in the Army, Your Honor.

8           So back on the tolling of the statute of

9    limitations, the Government, I don't think, met that burden;

10   and, therefore, we have to be able to identify which crimes

11   the defendant can be extradited for and which not.

12          I know the Government continues to argue that the

13   rules of specialty isn't even something we should bring up

14   here, but in *Man-Seok Choe* -- if I'm pronouncing it right --

15   the Ninth Circuit case I was just mentioning -- they also

16   just note that under the rules of specialty they need to

17   identify the crimes because of the statute of limitations

18   and make sure that the person is only extradited for the

19   crimes that are allowed under the treaty.

20          That's not to say that we can raise any objections

21   right now to what Bosnia is doing in this Court.  We have to

22   wait until she gets to Bosnia.  But certainly this Court

23   should follow the idea that under the treaty one should only

24   be extradited for crimes that are permissible, that are not

25   barred by the statute of limitations, that are listed in the

1     treaty, and the Court should list those crimes in the

2     certification.  That's what the rule of specialty is about.

3           This *Man-Seok* case also talks about dual

4     criminality; when a treaty allows dual criminality and when

5     it doesn't.  And, of course, the Government's position in

6     our case is that the treaty does not involve dual

7     criminality and they should just follow the list.  Which, I

8     agree that the list is what controls here.

9           I think one of the confusing points is that

10    sometimes the distinction between a list treaty and the

11    other form of treaty is called a dual criminality treaty.

12    So there's that analysis.

13          And then there's also the question about whether

14    the treaty itself has language in it that has some

15    requirement that the crime be both here and in the -- in the

16    United States and in the other country.

17          I pointed out a number of cases that say that this

18    treaty also requires the Court to do a dual criminality

19    analysis, because, first, you have to follow the list, and

20    then you have to make sure it's a crime to both

21    jurisdictions.

22          I think the Government's point is well taken, that

23    if you follow the list, that it collapses the analysis,

24    because the parties have already decided that these crimes

25    are crimes in both jurisdictions.

1          Again, that gets back to the point that you have

2    to have a crime on the list.  You can't extradite for a

3    different crime.

4          Your Honor, the Government suggested that maybe

5    the Court could solve the question of certification by just

6    saying that she could only be convicted if there's at least

7    one murder involved.  I don't know of any precedent to limit

8    the certification that way.  The cases that I've seen that

9    limit the certification like this *Man-Seok* case in -- there

10   were several others that I listed in my brief that I could

11   try to pull back up, where the Court said, "Let's limit the

12   certification," they are trying to limit the crime that she

13   could be charged with so that it fits the statute.

14         The Government sounds as if they're saying, well,

15   as long as one element is murder, she could be charged with

16   everything else.  As long as there's one murder, go ahead

17   and put in evidence of harm, go ahead and put in evidence of

18   attack on civilian populations, or whatever Bosnia wants in

19   that country.  I think the requirement is it be listed

20   specifically what can she be -- what can she be charged

21   with?  And we should list the exact murders.  And that's the

22   Government's burden of proof.  And I don't think -- I don't

23   think they waded through this evidence to do that.

24         Your Honor, if you'd like further briefing, I

25   would be willing to go through and put together what I think

1  the witness statements show.  I've done it to show which of

2  the witness statements of A, B, C -- A, B, D, E, and O

3  actually place Ms. Handanovic at a certain place before or

4  after alleged motivating factors are stated such as that

5  Samko was injured, and the Court can then determine, well,

6  which of these actually should be charged as murder.

7          Because the way I read this now is there's 22

8  people, maybe 19 people, maybe more, that are either injured

9  or harmed, and they're seeking to extradite her for all of

10 that.  And the specific witness statements don't match up to

11 that.

12         THE COURT:  Well, she makes a good point that

13 there seems to be discrepancies here between the number of

14 potential victims killed or injured and things don't match

15 up.

16         If -- assuming that she's right, that the

17 extradition here has to be limited to the crimes listed,

18 therefore it must be limited to murder or attempted murder,

19 depending on the statute of limitations, what, then, should

20 the certification order read?  Shouldn't it read:  Yes, you

21 can extradite for those crimes listed in the treaty, namely

22 murders or attempted murders?  And can you leave it wide

23 open when you've got a problem with discrepancies as to who

24 you're really talking about as potential victims?

25         Either one of you is fine.  Go ahead.

Proceedings - 9/29/11

1          MS. CHANG:  Your Honor, I -- if I'm understanding

2     Counsel correctly, she is stating there's a discrepancy

3     based on the arrest warrant, the numbers that she finds in

4     the arrest warrant versus --

5          THE COURT:  Well, she's finding other

6     discrepancies, though.  She's finding -- I tried to write it

7     down.  Although, she went through it pretty fast.  Between

8     the warrant with the prosecutor's summary, and then some

9     other evidence listed on page 277, which is --

10          MS. HAY:  There's a statement by an investigator

11     who's listing the type of crimes that had been discovered.

12          THE COURT:  Okay.  You have an investigator

13     saying -- having one count, the prosecutor having another

14     count, and the warrant, obviously, you have, yet, a third

15     count.  Is that -- am I summarizing it correctly?

16          MS. HAY:  Yes, Your Honor.

17          THE COURT:  Which is the page with the

18     prosecutor's statement on it?  Do you have that?

19          MS. HAY:  I have it at page 27.

20          THE COURT:  Okay.

21          MS. HAY:  They don't actually count the number of

22     civilians.  It's a list of names.  So I added -- I counted

23     them up.

24          THE COURT:  Okay.

25          MS. CHANG:  Well, Your Honor, the arrest warrant,

1    as you know, the Government has stated its position on that,

2    it -- it is not a comprehensive document as to what she's --

3    which offenses, in particular, she is being -- sorry, which

4    deaths, in particular, she's being charged with committing.

5              The arrest warrant was the authority given to law

6    enforcement officers to take her into custody.

7              The Government submits that the count in the

8    prosecutor's affidavit, which is the actual request for

9    extradition, would be the authoritative document, as to the

10   deaths for which she sought -- deaths and attempted murders

11   for which she is sought.

12             And I did conduct a count of all the names.  That

13   was a while ago, Your Honor, but I do believe it does come

14   up to 22 individuals dead and four injured.

15             MR. ATKINSON:  Judge, I might add that this has

16   been an organic process.  This has been an ongoing process.

17   When one looks at the date of the warrant and then moves

18   forward, you'll see that things have clarified.  And it

19   makes logical sense to rely upon the latest-dated document,

20   which is, I believe, the prosecutor's statement.

21             In any event, the prosecutor's statement ought to

22   be the most authoritative.  There are cases that hold that a

23   sworn prosecutor's statement summarizing the evidence, such

24   as we have here in -- in tab 5, before we get into the

25   exhibits appended, is sufficient, predicated a -- an

1    extradition in and of itself, you know, absent any witness

2    depositions or witness statements.  So that's what I'd rely

3    upon.

4            It's not unusual in a -- in an investigation for

5    the facts to change as the investigation proceeds.

6            THE COURT:  Well, the investigation should have

7    been completed by the time you're putting together a request

8    for extradition.  I mean, you're not doing the investigation

9    here in the United States.  You're simply relying on what

10   was done prior to the time Bosnia submitted the request and

11   then you submitted it here.

12           So I'm not sure I understand you when you say

13   things are ongoing or progressing.

14           MR. ATKINSON:  Well, the warrant predates the

15   prosecutor's statement by a -- by a fairly significant

16   period of time, Judge Stewart, so --

17           THE COURT:  Yeah.  All right.

18           MR. ATKINSON:  So the -- the warrant represents

19   the facts as they were then understood.  If I'm not

20   mistaken, I think the judge's detention order post-dates the

21   original prosecutor's warrant.  And I might add that there's

22   simply no distinction between a court order such as the

23   order issued by Judge Jukic ordering someone to be taken

24   into custody, and a warrant.  That's exactly what a warrant

25   is.  It's a judicial order requiring somebody to be taken

1    into custody.  It certainly doesn't set the parameters for a

2    charge.

3              And then we have the prosecutor's statement,

4    which, you know, makes -- makes sense, makes logical sense

5    that that would be the -- you know, the facts as they were

6    then understood when she executed the affidavit.

7              I might --

8              MS. HAY:  Can we just clarify those facts?  I

9    believe that Judge Jukic's opinion, which is under tab 2 --

10   Exhibit 2, tab 5, is dated December 21st, 2009, and the

11   prosecutor's --

12             THE COURT:  Summary?

13             MS. HAY:  -- statement, summary, is July 7th,

14   2010.

15             So I guess this is part of the issue, is where --

16   what is the charging document that she's been extradited on?

17             She's -- we heard the warrant that I was looking

18   at originally, tab 12, is not sufficient.  That only lists

19   six people, I believe.  And so now we hear that's not really

20   enough.  We can rely on Judge Jukic's opinion.  That's from

21   December of 2009.  I can't recall if I listed -- if I went

22   through and counted all of the people that were described in

23   this, but I don't believe it has enough detail to, in

24   itself, define what she should be charged with.

25             And then now we're hearing, well, we could rely on

1   the prosecutor's statement from July of 2010.

2           THE COURT:  Well, the prosecutor's statement is

3   actually the request for extradition.  That's what it's

4   labeled; right?  That's the one dated July 7th, 2010.

5           To my mind, that is the request for extradition

6   and that is the document that we all have to work with.

7           MR. ATKINSON:  Right, Judge.  And, again, to

8   emphasize, this has been an organic process.  The facts

9   contained in the first warrant, back at tab 13, I think,

10  which is the, you know, first dated document that we're

11  discussing here, relate to facts as they were then

12  understood.  And that was a couple years ago.

13          They proceeded to get a judicial order.  And,

14  quite frankly, this judicial order requiring detention,

15  although it may not be apparent from its face, unless you

16  really get into the weeds on this, Judge Stewart, if you

17  read it very carefully, you'll see that essentially what

18  they're requesting is the authority to issue an

19  international warrant.

20          THE COURT:  I see that.  The judge had to find

21  that this person was actually a fugitive of another country

22  in order to authorize the warrant.

23          MR. ATKINSON:  Right.  There wasn't a separate

24  piece of paper, that I'm aware of, that constitutes a

25  warrant.  It's just necessary in order to put it into

1    Interpol and things of that nature.

2             But that, Judge Jukic's order, represents the

3    facts as they were then understood.

4             And, finally, we have the last dated document,

5    which describes the facts as they're finally understood.

6    It's not unlike a case here in the United States in which a

7    search warrant is sought at the beginning of an

8    investigation based upon facts as they are then understood,

9    and then, as the investigation proceeds and the facts

10   sharpen and the understanding of the facts becomes better

11   and more accurate, a final affidavit, perhaps in support of

12   a complaint for an arrest, may differ markedly from the

13   facts as they were understood at the beginning of the

14   investigation.

15            I would not --

16            THE COURT:  Except, normally, you have a --

17   everything is the same.  You've got an arrest warrant for

18   certain charges.  Those charges, then, are the same as the

19   charges for which extradition was requested.

20            Here you have the same charges.  The problem is

21   you have different supporting allegations, I guess, for

22   those charges.

23            The charges remain the same.  War Crimes Against

24   Civilians, War Crimes Against POWs -- well, even then, I

25   guess, you switched, though, and deleted one of the

1    subsections in one of the statutes.  But what's changed are

2    the specific allegations underlying those charges.  Am I

3    right?

4            MR. ATKINSON:  Well, to reflect the facts as

5    they're understood at various phases during the

6    investigation.

7            Judge Stewart, what's required is a warrant and

8    statements of witnesses to support extradition, essentially.

9    And, again, our position is that this is a unit that the

10   crime for which Ms. Handanovic is sought is a unitary crime.

11   It's a unitary crime involving multiple victims.

12           THE COURT:  Yes.  But the problem is the treaty

13   doesn't say you can extradite for a unitary crime of

14   multiple victims.  That's not what the treaty says.  The

15   treaty says you can extradite for murder or attempted

16   murder.  And those are, as you have properly noted,

17   incorporated as -- as conduct or acts chargeable as war

18   crimes.

19           I mean, you're right about that.

20           MR. ATKINSON:  Well, the answer -- the answer,

21   then, is the last dated document, which is actually the

22   request for extradition, contains the facts as they were

23   then understood, and I -- Bosnia is bound to those facts

24   now.  And if the Court wants to include the names of the

25   victims and the precise number, then --

100

1          THE COURT:  Well, I don't know if I want to.  It's

2     a matter of what the treaty is going to require.

3          MR. ATKINSON:  If the Court believes that that's

4     necessary.

5          One point I wanted to make, Judge Stewart, and

6     perhaps this might be a good time to do that, with respect

7     to the analogy, the degree of akinness, as it were, between

8     the war crimes statutes and the murder, as we understand it

9     here in the United States, I point the Court to page 32

10    where the Bosnian prosecutor says in the second -- the

11    second paragraph, in number six, "Such crimes can only be

12    committed with intent," referring to crimes under Article

13    173 and 175.

14         So when one toggles back to Sections 173 and 175,

15    in which the Bosnian statutes are set out, one needs to take

16    that into consideration that in -- for example, in

17    173(1)(a), when there's a description of an attack on a

18    civilian population which results in death, that's which

19    intentionally results in death.  And, similarly, in 175,

20    even though murder is parenthetically mentioned there,

21    there's also an intent requirement.

22         I also would like to point out to the Court that

23    this debate about whether an individual can be prosecuted in

24    Bosnia in absentia seems to be contradicted conclusively by

25    Ms. Budimir's affidavit in the paragraph immediately above

1    the bolded War Crimes Against Civilians and War Crimes

2    Against Prisoners of War.

3            If you read that paragraph, Judge Stewart you'll

4    see exactly what I was referring to earlier and was unable

5    to put my hand on it earlier, where Bosnian law provides no

6    indictment shall be issued, the suspect has not been

7    questioned.  Since the suspects aren't in the -- in Bosnia

8    and Hernzegovina, they can't be questioned, and therefore no

9    indictment would be raised.

10           Now, if there was some case somewhere where

11   someone was prosecuted in absentia, in Bosnia, I would wager

12   they will find that it predates the enactment of that

13   statute.

14           THE COURT:  Okay.

15           MS. CHANG:  Your Honor, if I may address your

16   question to what the treaty requires in terms of

17   certification?  A couple -- one prefatory mark, and that is

18   the list treaty, it is true that it lists offenses by name,

19   but the Supreme Court is clear that those named offenses

20   indicate categories of offenses, and that the -- the Supreme

21   Court following the treaty construction principles of

22   liberally construing treaties has established that treaties

23   should not be construed over technically and strictly, but

24   should be construed to enlarge the rights of the parties and

25   to further the goals of the extradition treaty, which is to

1    allow for extradition of individuals.

2            Now, with that as a preface, the various cases

3    that Ms. Hay had cited and which the Government analyzes on

4    pages 13 and 14 of our surreply, opposition of

5    extradition -- to extradition demonstrate the long track

6    record of extradition magistrates certifying individuals for

7    extradition for the offenses for which extradition is

8    sought.  And that has included certifying *Pajkanovic*,

9    mentioned on page 13, for aggravated robbery, the offense

10   for which extradition was sought, even though aggravated

11   robbery, by its terms, was not included in the list.

12           It also includes certification for *Zelenovic* for

13   attempted homicide, the offense for which his extradition

14   was sought, even though the words "attempted homicide" are

15   not included in the list.

16           Also, in *Arambasic*, the case that Mr. Atkinson

17   analyzed in some depth, the magistrate, as well, there,

18   stated that Mr. Arambasic is to be extradited on the charges

19   for which extradition is sought.  And that is because the

20   only charges that -- that any fugitive is facing are those

21   charges pending in the foreign country.

22           THE COURT:  Well, what I hear you saying, though,

23   is the only charges for which they're sought in Bosnia --

24   which is sought in Bosnia, really is murder and attempted

25   murder.  That's equivalent to murder or attempted murder.

1    So the certification could very well list War Crimes Against

2    Civilians or Prisoners of War and we will presume that means

3    only charges of murder and attempted murder unless the Court

4    finds that attempted murder was tolled by the statute of

5    limitations.  Then you'll have some qualifying statement

6    that it will be war crimes premised on the actual killing,

7    as opposed to any attempted murder.

8              MS. CHANG:  That's correct, Your Honor.

9              THE COURT:  Okay.  Yes, Ms. Hay.

10             MS. HAY:  Just responding to that argument,

11   Your Honor.  The case that the Government cited, aggravated

12   robbery was not in the list, but robbery is in the list.

13   Attempted homicide is not in the list, but attempted murder

14   is in the list.  Those are very equivalent.  I think that's

15   what the Supreme Court was talking about when they said the

16   actual name is not as important as the offense.  But the

17   Government stretches far to say that war crimes is the same

18   as murder.

19             I think the way to address this -- first, of

20   course, I don't think the Court should certify any

21   extradition, because war crimes is not listed in there.  If

22   the Court were inclined to do that, then you should

23   extradite only on the offense of murder or attempted murder

24   if the statute of limitations were not tolled, and list the

25   individuals that the defendant is accused of murdering.

1           That's what the Ninth Circuit did -- the District

2    Court in the Ninth Circuit did in the case -- I'll say it

3    wrong now.  It's not *Arambasic*.  It's the other one.

4    *Artukovic*.  So in that case they specifically listed murder

5    and then, based on the evidence the Government provided,

6    describes the area of the people who had been murdered.

7           That's, I believe, what should happen in this

8    case.  If you're inclined to even go that far.

9           I did want to point out that the -- excuse me --

10   the statute, 18 U.S.C. § 3184 requires that there be a

11   complaint made, under oath, charging a person with having

12   committed a crime provided for by the treaty.

13          And so what I'm understanding is the complaint

14   under oath is the complaint of Mr. Atkinson, which is

15   document docket 1 in this case.

16          This is a complaint that's charging her with

17   committing a crime that's supposed to be provided for in the

18   treaty.  My argument is that this crime -- war crimes is not

19   provided for in the treaty, so, of course, the Court should

20   just deny extradition.

21          To the extent that you want to take a view that is

22   analogous to murder, this is the document I think we have to

23   rely on under the statute.  This document refers to the

24   warrant for arrest from September of 2009.  It doesn't

25   discuss the judge's -- as far as I can see, the judge's

1    statements.  I mean, this says that a warrant for her arrest

2    was issued September 21, 2009, by the prosecutor's office.

3            That's the document I had been relying on, which

4    only listed six or so individuals.

5            The Government now says that's merely not what

6    they're relying on.  But that's what's stated in

7    Mr. Atkinson's complaint.

8            This lists the fact that they're relying on.  It

9    says there were 16 civilians killed.  That's what I'm

10   disputing.  I don't believe I've seen evidence that

11   Ms. Handanovic should be held culpable for 16 civilian

12   deaths.  There's just not evidence of that.

13           It refers to her alleged participation of

14   firing-squad-style execution of three HVO soldiers.  If

15   there's evidence of that, that would be an example,

16   Your Honor, that the Court could formulate an extradition

17   for murder for that offense.  That's in the Government's

18   complaint.

19           And I just -- I don't see the other -- other bases

20   for the kind of charge the Government is asking for here.

21           So that document, that's the complaint, that's

22   what we have to rely on under the statute, and I think that

23   complaint is insufficient based on all the arguments we've

24   made.  The 1902 treaty should not be continued indefinitely;

25   that the Government should go get a real treaty ratified by

```
 1   the Senate if they want to conduct these kind of
 2   extraditions.
 3         To the extent the Court is going to rely on it,
 4   you should rely on the actual terms of the treaty, and that
 5   list does not include war crimes.
 6         If Your Honor would like post-hearing briefing, of
 7   course, we would be happy to brief additional questions if
 8   it's something that would be of use.
 9         THE COURT:  Do you have anything else?
10         MR. ATKINSON:  No, Your Honor.
11         THE COURT:  All right.  Obviously, I'm taking this
12   under advisement, and I'll be issuing a written opinion and
13   order.  If I decide I want supplemental briefing, I'll let
14   you both know.
15         At this point I am expecting a copy of that
16   *Veletic* case that you rely on.  You can simply file that as
17   a supplement to your -- to your memorandum, since it's just
18   a case.
19         Is there anything you were going to speak on,
20   Mr. Atkinson?
21         MR. ATKINSON:  I'm sorry.  I didn't hear you,
22   Your Honor.
23         THE COURT:  I'm sorry.  Was there something you
24   said you wanted to provide?  Now I don't remember.
25         MR. ATKINSON:  I think it was a -- the provision
```

Proceedings - 9/29/11                                      107

1    in the prosecutor's affidavit relating to intent.  I've

2    found that.

3            THE COURT:  No.  I think it is to support your

4    argument that among those who were indicted in July 1995 --

5    they included some low-level individuals --

6            MR. ATKINSON:  Lower-level individuals.

7            THE COURT:  -- that went to --

8            MR. ATKINSON:  Yeah, we'll provide that.

9            THE COURT:  Okay.

10           MR. ATKINSON:  If I'm in error, I'll make sure the

11   Court understands that as well.

12           THE COURT:  Okay.  I would appreciate that.

13           All right.  Thank you.  It's been very helpful.

14   I'll try not to delay getting my decision out to you.  If I

15   need something further, you'll hear from me.

16           MR. ATKINSON:  Thank you, Your Honor.

17           MS. HAY:  Thank you.

18           THE COURT:  Court is in recess.

19       (Extradition hearing was concluded at 12:11 p.m.)

20

21

22

23

24

25

1                          CERTIFICATE

2              I hereby certify that the foregoing is a true and

3      correct transcript from the stenographic record of the

4      proceedings in the foregoing matter.

5      /s/ Jill L. Erwin                   Date: 10/19/11
       Jill. Erwin, RPR, CRR, CSR
6      OR CSR No. 98-0346

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25