1     IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF OREGON

3                Portland Division

4

5    IN THE MATTER OF THE              )
     EXTRADITION OF                    )
6                                      ) Case No. 11-MC-09097-ST
                                       )
7    RASEMA HANDANOVIC,                ) October 20, 2011
     aka "ZOLJA,"                      )
8    aka SAMMY RASEMA YETISEN,         ) Portland, Oregon
     _____ )
9

10

11

12            TRANSCRIPT OF PROCEEDINGS

13        THE HONORABLE JANICE M. STEWART

14        UNITED STATES MAGISTRATE JUDGE

15          MOTION FOR RELEASE HEARING

16

17

18

19

20

21

22

23

24

25

1                    APPEARANCES OF COUNSEL

2     FOR THE MOVANT:

3     Mr. David L. Atkinson
      United States Attorney's Office
4     1000 SW Third Avenue
      Suite 600
5     Portland, OR 97204

6

7     FOR THE RESPONDENT:

8     Ms. Lisa Hay
      Assistant Federal Public Defender
9     101 SW Main Street, Suite 1700
      Portland, OR 97204

10

11

12    COURT REPORTER:

13    Jill L. Erwin, RPR, CSR, CRR
      United States District Courthouse
14    1000 SW Third Avenue
      Room 301
15    Portland, OR 97204
      (503)326-8191

16

17                               *  *  *

18

19

20

21

22

23

24

25

1                              **INDEX**

2    **RESPONDENT'S WITNESSES:**

3    DANIJELA MARJANOVIC

4    Direct Examination by Ms. Hay                        6

5    Cross-Examination by Mr. Atkinson                   10

6    MARLA RANSOM

7    Direct Examination by Ms. Hay                       13

8    Cross-Examination by Mr. Atkinson                   16

9    JOHN COCHRAN

10   Direct Examination by Ms. Hay                       19

11   JACOB GUILD

12   Direct Examination by Ms. Hay                       23

13   Cross-Examination by Mr. Atkinson                   27

14   MIRSADA GUILD

15   Direct Examination by Ms. Hay                       28

16   Cross-Examination by Mr. Atkinson                   41

17

18

19

20

21

22

23

24

25

1          (October 20, 2011)

2          TRANSCRIPT OF PROCEEDINGS

3          (In open court:)

4          DEPUTY COURTROOM CLERK:  All rise.  The United

5    States District Court for the District of Oregon is now in

6    session.  The Honorable Janice M. Stewart presiding.

7          MR. ATKINSON:  Good morning, Judge Stewart.  On

8    behalf of the United States, we're here in Miscellaneous

9    11-997 in the matter of the extradition of

10   Rasema Handanovic.  Ms. Handanovic is here.  She's in the

11   custody of the U.S. marshal, and she's with her counsel,

12   Lisa Hay, an assistant federal defender.

13          Today's proceedings are to adjudicate the

14   fugitive's renewed motion for release.

15          THE COURT:  All right.  Ms. Hay?

16          MS. HAY:  Good morning, Your Honor.  Your Honor, I

17   did file a motion with some exhibits.  I would like to call

18   some witnesses to assist in our argument that Ms. Handanovic

19   is not a danger or a flight risk and that special

20   circumstances exist for her release.

21          THE COURT:  All right.  I should note that both of

22   you have submitted legal memoranda to the Court in advance

23   of the hearing, which I have reviewed.  So we'll go ahead at

24   this point, then, and proceed with the evidence, and then I

25   can hear arguments from you after you put on your evidence.

Proceedings - 10/20/11

1           I assume the Government has no evidence other than

2     what you presented in your memoranda.  Is that right?

3           MR. ATKINSON:  We're not going to call any

4     witnesses, Your Honor.

5           THE COURT:  All right.  Very good.  All right.

6     Ms. Hay, then, you may proceed.

7           MS. HAY:  Thank you, Your Honor.

8           THE COURT:  Your first witness?

9           MS. HAY:  We'll call the first witness.

10    Danijela Marjanovic.

11          DEPUTY COURTROOM CLERK:  Please come forward and

12    be sworn.  Raise your right hand.

13

14                    DANIJELA MARJANOVIC,

15    called as a witness in behalf of the Respondent, being first

16    duly sworn, is examined and testified as follows:

17

18          DEPUTY COURTROOM CLERK:  Please be seated and

19    please state your name and spell your first and last name

20    for the record.

21          THE WITNESS:  My name is D-A-N-I-J-E-L-A.  Last

22    name M-A-R-J-A-N-O-V-I-C.

23          DEPUTY COURTROOM CLERK:  Thank you.

24          MR. ATKINSON:  I'm sorry, ma'am.  Would you spell

25    your last name again, please?

Marjanovic - D                                6

1        THE WITNESS:  M-A-R-J-A-N-O-V-I-C.

2        THE COURT:  Okay.

3

4                    DIRECT EXAMINATION

5    BY MS. HAY:

6    Q.   Ms. Marjanovic, you've submitted a report in support of

7    Ms. Handanovic already; correct?

8    A.   Yes.

9    Q.   That's one of the exhibits in front of the Court.

10           Can you tell us, as background, how old you are,

11   your citizenship, and what kind of work you do?

12   A.   I'm 31 years old.  I worked at OHSU as an

13   administrative coordinator for 11 years.  I'm unemployed for

14   three months.  I've known Rasema -- Sammy -- Handanovic

15   pretty much my whole life.  She lived in the house right

16   across from mine, from our family.  We grew up together,

17   playing with other kids.  We were separated in '93.  I know

18   her as a good, caring person.

19   Q.   Let me interrupt you for one moment.  When you say her

20   family lived near yours, are you speaking back in Bosnia?

21   A.   In Bosnia.  Sanski Most.  Her family and her lived

22   right across from my family.  Like, it was the same street,

23   just right across the street.  So my window would look at

24   her window.

25   Q.   So you had a chance to know Ms. Handanovic's character

Marjanovic - D

1  before the war in your country?

2  A.    Yes.

3  Q.    And then tell us, what was your impression of her

4  character and the kind of person she was?

5  A.    She was always a good listener.  Any time we had

6  problems in school -- I'm talking back in Bosnia now,

7  because I was a child back then.  I was 12, 13.  She was

8  always listening; helped us with homework.  She would help

9  us play.  Make clothes for Barbies.  I talk about her going

10  out, because she was older.  She would dress up.  She was

11  always pretty.  We, as kids, would always come outside just

12  to see her going out; how she dressed up and how she'd do

13  her makeup.  She was beautiful.

14  Q.    You mentioned in your letter that you were raised in a

15  different religion from Ms. Handanovic.

16  A.    Yes.

17  Q.    That her family was Muslim and your family was

18  Christian?

19  A.    Yes.

20  Q.    Did you ever hear her say anything about religion or

21  did that have an effect on your relationship?

22  A.    No.  I could never feel anything -- any bad feelings or

23  anything towards me from Sammy.  Never.  I could never feel

24  anything that she -- she -- she never looked at me as a

25  Christian or -- you know, my mom is Catholic and my dad is

Marjanovic - D

1    Christian.  She -- we never talked about religion.  That was

2    never the case between us.  We never argued about it or

3    anything.

4    Q.   Do you remember any incidents in her family or anybody

5    ever expressing any bias; something that would stand out in

6    your mind today?

7    A.   No.  No.

8            MR. ATKINSON:  Excuse me, Your Honor.  Objection

9    on the grounds of relevance.

10           THE COURT:  Well, I'll allow a great deal of

11   latitude with respect to the evidence that can be presented

12   in today's hearing.  Character generally is not particularly

13   relevant to any release decision, other than perhaps it

14   shows responsibility or truthfulness and those sorts of

15   things, but I'll go ahead and, as I say, give you fairly

16   wide latitude today.

17           MS. HAY:  Thank you, Your Honor.

18           THE WITNESS:  I can -- I can say that we all

19   celebrated -- Muslims, Croats, and Catholics and

20   Christians -- we all celebrated same -- I mean, Muslim and

21   Christian holidays together.  For Easter we would dye eggs,

22   color eggs.  For Muslim holidays we would go kiss her

23   grandma's hand just to get money and do things like that.

24   But religion was never a big issue before the war started.

25   And then during the war everything broke apart.  I haven't

Marjanovic - D

1  even seen her since then.  Since -- until '97.

2  BY MS. HAY (Continuing)

3  Q.   So in '93 you were separated and you didn't see her

4  again until 1997?

5  A.   Correct.

6  Q.   And in 1997, that was in the United States?

7  A.   Correct.  In Portland.

8  Q.   Tell us about your dealings with Ms. Handanovic here in

9  the United States.

10  A.   Ever since we saw each other in '97, she was helping

11  me.  She was helping us, my whole family, get furniture, get

12  anything to start -- anything that we needed to start

13  living.  She helped me open my first checking account.  She

14  helped me with homework.  She would listen to me.  She was

15  helping me make it here, pretty much, because I was very

16  depressed that I had to move here in the first place.  She

17  was always talking to me and telling me different options to

18  become successful.

19  Q.   Have you ever known her to be violent or to express

20  anger or rage against people?

21  A.   I've never seen her angry or never lost her temper in

22  front of me.

23  Q.   Have you had the chance to see her as a mother?

24  A.   She's a great mother.

25  Q.   What can you tell us about her mothering abilities?

Marjanovic - D/X                                    10

1    A.    She was -- even though she had low income in the past

2    couple of years, she didn't want to move to a cheaper area

3    in Portland, just to keep her son in the same school, so he

4    doesn't sacrifice.

5    Q.    So she wanted to keep her son in the same --

6    A.    In the same school, so he doesn't have problems and

7    just to be -- to stay in the same school, same teachers,

8    same kids; just to be more successful.

9    Q.    Do you have an opinion of if Ms. Handanovic were

10   released by this Court whether she would stay here in

11   Portland and do what she's told to do?

12   A.    I'm positive she would stay here with her son.

13   Q.    Okay.

14   A.    Her family is here and her home is here.

15            MS. HAY:   I don't have any further questions.

16            THE COURT:   Cross-examination?

17

18                      CROSS-EXAMINATION

19   BY MR. ATKINSON:

20   Q.    Ms. Marjanovic, has Ms. Handanovic ever spoken with you

21   about her training when she was in the Bosnian military?

22   A.    No.

23   Q.    Did she ever speak with you about explosives training

24   she may have taken or specialized weapons training or

25   special forces training at all?

1   A.   No.

2   Q.   Do you know whether Ms. Handanovic regularly takes

3   medications?

4   A.   I know in the past couple of years that she's been ill

5   and that she's been taking medications, but I know -- I

6   don't know what kind.

7   Q.   What sorts of illnesses does she have, ma'am?

8   A.   As much as I can remember, myo -- I can't -- I can't

9   remember the diagnosis, but I know it's the body aches all

10  over.  I can't remember the name of the --

11  Q.   Does she have any psychiatric illnesses?

12  A.   I don't remember.

13  Q.   Bipolar?

14  A.   I don't remember.  I don't think so.

15  Q.   Were you here when she was presented to

16  Judge Ashmanskas back on April 11th?

17  A.   April 11.  I believe I was here the very first time.

18  So that was -- that was back in April?  Yes.  Yes.

19  Q.   You heard her wailing and screaming through the walls

20  of the court, didn't you?

21  A.   I wasn't here then.  I was not here when she was

22  screaming or yelling through the halls.

23  Q.   If she were to be wailing and screaming and pounding

24  her head against the wall, that would be inconsistent

25  with --

1              MS. HAY:  Objection to the question.  That's

2    adding evidence that's not in the record.

3              MR. ATKINSON:  I'll withdraw the question.

4              THE COURT:  Very good.

5    BY MR. ATKINSON (Continuing)

6    Q.   Does she drive, ma'am?  Does she have a car?

7    A.   Yes.

8    Q.   As far as you know, she has a driver's license and

9    regularly drives?

10   A.   I know she has a driver's license.

11             MR. ATKINSON:  Those are my questions.

12             THE COURT:  Any redirect?

13             MS. HAY:  No, Your Honor.

14             THE COURT:  Thank you.  You may step down.

15             MS. HAY:  Your Honor, I'll call Marla Ransom.

16             DEPUTY COURTROOM CLERK:  Please come forward and

17   raise your right hand.

18                        MARLA RANSOM,

19   called as a witness in behalf of the Respondent, being first

20   duly sworn, is examined and testified as follows:

21

22             DEPUTY COURTROOM CLERK:  Please be seated.  Please

23   state your name, your full name, and spell your last name

24   for the record.

25             THE WITNESS:  My name is Marla Ransom,

```
 1    R-A-N-S-O-M.
 2            DEPUTY COURTROOM CLERK:  Thank you.
 3
 4                    DIRECT EXAMINATION
 5    BY MS. HAY:
 6    Q.    Ms. Ransom, can you tell us how old you are and your
 7    citizenship?
 8    A.    I'm 50 years old, and I'm a United States American.
 9    Q.    Do you have any criminal record?
10    A.    No.
11    Q.    Is it right that you're currently a home -- a
12    homemaker?
13    A.    Uh-huh.  Yes, it is.
14    Q.    Can you tell us how long you've known Ms. Handanovic.
15    A.    I met Sammy when her son was about a year and a half
16    years old and I began doing day care for him.
17    Q.    So that's a little more than 11 years ago; 10 years
18    ago?
19    A.    Yes.  Yes.
20    Q.    So you helped provide day care for her son?
21    A.    Uh-huh, I did.
22    Q.    Have you stayed in touch with the family since then?
23    A.    Absolutely, yeah.  We're like family.  I've known them
24    for many years, and Sammy and I have been very close.  Just
25    like family.
```

Ransom - D

1  Q.   Can you tell us your opinion of her character and her

2  representation in the community?

3  A.   Yeah.  Sammy is a very loving, very caring, very

4  giving -- she's a very good mother.  As a friend, she was

5  always there for me no matter what it was that I needed.

6            I was very sick and in the hospital for about two

7  months, and she rarely left my side.  She was always right

8  there.  My daughter moved in with her for a few months and

9  helped her with Ronai, as well, so --

10 Q.   Was there a time when you were living in Vernonia that

11 she was especially helpful to you?

12 A.   Absolutely.

13 Q.   Could you tell us about that incident?

14 A.   Uh-huh.  We moved out there, and there were many times

15 where I didn't have food, and she would come out there in

16 the snow, in the rain, no matter what it was.  During the

17 flood, she was always there.  No matter what I needed.

18 Q.   So she would drive food and supplies out to you when

19 you were stranded?

20 A.   Absolutely.  Absolutely.

21 Q.   Is that the kind of actions that you could see her

22 doing in a lot of situations?

23 A.   Uh-huh.  Yeah.  Not just for me, but for a lot of other

24 people, as well.

25 Q.   Are you aware if she suffers from any kind of medical

1    illnesses?

2    A.    Yeah.  Sammy has fibromyalgia.

3    Q.    Fibromyalgia?

4    A.    Uh-huh.  It's very painful, and I've seen her become

5    very sick.  I've been there to help her, as well.

6    Q.    Can you tell us some of the symptoms you've seen when

7    you've had to try to help care for her?

8    A.    Oh, yeah.  Fibromyalgia is a very painful disease, and

9    there's really no cure for it.  She's had to take different

10   medications, and it's -- it can be very debilitating.

11   Q.    Is that something that's gotten worse over the last

12   years that you've known her?

13   A.    Uh-huh, yeah.  When I first met her, she was having

14   problems with her hands and her arms, and it soon just kind

15   of slowly progresses through your body, where she had

16   problems with her legs and her back and -- but she still

17   worked, still took care of her son.  If I needed anything

18   when I was sick, she was right there for me.

19   Q.    Do you have an opinion about whether she's a dangerous

20   or violent person based on your ten years of knowing her?

21   A.    There's no way I can ever see Sammy being violent to

22   anyone at all, no.

23   Q.    And what about whether she would stay here in Portland

24   if the Court ordered her to stay here?  What do you think?

25   A.    Oh, she would stay here.  Sammy is very connected to

1   all of us.  You know, she has a pretty big family here now.

2   She has a lot of friends and Ronai is her son, and she would

3   never, ever want to leave.  So, no, she's no flight risk

4   whatsoever.

5   Q.   When you say she would never want to leave, what about

6   disrupting her son and taking him with her?  Do you think

7   she would flee and do that?

8   A.   Never.

9   Q.   Why not?

10  A.   No.  She has always made for sure that Ronai was very

11  stable in school and with family and friends.  She's always

12  made for sure that he had whatever he needed here.

13  Q.   You said in your letter that you feel that

14  Ms. Handanovic has upheld the very definition of what we

15  revere to be a U.S. citizen.  What do you mean by that?

16  A.   She has abided by every law.  She has never been

17  criminally arrested for anything other than the war crimes.

18  She just is the epitome of a U.S. citizen.  She's raised her

19  son here.  She's raised him with morals.

20          MS. HAY:  Okay.  Thank you.  No further questions.

21          THE COURT:  Cross-examination?

22

23                    CROSS-EXAMINATION

24  BY MR. ATKINSON:

25  Q.   Ms. Ransom, has Ms. Handanovic attempted suicide on a

1   few occasions?

2   A.   Not that I'm aware of.

3   Q.   You've described her fibromyalgia.  What other

4   illnesses does she suffer from?

5   A.   Honestly, that's the only one that I really know of is

6   her fibromyalgia.

7   Q.   Did she ever talk with you or did you ever hear about,

8   from some other source, any specialized training that she

9   may have received when she was a member of the military in

10  Bosnia?

11  A.   She never talked to me about anything like that.

12  Q.   She never talked about specialized weapons training or

13  special forces training?

14  A.   Nothing.  I knew nothing of her life back then.

15  Q.   Okay.  And you know nothing about the facts of this

16  case; is that right?

17  A.   That's right.

18  Q.   You don't know how many people she's alleged to have

19  harmed --

20  A.   Huh-uh.

21  Q.   -- or killed?

22  A.   No.

23  Q.   Were you here when she initially came into court back

24  on April 11th of this year?

25  A.   No, I wasn't here for that.  I didn't come in until --

1   I don't know.  I think she had been here two, maybe three

2   weeks.

3   Q.   Do you know what medications she takes?

4   A.   I do not.  I --

5   Q.   Did you see her that day, on April 11th?

6   A.   No.  I was not here for that.

7   Q.   You don't know whether she had taken her medication

8   that day; is that right?

9   A.   That's right.  I don't know.

10          MR. ATKINSON:  Those are my questions.

11          THE COURT:  Any redirect?

12          MS. HAY:  No, Your Honor.

13          THE COURT:  Thank you.  You may step down.

14          MS. HAY:  Your Honor, I'd like to call

15   John Cochran.

16          DEPUTY COURTROOM CLERK:  Please come forward.

17   Please raise your right hand.

18

19                    JOHN COCHRAN,

20   called as a witness in behalf of the Respondent, being first

21   duly sworn, is examined and testified as follows:

22

23          DEPUTY COURTROOM CLERK:  Please be seated.

24          Okay.  Could you please state your name and spell

25   your last name for the record.

1    THE WITNESS:  Name is John Cochran.  J-O-H-N.

2    C-O-C-H-R-A-N.

3    DEPUTY COURTROOM CLERK:  Thank you.

4

5    DIRECT EXAMINATION

6    BY MS. HAY:

7    Q.   Mr. Cochran, could you tell us, as background, your

8    age, your citizenship, what kind of work you've done?

9    A.   My age is 67.  American.  And I have a pension from

10   Tri-Met and Reser's Foods, and the last years of my work I

11   worked in private security.

12   Q.   So you're currently retired; is that right?

13   A.   Yes.

14   Q.   And how did you come to meet Ms. Handanovic?

15   A.   I met her in the workplace.  She and her sister both

16   worked in private security, and I met her 12 years ago while

17   she was working.  Actually, it was Pinkerton Security, and I

18   knew her there.

19   Q.   Were you, in fact, her supervisor at Pinkerton

20   Security?

21   A.   Yes.

22   Q.   What can you tell us about how Ms. Handanovic was as a

23   worker?

24   A.   She was a very good worker.  She was one of the most --

25   maybe the most dependable of the employees.  She was always

1  punctual.  She never had any absenteeism.  She was always

2  dependable.  When she said she would work a night shift or

3  any shift, she would always be there.  She was very

4  reliable.

5  Q.   Did you feel that she was an honest person?

6  A.   Yes.  She was always honest about anything she said,

7  yes.

8  Q.   And did it matter to her that she kept her word?

9  A.   Yes.  Yeah.  I think she took pride in that.

10  Q.   You had a chance to see her interacting with a number

11  of different customers; right?

12  A.   Yes.

13  Q.   Did you notice any bias or discrimination or anger by

14  Ms. Handanovic?

15  A.   No.  She was always very polite.  Always followed the

16  work rules closely, which was to have a -- certain rules

17  about customer relations, and she was always good at that --

18  dealing with people and always got along with her fellow

19  workers very well.  I never heard any complaints about

20  anything from any of the other employees.

21  Q.   Now, your health -- for reasons of health, you ended up

22  retiring; is that correct?

23  A.   Yeah, I had a stroke.  I had a major stroke about five

24  years ago, and that forced me into retirement; somewhat

25  early retirement.

1   Q.   And so are you aware of whether Ms. Handanovic's health

2   also deteriorated after this time period?

3   A.   Well, after the stroke I saw her and her sister

4   infrequently.  They would -- they would come out to my farm

5   every year for vegetables and certain fruits, so I'd see

6   them every year, and I still keep in contact.

7        What did you ask about?

8   Q.   Well, when she was working with you, did her health

9   keep her from working during that period?

10  A.   No.  Not during that period, no.

11  Q.   And that was in about 1998 you met her?

12  A.   '98, '99, yes.  She was -- her son is 12 years old, and

13  I knew her when she was pregnant with her son.

14  Q.   That puts us back to about 1998 when you first would

15  have known her?

16  A.   Yes.  Yes.

17  Q.   What is your opinion about whether she would be a

18  danger to anybody if she were out in the community?

19  A.   Well, I never had any -- there was never anything that

20  would bring that up.  She never showed any kind of emotion

21  toward that way.  I mean, she was always nice and polite and

22  got along with everybody.  She never appeared to be

23  dangerous about anything.

24  Q.   And do you believe she's the kind of person who would

25  keep her word if she said she would stay here in Portland if

Cochran - D

1  released?

2  A.   Well, I think she would, yes.  She gives her word and

3  keeps her word.  Also, she's very close to her son.  If her

4  son was here, I think she would be here for that reason.

5          MS. HAY:  Okay.  Thank you.  I have no further

6  questions.

7          MR. ATKINSON:  No questions, Your Honor.

8          THE COURT:  All right.  Thank you.  You may step

9  down.

10          THE WITNESS:  Step down?

11          THE COURT:  Yes.  Thank you.

12          MS. HAY:  Your Honor, I might not call every

13  witness who's here.  We submitted letters to the Court of

14  people who wanted to support Ms. Handanovic.

15          I will call her brother-in-law, Jacob Guild.

16          DEPUTY COURTROOM CLERK:  Could you please raise

17  your right hand?

18

19                  JACOB GUILD,

20  called as a witness in behalf of the Respondent, being first

21  duly sworn, is examined and testified as follows:

22

23          DEPUTY COURTROOM CLERK:  Please be seated and

24  please state your name and spell your last name for the

25  record.

J. Guild - D                                23

1        THE WITNESS:  Jacob Guild, G-U-I-L-D.

2        DEPUTY COURTROOM CLERK:  Thank you.

3

4                    DIRECT EXAMINATION

5   BY MS. HAY:

6   Q.   Mr. Guild, you're married to Ms. Handanovic's sister;

7   is that correct?

8   A.   Yes.

9   Q.   So you've known her about 12 years?

10  A.   Yes.

11  Q.   Just as background, I didn't ask you, could you tell us

12  your age, your citizenship, and what you're doing for work

13  or to occupy your time right now?

14  A.   I'm a U.S. citizen.  I'm 34 years old.  I was born in

15  Fort Collins, Colorado.  I'm currently a student at PCC and

16  a stay-at-home dad.

17  Q.   And you have two young children; is that right?

18  A.   Yes.  Two and four.

19  Q.   Are you also helping to care for Ms. Handanovic's son

20  while she's in custody?

21  A.   Yes.  That's correct.

22  Q.   I wanted to ask you, just generally, to give us your

23  opinion of what kind of person you know Ms. Handanovic to

24  be, having lived with her and her sister and known her all

25  these years.

J. Guild - D

1    A.    We have a good relationship.  We were always able to

2    problem solve and work together so that we could all do what

3    we needed to do to get where we're at today, you know, with

4    work and school.  You know, juggling schedules, and stuff,

5    early on with -- with Ronai's -- when he was a toddler and

6    stuff like that.  We worked together.  I could always rely

7    on her, you know, to be there for me if I needed, you know,

8    help.

9    Q.    Does she have a good work ethnic?

10   A.    Yes.  Yeah.  She was always, you know, looking to work

11   to do what she needed to do so that she could provide for

12   her son.

13   Q.    What about her honesty and her morals and character in

14   that way?

15   A.    She's very -- I believe her to be a very honest person.

16   She's very open-minded.  She'll tell you what she believes,

17   what she thinks, you know, and not have really a second

18   thought about it, you know.

19   Q.    Can you tell us whether religion has been a major

20   factor in her life or her family?

21         I assume, first, you know her parents; is that

22   correct?

23   A.    I do.

24   Q.    Okay.  And so is religion a major factor in her life

25   and --

1   A.   I don't believe it to be a huge factor.  I believe, you

2   know, it became a big factor during the war; but that's not

3   for me to say, I guess.  But as far as her living her own

4   personal life, you know, her being a Muslim hasn't been an

5   issue.

6   Q.   When you say it became a factor during the war, do you

7   mean you've heard stories about what occurred during the

8   war?

9   A.   Well, it's -- you know, my understanding of the war was

10  that, you know, a lot of it was based on ethnic -- ethnicity

11  and things like that.

12  Q.   So has she personally told you that she was reacting to

13  people based on religion during the war or -- I'm trying to

14  understand.

15  A.   No, just from me learning about the war, you know,

16  reading about it.

17  Q.   Okay.  So your understanding of the war is that during

18  that time period many people were divided on ethnic and

19  religious grounds?

20  A.   Yes.

21  Q.   Do you know whether Ms. Handanovic was expressing those

22  kind of views to you at any time or to any other people, so

23  antireligious or anti-ethnic --

24  A.   No.

25  Q.   Okay.  What can you tell us about Ms. Handanovic's

J. Guild - D

1  health?

2  A.   When I first met her, she was -- she was healthy, you

3  know.  She was, you know, able to go to work and, you know,

4  work long hours.  She did that for a long time; for many

5  years.  But, in time, you know, her health did start to

6  decline.  She had troubles, I think, with carpal tunnel at

7  one point, and then it sort of turned into this fibromyalgia

8  that she's suffered with for some time.

9  Q.   And have you witnessed her in pain and suffering the

10 kind of body aches that come with that disease?

11 A.   Yeah.  Yeah.  Yeah, it looks painful.  She's unable to

12 get out of bed.  You know, she can't walk.

13 Q.   What can you tell us about her relationship with her

14 son?

15 A.   She lives her life for her son.  That's -- you know, he

16 is the cornerstone -- excuse me, the cornerstone to her

17 life.  I mean, anything that she does is for Ronai.  I mean,

18 he is everything to her, so --

19 Q.   Have you considered her to be a good mother over all

20 these years?

21 A.   Yes.

22              MS. HAY:  I don't have any further questions.

23              THE COURT:  All right.

24

25

J. Guild - X                              27

<u>CROSS-EXAMINATION</u>

BY MR. ATKINSON:

Q.   Mr. Guild, were you aware that your sister-in-law had attempted suicide on a couple of occasions?

A.   No.

Q.   You've described her fibromyalgia.  Do you know of what other illnesses she may suffer from?

A.   I believe she had a recent diagnosis of PTSD.

Q.   Bipolar disorder?

A.   I'm not sure.

Q.   Severe depression?

A.   I'm unsure about the depression.

Q.   Have you observed her taking medications?

A.   She takes medications for her fibromyalgia.

Q.   For anything else?

A.   Not that I'm aware of.

Q.   She's never talked to you about anything -- about it; is that right?

A.   Not in, you know, great detail.

Q.   Were you here when she first appeared in court back on April 11th?

A.   I was not.  I was at home with my kids.

        MR. ATKINSON:  Those are my questions.

        THE COURT:  Anything else?

        MS. HAY:  No, Your Honor.

1           THE COURT:  Thank you.  You may step down.

2           MS. HAY:  I'd like to call Mirsada Guild.

3

4                       MIRSADA GUILD,

5    called as a witness in behalf of the Respondent, being first

6    duly sworn, is examined and testified as follows:

7

8           DEPUTY COURTROOM CLERK:  Witness sworn in.

9           THE WITNESS:  Yes, I do.

10          DEPUTY COURTROOM CLERK:  Please be seated.  Please

11   state your name and spell your first and last name for the

12   record.

13          THE WITNESS:  M-I-R-S-A-D-A, G-U-I-L-D.

14          DEPUTY COURTROOM CLERK:  Thank you.

15

16                    DIRECT EXAMINATION

17   BY MS. HAY:

18   Q.   Ms. Guild, you are the sister of Rasema Handanovic;

19   correct?

20   A.   Yes.

21   Q.   And you've testified once already in this matter?

22   A.   Yes.

23   Q.   I wanted to ask you some questions about your life back

24   in Sanski Most with Ms. Handanovic and your family.  Can you

25   tell us what it was -- what her character was like back then

1  and what kind of person she was?

2  A.    Rasema is 14 months older than me, and we were pretty

3  much raised like twins.  We are always together.  Even

4  though we were so close, she was always a role model, and

5  she always took the responsibility of older sister to take

6  care of me and my younger brother, and she was very

7  responsible and -- for her age, and she would set always

8  high bars for us and --

9  Q.    High bar or a high goal, you mean?

10 A.    Goals that we have to achieve.  But she was always

11 there to push us and help us and then celebrate when we

12 reached those bars and overcome them.  Because my parents

13 were self-employers and for them was really important work

14 ethics, honesty, and push yourself as far as you can do.

15 And Sammy was there.  She was always there to help us out to

16 be -- to go through the process.

17         At school she was always role model.  She was

18 always willing to help my younger brother and I and kids in

19 the neighborhood.  We grew up in a different society.  Kids

20 in our country, we go out in the neighborhood.  Older kids

21 watch younger kids, you know, so we can play.  But Sammy was

22 always there, a leader, to be like, Okay, let's do things

23 that are going to help us in life.  Let's go do math and

24 create games that we will do and play that we gonna use in

25 life.

1  Q.   Okay.  When you were growing up, did your families live

2  only -- live only in Sanski Most the whole time or did you

3  live in other places?

4  A.   No.  We -- our parents run business out of Croatia and,

5  it was actually in Istra, which is part of border by Italy.

6  Q.   Could you spell that name, please?

7  A.   Istra, I-S-T-R-A.

8  Q.   Okay.  Okay.

9  A.   And we spent pretty much summers in Croatia, and

10  through school year we would be in Bosnia.

11  Q.   Did your parents teach you or did you ever within your

12  family express bias against people from Croatia?

13  A.   No.  The religion in our family was not emphasized

14  ever.  We -- for my dad what's really important was work

15  ethics, honesty, and schoolwork, and -- but religion was

16  not.

17  Q.   Okay.  Right when the war broke out in your -- in your

18  town, I know things were very difficult then.  Can you tell

19  us about your sister's character during that time when the

20  family was together during the war?

21  A.   Well, Sammy -- my biggest fear then -- I was fear

22  for -- I was 18, and my biggest fear was of rape.

23  Q.   I'm sorry.  What?

24  A.   My biggest fear was afraid I was going to be raped.

25  And I didn't fear being shot and killed.  I always fear of

M. Guild - D

1    being raped.  And we will be taken out of a house and our

2    house would be searched.  Sammy was there.  She would always

3    shelter me and she will hide me behind her so that I'm not

4    in -- on the point in front of soldiers and that I would be

5    their target.  She would be always protecting me, younger

6    sister.

7            And we get to the point that we started running

8    out of food, and we will have to go to places where they

9    will allow us to buy food, and Sammy will always take the

10   task of going and buying food for us.

11   Q.   So she would be the person who would leave the safety

12   of the house and go out to get food for the rest of you?

13   A.   Yes.  Sammy and my older brother.  It depends.  The two

14   of them will be the ones that pretty much took

15   responsibility of and -- on them, and she will shelter me.

16   She will not let me get out of the house because of my fear,

17   and I just -- she will take whatever it takes to provide

18   food for us.

19   Q.   And a fear of rape during that time, you had already

20   heard soldiers were raping women in the towns; is that

21   right?

22   A.   That's right.

23   Q.   When was the -- what was the situation when -- the last

24   time you saw her sister?

25   A.   Well, the morning she -- we find out that there is a

1   place where she can -- we can get flour for us, and she took
2   her bike, and she find out if we can get 50 kilograms flour.
3   And my brother and her went to get flour for us so we could
4   have bread on the table.  Then she never came back.  She was
5   put in convoy for Travnik.  We didn't find out until later
6   in the day where she was.  The convoy, we find out, that was
7   going to Travnik, was going to Vlasic.  Vlasic.  It was a
8   town.  And somebody told us that they find Sammy's bike, and
9   somebody said -- some relatives, I think, called my parents,
10  and they said they saw Sammy and Rasim in the trailer going
11  to Vlasic.
12  Q.    Rasim is the name of your brother?
13  A.    Older brother.
14  Q.    R-A-S-I-M, Rasim?
15  A.    Yeah.  They were taken to Vlasic, and at that time
16  Vlasic was known for taking other convoys and Vlasic is
17  mountain, and it's about three kilometers which would be
18  about 19 miles.  And para convoys are people that will die,
19  because they will let people get out of convoy, out of
20  buses, trailers, or whatever they will put them in, and on
21  the mark -- they will have to march up the mountain where
22  the soldiers will be shooting at them.
23  Q.    Okay.
24  A.    There are land mines, and there was lots of people,
25  women and soldiers that will die.  And when you make on the

     1    other side, it was Travnik, where it was Muslim territory.
     2    And your option was because there was overflood of -- of
     3    refugees.  That you have option of either if you don't have
     4    anybody, you have to join military for survival.
     5    Q.   Okay.  I won't ask you to go through all of what you
     6    know your sister experienced during the war.  You testified
     7    about some of that before.  I'm sorry to have you go through
     8    any of this again.
     9         I wanted to ask you to talk about your sister here
    10    in the United States, then.  How you came to meet up with
    11    her in the United States and what her character and her
    12    reputation has been here.
    13    A.   I was in Germany during war, and I couldn't go to
    14    school.  My dream was to be a dentist.  And she invited me
    15    and she said she going to help me to get -- to achieve my
    16    dream.
    17    Q.   She invited you to the United States?
    18    A.   To the United States.  And she said -- she told me that
    19    we can be what we are in this country.  We can be honest and
    20    hardworking people.  The sky is the limit.  We -- she going
    21    to help me to learn English and everything.
    22         I arrive, I think, it was Wednesday or Thursday
    23    night, and she had me already enrolled for English classes
    24    on Monday.  I didn't speak absolutely any English when I
    25    came here.  She worked 60 to 80 hours so I could focus on my

M. Guild - D

34

1    education, and she was always there for me.

2           I, at some point in the process of going, I became

3    dental assistant.  I work as a dental assistant, and I was

4    working to achieve my goal to be a dentist.  And it got to

5    the point that I learned I cannot be a dentist because of --

6    I faint when I see blood, and I -- my world was crushed, but

7    Sammy encouraged me after that that it's not the end of the

8    world; that I have other skills; that my math skills can

9    help people, and I -- I can do other stuff with my skills

10   and still help people and be in the work force and

11   successful and go to school and --

12   Q.   She encouraged you and helped you become a citizen

13   here?

14   A.   Yes.

15   Q.   And are you working today?

16   A.   I am.

17   Q.   Where do you work now?

18   A.   I work for OHSU.  I work as a financial analyst.

19   Q.   Okay.  So using the math skills you were mentioning?

20   A.   Yeah.

21   Q.   Okay.

22   A.   And skills that -- I work in research department, and I

23   feel that with my work I contribute great deal to the

24   society.  And because I work for researchers, and I have

25   unique position -- probably my only position -- only person

M. Guild - D

1    who does -- I mean, there is -- OHSU has finance, but I go

2    beyond that.  I do application with researcher to get funds.

3    Q.   Sorry to interrupt you.  This is something that your

4    sister helped you to achieve to get to this position?

5    A.   Yes.  I --

6    Q.   Can I ask you, do you -- do you know if she's helped

7    other people in the United States in similar ways?

8    A.   Yes.  For her was -- she will always look over all the

9    benefit of everyone.  We will -- at some point we live

10   together -- my husband, her, and I -- and we will -- for her

11   was always success of people important, and my neighbor's

12   daughter, when she struggle with math, she will find time to

13   do math with her.

14   Q.   She will --

15   A.   She will do math.  Study problems with math.

16        She will go to church and help collect food and

17   hand out to less fortunate people here in America.  She will

18   organize -- for the church she will organize food drive.

19   Q.   Okay.  I won't ask you to go through all the different

20   examples that she has done, but can you say she is somebody

21   who's done a lot of good works here in the United States?

22   A.   Yes.

23   Q.   Okay.  I wanted to turn to an area that's also

24   difficult to discuss, but you are currently taking care of

25   her son Ronai; correct?

1   A.   Yes.

2   Q.   And would it be fair to say that even before this whole

3   event with your sister getting arrested Ronai would be

4   considered a fragile child in some ways?

5   A.   Yes.

6   Q.   And could you just tell us what happened, what was

7   the -- one of the triggering events that you know of?

8   A.   Well, after the war -- Sammy had bad marriage and the

9   environment was not very good for Ronai, and over the time

10  his father will come in and out of Ronai's life, and there

11  was incident, I think, two or three years -- in 2009, around

12  Ronai's birthday.  Sammy was at work, and neighbor was

13  taking care of -- after school for Ronai and another

14  neighbor child when his father came into the house.  And he

15  didn't call or anything, and he attacked the neighbor.  And

16  Ronai got so scared, because all along he was threatening

17  that he was going to take Ronai to Turkey.

18       Just to clarify, Sammy's ex-husband is from

19  Turkey, but he's a Kurd.  And he will always threaten us

20  that he's going to take Ronai to his parents' and his

21  sister's to take care of him.  At some point, he even offer

22  money to Sammy to just hand him Ronai.

23       So he threaten that he going to come, and Ronai

24  run into the restroom and hide himself and call his mother

25  to come home.  By the time she came home, he was already

1  gone.

2         But Ronai got really sick.  And for several days

3  he had -- was running fever.  And then the doctors couldn't

4  figure out what was going on.  Nothing will help with the

5  fever.  And she asked Sammy if he was under any traumatic --

6  did anything traumatic happen in his life, and Sammy brought

7  up the incident with the father, and she suggested that he

8  needs to go see counselor.

9  Q.   And so since about that time has he been seen by a

10  counselor?

11  A.   Yes.

12         MS. HAY:  And, Your Honor, at the previous hearing

13  I submitted a defendant's exhibit.  It was then marked 102.

14  It's a letter from the counselor and an interview with the

15  counselor.  I'd like to resubmit those.  I may need to

16  renumber them -- I'm not certain what number we're up to --

17  just to make sure the record has those documents in it.

18         Maybe the clerk could help me figure out the

19  numbering later.

20         THE COURT:  If it's already been admitted once, I

21  don't think you need to do it again.  Just provide me a copy

22  so that I can see it.

23         MS. HAY:  Okay.

24         THE COURT:  Although, I don't know.  Maybe they

25  were returned to you after the last hearing.

M. Guild - D

1      MS. HAY:  I believe they were attached to the

2  pretrial services report and kept on the confidential side

3  of the Court's file.

4      THE COURT:  Okay.  So just provide me a copy, and

5  I think that's all that will be needed.

6      MS. HAY:  Thank you, Your Honor.

7  BY MS. HAY (Continuing)

8  Q.   Now, right now you are -- you're caring for Ronai while

9  your sister is in custody; is that right?

10 A.   Uh-huh.

11 Q.   Have you tried to keep him in as stable of a situation

12 as you can?

13 A.   Well, yes.  Sammy explained that it will be really

14 important for him to stay in the same school, and she

15 suggested that I need to go talk to principal.  After

16 talking to his principal, he agreed, because Ronai is in

17 same school since first grade, and he thought that for

18 Ronai's best interest will be to stay in the same school.

19      However, we live in the Hillsboro School District,

20 and Ronai's school is in Beaverton School District.  We had

21 to go through the process that we requested from Hillsboro

22 School District for Ronai to be released and -- and

23 Beaverton School District accepted him under circumstances

24 because of his background and --

25 Q.   Okay.  Do you drive him every day?

1  A.    I drive him every morning, and my husband picks him up

2  after school at 3:00.

3  Q.    You are currently -- you're aware of a custody

4  proceeding about Ronai that's ongoing right now; correct?

5  A.    Yes.

6  Q.    And are you -- what have you been told about whether

7  you can have custody of Ronai?

8  A.    No.  As a result of me not having custody of Ronai,

9  Ronai had to go through a few months without glasses,

10  because his father will not give me power of attorney to get

11  him glasses.  We didn't have the Court that he can stay

12  legally until -- for -- at our place until we see what's

13  going to happen with his mother.

14         At that time -- at that point, I guess, the Court

15  ordered that I can take care of Ronai until we find out

16  what's going to happen with Sammy.  And then Ronai got

17  insured, and we took him to the doctor and dentist.  But his

18  father refused to send him for therapy or for eye doctor or

19  anything.

20  Q.    So right now his father has a temporary emergency

21  custody order; is that right?

22  A.    That's correct.

23  Q.    And the judge said that Ronai can still stay at your

24  house temporarily?

25  A.    Uh-huh.

M. Guild - D

40

1   Q.   But they're making a decision about who's going to get

2   custody?

3   A.   That's correct.

4   Q.   And has the lawyer told you that because you're not the

5   parent you're not going to get custody?

6   A.   That's correct.

7   Q.   So the blood relatives are the ones who have to have

8   custody based on the Oregon law?

9   A.   That's correct.

10  Q.   If Ronai were to live with you for a longer period, is

11  there a chance over time that you would be able to get

12  custody?

13  A.   If he demonstrated we are good psychological parents

14  and that we are providing the stuff that Ronai needs, that

15  we could become -- we could get custody at some point.

16  Q.   But you've been told that -- so he hasn't lived with

17  you long enough?

18  A.   Not long enough.  But this is not -- it's pretty much

19  all still with what's going to happen with Sammy.  And if

20  Sammy gets released temporarily and stays with Ronai, and

21  I -- I think we will have more chance to help Ronai in his

22  case.

23         MS. HAY:  Thank you.  I don't have any further

24  questions.

25         THE COURT:  Cross-examination?

<u>CROSS-EXAMINATION</u>

1  BY MR. ATKINSON:

2  Q.   Well, the custody matter is being handled in state

3  court out in Washington County; is that right?

4  A.   That's correct.

5  Q.   In Hillsboro; is that right?

6  A.   Right.

7  Q.   And are officials from the Oregon Human Services

8  Division involved at all?

9  A.   I don't know.  What do you -- I mean, I didn't talk to

10  anybody.

11  Q.   A judge will be -- a state court judge will be

12  presented with -- with the equities and facts of this case

13  and make a decision?

14  A.   Uh-huh.

15  Q.   Isn't that true?

16  A.   The judge make decision?  Yes.

17  Q.   Yes.

18       And, more likely than not, a representative of the

19  state agency that's responsible for the welfare of children

20  will weigh in on this and help the Court make that decision.

21  Isn't that true?

22  A.   Well, I don't think that anybody is involved.  My

23  understanding is that from the last hearing the judge was

24  strongly leaning towards that father -- biological father is

M. Guild - X

 1  father and -- in other words, that he was -- that he should
 2  be --
 3  Q.   Well, if the father were -- were not a good parent or
 4  were abusive or did not take good care of Ronai, all of that
 5  could be presented to the state agency that's responsible
 6  for the welfare of children here in Oregon.  Isn't that
 7  true?
 8  A.   Yes.  But his father lives in Canada.  His intention is
 9  not to take him to Canada.  His intention is to take him to
10  Turkey; to his family.
11          So he is not -- his intention is not to take care
12  of him.  He just wants to get the custody.  As soon as he
13  gets custody, he wants to take him to Turkey, and he is not
14  a Turk.  He's a Kurd.  And Ronai is American.
15  Q.   So who has made someone from the responsible agency
16  here in Oregon aware of all these facts?
17          MS. HAY:  Your Honor, maybe the Government could
18  clarify what responsible agency he's talking about.
19          MR. ATKINSON:  I'm talking about Human Services.
20          MS. HAY:  I don't think Human Services is involved
21  in this.
22          THE WITNESS:  Nobody is involved.  His father
23  came --
24  BY MR. ATKINSON (Continuing)
25  Q.   You have not made anyone from the Human Services

1  Division aware of any of this and asked --

2  A.    I called --

3  Q.    -- them to intervene?

4  A.    Sorry.  I didn't mean to interrupt.

5        I called every single phone number.  This country

6  doesn't have anything to prevent child's welfare.  This

7  country has stuff to save kids that are already abused.

8  There's no agency in this country that will help in Ronai's

9  case.  I have no rights to anything.  I'm not the mother.

10  I'm not the father.  I have been taking care of Ronai since

11  he was three months.  I move in with Sammy in August of 1999

12  and lived with her and closely in the neighborhood of a

13  distance of 3 miles, at most, in the last 12 years.

14        But there is no agency that will do -- listen to

15  me.  I call every single phone number in Oregon.  Anything

16  involved with child services, anything, there is nothing

17  that will do prevention of a child.

18        Ronai is 12 years old.  He doesn't have a

19  relationship with his father.  And the only thing he

20  experienced was bad.  Including, like, the judge ordered a

21  two days' visit with his father.  His father locked him in

22  the car to sit while he's in a meeting.

23        THE COURT:  I think I understand from her

24  testimony that for whatever reason Oregon DHS is not

25  involved, but it is a matter pending in the Washington

1     County Circuit Court.

2               MR. ATKINSON:  I don't have any further questions.

3               THE COURT:  All right.  Any redirect?

4               MS. HAY:  No, Your Honor.

5               THE COURT:  Thank you.  You may step down.

6               MS. HAY:  Your Honor, I want to acknowledge that

7     other people submitted letters.  I know Mr. Samuel Park is

8     here.  He's a family friend and has known Ms. Handanovic for

9     some time and wrote a letter, but I think the witnesses

10    we've called today so far have put forward enough of the

11    evidence that I wanted to have about her character and --

12    her character both back in Bosnia and back here in the

13    United States, so I won't call any further fact witnesses

14    like that.

15              I let the Government know that I won't try to call

16    an expert today either, so I think we're ready to just argue

17    the case.

18              THE COURT:  Just so I'm clear, I know that with

19    your memorandum you submitted several exhibits.  The notice

20    of this court proceeding in the custody matter, a statement

21    from Mirsada Guild, and an investigator's confidential

22    memoranda summarizing statements by several individuals.

23              You keep mentioning letters.  I'm not sure I know

24    what you're referring to, other than those submissions.

25              MS. HAY:  After that document, Your Honor, and

1   after the Government responded, I did file a reply that

2   included --

3              THE COURT:  Oh, with your reply?

4              MS. HAY:  Right.

5              -- letters from supporters.  And, in addition to

6   that, there is an exhibit that was an affidavit from an

7   interpreter noting a mistranslation in the fact section of

8   the Government's evidence against Ms. Handanovic.

9              THE COURT:  Okay.  So I take it that is the

10  evidence at this point.  It is your motion, Ms. Hay, so if

11  you would like to make argument at this time in addition to

12  what's already been presented, please do.

13             MS. HAY:  Thank you, Your Honor.

14             Your Honor, we recognize that in extradition

15  proceedings that the standard is to have somebody kept in

16  custody, but the case law recognizes that there are

17  exceptions to that standard.  And just as in any other case

18  when we're before a magistrate judge in a criminal case, the

19  Court has to make a decision about flight risk and danger

20  and then whether there are any special circumstances that

21  would support release in this case.

22             When we originally appeared in this case,

23  Your Honor, it was only a few days after Ms. Handanovic had

24  been arrested.  The Government had presented us with a

25  binder of a number of documents that I was not able to

1    digest in the few days between when she was first arrested

2    and the two days when we had a hearing.  I think there was

3    some misstatements at that hearing about what the evidence

4    was against her, and we appreciate the chance to try to

5    convince the Court today that, in fact, despite any previous

6    findings in the case, now that we've been able to put on

7    witnesses and have looked at the actual evidence presented

8    by the Government, Ms. Handanovic is not a flight risk or a

9    danger.

10            The Court's familiar with the citing flight risk.

11   It's the same standard that we could use in any of our

12   cases.  The Government has called her a fugitive.  And, yet,

13   we know from the hearing before, that she's not a fugitive.

14   She left a war-torn country under her own name and applied

15   for protection here in the United States.  She admitted that

16   she had been in the Army.  She came here legally.  She

17   became a U.S. citizen.

18            At a prior hearing the Government discussed her

19   name changes, but we know she was married and that was the

20   cause of her name change and that she gave all of those

21   names to the U.S. Government.  So she's never been hiding.

22   She's never been a fugitive.  She's never been running from

23   this.

24            I think that was a misperception at the earlier

25   hearing, and I hope throughout this case it's been cleared

1    up that she is, in fact, not somebody who has fled.

2           She's a U.S. citizen now.  She's lived exclusively

3    in the Portland area since she came to this country in 1996.

4    She has strong family ties here in Portland.  You've heard

5    from both her sister and her brother-in-law she has a strong

6    work history here.  The pretrial services report documents

7    the work what she had done, and we heard from one of her

8    supervisors.  She had a stable residence, before being

9    arrested, with a known address, and that was on her driver's

10   license and elsewhere.  She's raising a family here.  Her

11   son is in school.  And she has no criminal record, no

12   history of substance abuse or addiction, no failures to

13   appear.

14          And she's been aware of the potential of charges

15   like this for some time.  I presented to the Court last

16   time, and I believe it's still an attachment to my exhibits

17   in support of my first motion back in April, I have an

18   article, Defendant's Exhibit 104, which is about people

19   being arrested in the Zulfikar Army unit in February of

20   2010.  That was available on the Internet.  That was known

21   to Ms. Handanovic.  This is not a -- this was not a

22   surprise.

23          So the fact that this was an open investigation,

24   that people were being arrested and that she stayed here

25   anyway, she's continued to live here under her own name,

1  shows that she -- there's no way that she's a flight risk.

2  Not -- not a single one of the factors we used to determine

3  whether someone is a flight risk indicates that she would be

4  a flight risk in this case.

5          Your Honor, Ms. Handanovic is willing to surrender

6  her passport, her son's passport, to be on an electronic

7  bracelet, to be on home detention at her sister's house.

8  She would follow all of those conditions, because, as you

9  heard, one of the issues in this case for her is the welfare

10  of her son.

11          If she could be living out of custody in the

12  community, she could continue being the actual legal

13  custodian of her son during the time that she's here.  Every

14  month that goes by that she could be here with her sister

15  and her son is further time that her sister can use to tell

16  the Court that she is also developing a parental

17  relationship with the child, and, eventually, hopefully, in

18  Washington County, can convince the Court that this is a

19  family unit, that the son is part of it, and that he should

20  not be taken out of there.

21          The standard that the Court is using right now is

22  that when one parent is incarcerated, the other parent is

23  the assumed natural custodian and that family members do not

24  take precedence.

25          What we've understood is that the longer the child

1   lives with family member, the better the chances are that

2   the family member could assume parental rights.

3          But the time has essentially run out.  The Court

4   has postponed that hearing, as my document showed, several

5   times.  They're trying to resolve the custody issue.  And

6   one way that Ms. Handanovic could solve that would be out of

7   custody, on an ankle bracelet, with her son.

8          So, Your Honor, all -- all the questions about

9   flight risk, I think those all weigh in favor of release in

10  this case.

11         In the same way the risk of dangerousness, I

12  think, was maybe unfairly portrayed at the last hearing.  I

13  recall the Government saying Ms. Handanovic is charged with

14  shooting 16 people.  There -- the number 16 is in this

15  document; but, in fact, from our review of them now and

16  having the Court -- the Court go through them, we know that

17  there was allegedly about five people at a firing squad

18  where Ms. Handanovic is alleged to have been one of the

19  people.  There were a few other civilians where

20  Ms. Handanovic is alleged to have been involved.

21         The other numbers that the Government brought out,

22  those are other people who are charged with doing that.

23         Now, the Government's view is Ms. Handanovic is

24  responsible for those, but many of those she's not even in

25  the area.  So it's not fair to say that Ms. Handanovic has

1    the blood of 16 people on her hands, as the Government said

2    at the previous hearing.

3            And, furthermore, now that we've gone through

4    these facts, it's very clear that this was a single day in a

5    war when Ms. Handanovic was part of a military unit as a

6    foot soldier, not a leader, and was following orders about

7    what's happening in this village.

8            Clearly, the Government's view is other things

9    occurred.  People didn't follow orders exactly.  But this is

10   not the same as somebody going into a high school and mowing

11   people down with machine guns.

12           When you say somebody has got 16 bodies on their

13   hands, it sounds like a single act of demented violence.

14   That's not what was happening here.

15           So I think if we look at the facts fairly and have

16   listened to the witnesses, Ms. Handanovic is not a dangerous

17   person.  She's not somebody who acts out in rage.  She's

18   never expressed bias or anger based on religion or

19   ethnicity.  So the question about whether she would be a

20   danger to anyone is whether 18 or 19 years ago, as a

21   22-year-old young woman, she committed acts for which she

22   should be punished.  Those don't make her a danger today.

23           So, Your Honor, I don't think there's any evidence

24   that she is a danger, and we put forth significant evidence

25   that she is not a danger to anyone.  She is a good mother, a

1   good neighbor, a caring person, and not someone who acts out

2   in violence.

3          So the last issue is whether there are any special

4   circumstances that would warrant release when she's

5   considered to be not a danger or a flight risk.

6          The case law says that there are -- the

7   district -- the magistrate court has discretion in this

8   matter.  That there's not a single list of circumstances.

9   There's not a checklist that you have to go through.  There

10  are a number of different ways that the Court should decide

11  someone should be released.  I cited in my brief several

12  different cases where the defendants, in fact, were released

13  in extradition proceedings.

14         In one case the defendant was charged with murder

15  in Mexico, with an intentional murder of actually --

16  actually trying to hurt somebody in a nonwar setting, and

17  that defendant was released.

18         There are different grounds the courts rely on;

19  but, Your Honor, some of the issues that we can look at here

20  are in those cases.  One is that the length of the

21  proceedings here are likely to be very time-consuming.

22  Ms. Handanovic has already been in custody now six months as

23  we've worked through this.  It's a complicated question.

24  I'm not blaming that delay on the Government.  I've needed

25  some time, too.  It's not something that's a standard

1   proceeding that we do every day here, and it takes time to

2   understand all this law.

3           Now we have the next steps continuing briefing

4   about the possible certification order by this Court.  We

5   have a question of whether the Secretary of State would

6   actually order the deportation of a -- or the extradition of

7   a U.S. citizen, and we have a question of an appeal.

8           And I know Your Honor has made some initial

9   rulings that go against the defense and that, for example,

10  uphold the treaty and say that there's probable cause here,

11  but I think some of those questions are clearly ones that a

12  higher court could disagree on, and I would like the

13  opportunity to raise those issues and have another court

14  look at them.  In part, because, as Your Honor recognized,

15  this is an old treaty and at some point a court should stop

16  this.

17          Now, you are bound in some ways by the

18  Ninth Circuit precedent that upheld the treaty before, but I

19  think the Ninth Circuit might look at this and think

20  differently.  But, Your Honor, trying to do that appeal

21  while Ms. Handanovic is in custody is -- is a very difficult

22  decision, because she might not get credit for any of this

23  time that she's here.  The law says that none of this time

24  would count against any sentence if she were to get one in

25  Bosnia.

1        So in order to pursue those, she has to continue

2   to be incarcerated, when, in fact, there's no good reason to

3   do that.  She would easily stay here.  We could work on

4   this.  She could be at home with her son.  She could be

5   caring for the people she needs to care for.

6        So, Your Honor, I think that's an important

7   circumstance and a special circumstance the Court could

8   consider.

9        In addition, I submitted, last time, a letter from

10  the doctor at OHSU who has been treating Ms. Handanovic

11  since 2009, treating her for depression, for posttraumatic

12  stress disorder, the trauma caused by war.  That doctor

13  indicated that it would be detrimental for her to stay in

14  custody; that what she needs is the continuing medication

15  and therapy that she had been getting there and that he felt

16  that it would be detrimental to her health and have

17  deleterious consequences for her to continue to be in

18  custody.

19        Now, six months have gone by.  She's receiving

20  medications while in custody.  When I talk to her she's

21  still in pain for fibromyalgia.  She's not able to get the

22  same medications she had been getting before.  This

23  defendant's exhibit from the doctor lists two, three, four,

24  five -- five different medications that she had been

25  prescribed.  These are not all available to her in custody

1    and her health is affected by this.

2            The courts have noted that deterioration of health

3    and health circumstances are a factor the Court can

4    consider.  We've heard evidence that she suffers from

5    fibromyalgia.  That's something that causes your whole body

6    to ache.  Being incarcerated and being in chains, as she is

7    here, is -- is made much worse by that kind of condition.

8            Finally, Your Honor, I'd ask the Court to consider

9    the extraordinary harm to the dependent here, her son, by

10   maintaining her in custody.  We presented to the Court

11   before with letters from the treating therapist about her

12   son's need to be with his mother and some of the issues that

13   he has.  The new event that's occurred is the father coming

14   in and getting a custody order and litigating this custody

15   issue in court.  That's developed since she was

16   incarcerated.

17           As you heard from the witness, this is obviously a

18   very traumatic issue for the family.  They do not want this

19   young U.S. citizen, who's 12 years old, to be taken from

20   this country, but they're hearing that there may be no way

21   to prevent that.  And the one way they know that they could

22   prevent that would be if Ms. Handanovic were out of custody

23   and could still continue to be a caretaker for her son.

24   Because there's no question that she was a very supportive

25   and loving mother; that she was doing everything that she

1    could to care for her son.  And I have no doubt that the

2    Washington County judge, given the option between a father

3    who has not been involved in this child's life and is not a

4    U.S. citizen and the mother, on an ankle bracelet, confined

5    to the home, but, nevertheless, a loving mother, that he

6    would choose that mother as a person to care for the child.

7           The overall benefit, even if she must eventually

8    go back to Bosnia, is that the child would be with the aunt

9    for a longer period, as well, because they could live

10   together and the relationship between them would be allowed

11   to be considered a parental relationship where the Court

12   eventually could consider that this child has been cared for

13   by the aunt, and she can -- he can weigh that against the

14   father's rights.

15          From my understanding of the Oregon law on

16   parental rights is that the time period that this child has

17   been cared for so far is not enough to outweigh the father's

18   rights.  That's just the way the law works, and there's not

19   a strong way around that.

20          So, Your Honor, that's an extraordinary

21   circumstance that this Court could consider.  And given that

22   Ms. Handanovic is not a flight risk or a danger, it would be

23   the right decision in this case to release her now on an

24   ankle bracelet and that would allow us to continue to work

25   on the case and to get the right decision without feeling

1    rushed or without sacrificing the kind of briefing that we

2    might require for an appeal.

3                Thank you.

4                MR. ATKINSON:  Your Honor, when we filed our

5    opposition, we made our position very clear, in that

6    post-certification, the Court is obliged to hold a fugitive

7    or a subject of an international extradition case, such as

8    Ms. Handanovic, in custody.  The statute 18 §3184 is really

9    quite clear.  It holds that if on an extradition hearing you

10   deem the evidence sufficient to sustain the charge -- which

11   you have done -- you shall issue a warrant for the

12   commitment of the person so charged to the proper jail,

13   there to remain until such surrender shall be made.

14               That language is clear, it's unmistakable, and

15   counsel and Ms. Handanovic misapprehend the application of

16   the special circumstances test and the availability of bail

17   in the procedural posture that we have for this case right

18   now.

19               The language is mandatory, it's unmistakable, and

20   it's supported by Supreme Court precedence.  Specifically,

21   *Wright v. Henkel*.  *Wright v. Henkel* recognized what is

22   apparent from the reading of the statute, and that is that

23   the statute is silent about the availability of bail

24   precertification.  And *Wright* held that in the face of that

25   silence the Court was hesitant to hold that bail was

 1    unavailable, but it did recognize that there were

 2    significant reasons to make the availability of bail

 3    something that was difficult to obtain, rare, and that would

 4    require special circumstances, and that would be a situation

 5    where there would be a strong presumption in favor of

 6    detention.

 7            The Court also noted or held very clearly that it

 8    would be inconsistent with the statute.  A statute, by the

 9    way, that has not changed with respect to the mandatory

10    nature of detention post-certification, since *Henkel* was --

11    *Wright v. Henkel* was decided.

12            It would be inconsistent with that statute to

13    consider bail post-detention.  There's just no mistaking it.

14            Had Congress intended for there to be bail

15    applicable after the Court certifies an individual for

16    extradition, it would not have enacted the statute, and we

17    wouldn't see this sort of language.  It's just very clear,

18    in the Government's perspective.

19            Ms. Hay did not -- for some reason did not see fit

20    to even respond to the Government's argument.

21            Now, there is circuit authority, specifically the

22    *Salerno* case, and a smattering of authority around the

23    country where courts have allowed bail post-certification,

24    but none of those cases talk about the application of §3184

25    and its mandatory nature.

1    And, admittedly, the Government simply didn't

2    argue the effect of §3184, because those -- those cases just

3    don't address it whatsoever.

4    Despite that, our view is that the Supreme

5    Court -- Supreme Court's ruling in *Wright v. Henkel* is

6    binding on this Court and it's mandatory, and the statute is

7    quite -- it's just not susceptible of any other

8    interpretation.

9    So I would ask you to find and to hold that you do

10   not have the authority to release her at this stage.  If one

11   were to turn to the merits of the release decision, and I

12   ask that you not do that, but if you were to turn to the

13   merits, the facts of this case speak for themselves,

14   Judge Stewart.

15   You have just found probable cause to believe that

16   Ms. Handanovic is responsible for murder in the first

17   degree.  Counsel argues that perhaps she's only personally

18   involved in the death of eight people, rather than 16.  Now

19   there's a distinction without a difference.  Eight people,

20   Judge, who have lost their lives as a result of

21   Mr. Handanovic and her -- and her colleagues in incidences

22   in which she was directly involved.

23   The evidence is -- is that she advocated for the

24   death of those prisoners in Gaj that -- that morning.  She

25   advocated that they'd be lined up and shot.  And, of course,

1   the evidence is very clear that she stood over them -- stood

2   over them -- and any that were showing signs of life she

3   killed or shot again.  Those facts, in and of themselves,

4   speak a significant potential for danger.

5           Now, on top of that, you have the pretrial

6   services report, a report from the marshals that when she

7   was taken into custody Ms. Handanovic had threatened to

8   commit suicide if she was not released.  If she is so -- if

9   she's willing to commit suicide in order to prevent her

10  staying in custody for her extradition, she poses a danger

11  to any deputy United States marshal sent out to arrest her

12  when it's time to surrender, when it's time to take her into

13  custody in order to deliver her to authorities from Bosnia.

14          This is a woman who, the evidence shows, based

15  upon the sealed exhibits that I submitted with the United

16  States' opposition, has specialized military training,

17  explosives training, special forces training, and who has

18  attempted to commit suicide on several prior occasions.

19  Someone who's mentally unstable, has threatened to commit

20  suicide, and has attempted to commit suicide is not a good

21  release risk, Judge Stewart, I'd submit to you.

22          And someone with that sort of military training,

23  who is so desperate that she's threatening to commit suicide

24  if she's not released from custody poses a danger to anybody

25  who would have to go out to arrest her.

1          Now, Counsel says that she is not a risk of

2   flight.  I'd submit that the potential penalties that she

3   faces in Bosnia, the relative proximity of Canada, and the

4   fact that she does drive, and the fact that even if she were

5   on electronic monitoring there's no way that law enforcement

6   would be able to effectively intercede and apprehend her

7   were she to decide to grab her son and make a run for the

8   border, all of those facts make her a flight risk.

9          This is a woman whose instability is evidenced by

10  her own words, by the -- her prior attempts at suicide, the

11  fact that she's a -- I -- I don't mean to say this for any

12  point other than the point I'm about to make -- the fact

13  that she has -- suffers from bipolar mental disorder, severe

14  depression, and has been suicidal and engages, apparently,

15  in suicidal ideation, all make her a risk of flight and an

16  unstable individual.  Despite the testimony that you've

17  heard today, this is evidence that is just undisputed.  She

18  admits that she has engaged in these things and suffers from

19  these -- from these illnesses.

20          When she first came into court back on the 11th,

21  we saw evidence of her instability.  She was wailing,

22  screaming, knocking her head against the walls.  She was a

23  problem when she came into court.  She is emotionally

24  unstable, Judge, and if she were to go off her meds or if

25  she were to have a downturn with her -- with her manic

1    depressive illness, she could very easily decide to make a

2    break, and she could very easily pose a danger to those who

3    would be sent to arrest her or try to engage in enforcement

4    action against her.

5            She argues that we should release her for the

6    benefit of her child.  There's case law citing the

7    Government's memorandum to the effect that that is not a

8    special circumstance, even if the Court were to rule that it

9    could consider bail in this case.  But I would ask you to

10   allow the best interest of the child to be attended to by

11   those whose responsibility it is to ensure the child's

12   interests are attended to.  That is the circuit court out in

13   Washington County and the Children's Services Division

14   representatives who could easily be brought into this case.

15           I have every confidence that the judge assigned to

16   this custody case is going to make decisions in the best

17   interest of Ms. Handanovic's child, and I'd ask that you

18   have that same confidence.

19           Counsel argues that one factor that we ought to

20   take into account here is the length of time that it will

21   take to pursue her appeals.  This is a difficult

22   circumstance, because that length of time is sort of, in a

23   way, a self-inflicted wound.  In the Government's view,

24   there have been multiple extraditions in modern times, since

25   the independence of Bosnia and Herzegovina, under this

Proceedings - 10/20/11

1    treaty.  It's pretty well established that this is a valid

2    treaty.  And every court to have considered the issue has

3    ruled that it is.

4         Ms. Hay, with all her skills of advocacy and her

5    tremendous legal research skills has mounted the best

6    argument that she can in her client's behalf.  I respect her

7    for that and commend her for it.  I'm sure that she'll

8    continue to do that, and I have every confidence that

9    Ms. Handanovic will be well represented.  But this is a

10   cause that is not -- it does not have a high prospect of

11   success in court's down the road, I'd submit, given the

12   precedent that we have here; the fact that this -- every

13   court has ruled that this treaty is still valid.

14        There's just ample evidence of probable cause.  We

15   may dispute the exact number of murders for which she's

16   responsible and the exact facts, but there's just no

17   question that there's probable cause to believe that she's

18   guilty of murder in the first degree, multiple victims, and

19   that's really all we need to consider for the purposes of

20   her prospects for countering your ruling on appeal that

21   there's probable cause to believe that she committed murder

22   in the first degree.

23        Finally, I'd submit that there was ample evidence

24   upon which to deny her release initially.  Now we're at a

25   stage where the Court has found probable cause to believe

1   her guilty of murder in the first degree and her extradition

2   is a step closer to being accomplished.  If there -- if she

3   was a risk of flight initially when Judge Ashmanskas heard

4   the case before the extradition hearing, given the fact that

5   her extradition is that much closer and that much more

6   certain, makes her an even greater risk of flight.

7          For those reasons, I would ask you to deny this

8   bail request.

9          MS. HAY:  If I could respond briefly, Your Honor.

10   On the legal issue, I believe we still are in the

11   precertification phase here.  The Court has not, in fact,

12   issued a certification order.  The Government has submitted

13   a proposed order of certification.  I still have another

14   week, I think, to file a reply to what I believe are errors

15   in that order and in the Government's explanation of it, so,

16   in fact, we are in the precertification phase still.  This

17   Court is not bound by the case law the Government cited.

18          And, in fact, the binding cases in the Ninth

19   Circuit on this issue do not distinguish between

20   precertification and post-certification.

21          As the Government acknowledged, in the Ninth

22   Circuit defendants have been released and the special

23   circumstances has been argued without any regard to

24   precertification or to post-certification.  So what the

25   Government is asking you to do is to disregard the

1    Ninth Circuit precedent and to rely on an argument they're

2    making now that -- when I glanced through their cases, and,

3    frankly, I wasn't able to open their memorandum on the

4    system for some reason.  We had some difficulty with that.

5    Mr. Atkinson eventually e-mailed it to me, but I didn't have

6    the time to file a legal reply to it.  But when I looked at

7    his cases, they're not citing cases that support their

8    argument at all.  They rely on *Wright*, which makes a

9    distinction looking at a different version of the statute

10   and then discusses release and special conditions.  Later

11   cases have rejected the argument the Government makes now.

12            In fact, they cite, in a footnote, a recent case

13   from the Central District of California, from 2009, which

14   not only rejects the argument, but explicitly goes through

15   it and says this is not -- this is not the law; that the --

16   this is not a -- the footnote on page 10, footnote three of

17   their brief.  They mention it in a footnote.  But, in fact,

18   that case says there is a federal common law of release in

19   extradition cases that the Supreme Court recognized in

20   *Wright* and that still exists and the distinction between

21   precertification and post-certification is not a distinction

22   recognized in the law.  It's a distinction the Government is

23   raising now based on the statutory language.  But the

24   century of federal common law that's developed around

25   extradition says there's a federal common law that does

1    recognize special circumstances.  So I don't think the law

2    is nearly as clear as the Government suggests.

3            And, frankly, I didn't find a case, in looking at

4    these, that they're citing any case that actually upheld

5    this argument.  Their cases are upholding the idea that

6    statutes should be read clearly.  But, in fact, the cases

7    they cite are -- they're trying to distinguish later cases

8    where courts, in fact, release people even

9    post-certification; that those are the cases we've all

10   looked at; those are the cases of the Ninth Circuit.  There

11   hasn't been a distinction recognized in this circuit,

12   certainly, based on those -- based on that argument.

13           So I don't think the Government's argument -- even

14   though superficially it has an appeal based on the statute,

15   I think that the cases that say there's a federal common law

16   of release in this cases that has to be recognized is the --

17   is the precedent this Court should follow.  If that

18   precedent is wrong, the Government can try to bring that up

19   with a higher court, just as they're arguing that I'll have

20   to do with my arguments, because the other courts have

21   precluded it.  I don't think the Court should rely on that

22   legal argument to deny release in this case.

23           On the question of probable cause that she

24   committed first degree murder, I want to be sure it's clear

25   that we deny that she committed those offenses.  And all the

1   Court has found here is an initial finding of probable

2   cause; not proof beyond a reasonable doubt, not something

3   that could ever have her convicted.  It's a very low

4   standard and doesn't mean that Ms. Handanovic actually did

5   these acts that the Government has accused her of.

6          The claims of threatened suicide, Your Honor, I

7   think if you look at the Government's documents, it's clear

8   that in fact what happened was she was arrested in the early

9   hours of the morning, half naked, by the marshals, from her

10  home.  You can imagine the disarray when her elderly

11  parents, who don't speak English, were there, and her son,

12  and they come to the door, break in to arrest her.  She's

13  not sure what's happening.  These are men in uniforms.  She

14  suffers from PTSD, which she explained later to the people

15  who are discussing -- talking to her in the jail, was that

16  the blue uniforms and the effect of the military appearance

17  caused her to be distraught; the handcuffs.  The differences

18  in the way different prisoners were being treated caused her

19  to have concerns about whether she was going to be isolated

20  or create -- treated somehow differently, and that was what

21  some of the initial distress was about.

22          The last page of the Government's brief is -- or

23  their exhibit, which are the log notes from the sheriff's

24  office is from October of this year, and it says, per the

25  captain, Inmate Handanovic has no negative notes in the red

 1    book.  He stated no issues or concerns related to behavior.

 2    Per previous chronos, she's classified to general housing.

 3    There's no housing changes.

 4          So after the initial shock of being arrested,

 5    the -- I guess the distress caused by that and after talking

 6    with the counselor she has managed to control a lot of those

 7    issues.  Clearly, being incarcerated is very difficult for

 8    her, but I don't think those are grounds to say that she

 9    should be held or she's a danger in any way.

10          She's receiving her medications.  She understands

11    the reasons she's here now.  She's not as distraught and not

12    feeling that she's being treated by a militaristic unit.

13          As for the Government having every confidence the

14    judge will make the best decision, judges are bound by the

15    law, and the law in Oregon says that parents have first

16    rights to custody of their children.  And when one parent is

17    incarcerated, the other parent is the first in line to have

18    custody.  That's the law, and I know that Ms. Handanovic's

19    sister has done everything she can to try to find a way to

20    get someone to listen to her about what might be different,

21    but I think you could hear the distress and the way she

22    feels that she's not been able to find somebody who will

23    intervene in a case where there's no allegation of abuse, no

24    child in danger.  Human Services are not interested in that

25    kind of case.  This is a custody case.  And the effect is a

1   special circumstance this Court can consider.

2         Releasing Ms. Handanovic on a bracelet to go stay

3   at the home would solve this very important family issue

4   that's a matter of a great deal of trauma for them.  There's

5   no danger or flight risk as we've now been able to put

6   forward with many witnesses and as we looked through the

7   exhibits.  It would allow us the time to thoroughly review

8   the law, that we want to file the appeal, and to ensure that

9   Ms. Handanovic is treated fairly under the laws.

10        She's a U.S. citizen, and I would like a chance to

11  represent her and make the arguments that I think should be

12  made on her behalf without having her suffer through

13  incarceration as we make these legal challenges.

14        This Court has the authority to release her and

15  the facts to support release.

16        THE COURT:  Well, you've both submitted written

17  arguments as well as oral arguments and evidence and all of

18  which I have carefully reviewed in advance of the hearing,

19  and of course I've listened closely to what you presented at

20  the hearing.

21        As we all agree, there's no statutory right to

22  bail or to release in international extradition proceedings.

23  In the *Wright* case, which you've referenced, in 1903 the

24  Supreme Court did recognize that special circumstances may

25  render release appropriate to one who's facing extradition

1    proceedings.

2          The Government has made an argument that *Wright*

3    involved only a release decision precertification and that

4    there is a different standard that must be applied under

5    18 U.S.C. §3184 after extradition is ordered.

6          Now, you're right, Ms. Hay, that, technically,

7    we're still in the precertification stage.  I've indicated I

8    will certify it.  We just need to get the order signed with

9    the right language.  It really would be rather futile to

10   release someone for a couple of weeks, knowing that the

11   minute the certification order is signed that person would

12   have to go back into custody.

13         As far as I'm concerned, at this juncture I need

14   to consider the standard post-certification.

15         To me, the statutory language is very clear.  It

16   says:  The judge, quote, shall issue his warrant for the

17   commitment of the person so charged to the proper jail,

18   there to remain until such surrender shall be made.

19         Admittedly, there are some cases, such as *Salerno*

20   which have considered special circumstances, even

21   post-certification, but I agree with the Government that

22   none of those cases address the argument that the Government

23   is making today.  It simply was not an issue in those cases.

24         The only cases I've been able to find to address

25   this issue is the *Garcia v. Benov* case from the Central

 1   District of California in April of 2009.  That case did, in

 2   a lengthy footnote, reject the argument made by the U.S.

 3   that's being made here today.

 4           Frankly, I read that, and I have to conclude that

 5   that court misread *Wright*.  I agree with the Government's

 6   argument here.

 7           In *Garcia*, the Court there noted that the statute

 8   is silent regarding the availability of bail in extradition

 9   cases that neither provides for no -- nor prohibits it; but

10   I think that is only true as to precertification.  Once the

11   certification order is signed, the statute is not silent.

12   It says, very clearly, that the person has to be committed

13   to remain in jail until surrender.

14           *Wright* did notice this difference in the statutory

15   language both pre- and post-certification.  And as I read

16   the *Wright* decision, I just can't read it the same way the

17   *Garcia* court did.  I read it the same way the Government has

18   explained it today.

19           I don't see anything in *Wright* that purports to

20   grant the judicial power of bail where the statute expressly

21   bars it post-certification.

22           This is a very interesting legal issue; another

23   issue that I think is going to be one that would be a very

24   good issue on appeal.

25           So I'm going to go also to the special

1    circumstances argument, because I acknowledge that this is a

2    situation where no other court, other that *Wright* and the

3    Supreme Court, has actually addressed this issue.  The only

4    case out there that I think addresses *Garcia*, another

5    district court, not binding on this Court, has reached the

6    opposite conclusion.

7              You wanted to say something, Ms. Hay?

8              MS. HAY:  Yes.  Thank you, Your Honor.  Just, the

9    language in *Wright*, I think Your Honor is correct that there

10   aren't other cases that have adopted the Government's

11   argument.  There's this case in the Central District of

12   California that's rejected it.  And I think the language of

13   the statute doesn't have to be read to include the word

14   "immediately."  That is, it doesn't say, "And then the judge

15   shall immediately issue a warrant."  So I believe this Court

16   can, because we are precertification, allow Ms. Handanovic

17   to be released, based on the special circumstances, on an

18   ankle bracelet; that even after this Court issues an order

19   of certification, a warrant is not required immediately.  At

20   some point the Court issues a warrant, she has to turn

21   herself in, and she gets processed and taken to another

22   country if the State department approves it and if the

23   appeal fails.  But there's no reason that all of that time

24   she has to be in custody.

25             So, you know, I agree that the language in the

1    statute could be read that way, but it doesn't say that you

2    have to issue that warrant immediately.

3              So, Your Honor, that's not an argument that I see

4    in any cases either.  When I looked at this, I thought the

5    Government is taking a 1909 -- is rejecting what has become

6    federal common law since 1909, since the *Wright* case, that

7    all cases all around the country have said, yes, there are

8    special circumstances that allow someone to be released.

9    And the argument they're making is not recognized in any

10   cases I could find.

11             So I think if the Court is going to be consistent

12   and say, you know, we're following other cases that say this

13   1902 treaty is valid and I have to appeal it, the Court

14   should follow the federal common law that's been

15   acknowledged in all these other cases and allow

16   Ms. Handanovic to be released on this precertification

17   moment and let the government appeal that issue.  They can

18   try to get another court to agree that that language,

19   despite not being accepted into any other cases, should bar

20   release in this case.

21             So, Your Honor, I -- I believe that would be the

22   right result in this case.  And since Ms. Handanovic is not

23   a danger of flight risk, having her released on a bracelet

24   would not pose a problem for the Government while they make

25   that appeal.

1          THE COURT:  Well, it's an interesting argument you

2     haven't made before; that the statute doesn't include the

3     word "immediately."  I maintain my current view that once a

4     certification issues, the warrant issues as well.  If not

5     immediately, certainly within a reasonable time; not until

6     someone deems it appropriate to surrender someone.  I -- I'm

7     not sure that I can adopt your reading of that statute, as

8     much as it might be helpful to your client here.

9          But because I recognize there is this issue, this

10    legal issue concerning interpretation of the statute, I will

11    turn to the special circumstances test, assuming it is

12    applicable in this case, which I don't think it is, but

13    assuming that it is applicable, I'm -- I certainly agree

14    with -- with you, Ms. Hay, that Ms. Handanovic doesn't

15    present a danger.  These crimes that she's allegedly

16    committed were 18, 19 years ago, when she was much younger,

17    and certainly different circumstances, with the horrors of

18    civil war and ethnic and religious strife.

19          Perhaps today there's some potential threat of

20    committing suicide.  Although, that seems to be a much

21    smaller threat now than it was in April.  I think as long as

22    she's on her medications that she's not particularly

23    unstable mentally.  I just don't perceive that at this point

24    that her release would be a danger either to the community

25    or to herself.

1         As to flight risk, which is a special or a

2   separate analysis for special circumstances, I want to make

3   it clear that under *Wright* my reading of *Wright* is that the

4   absence of a risk of flight is not itself a special

5   circumstance, but is an independent consideration that has

6   to be met.  And then on top of that, there have to be

7   special circumstances for release in extradition

8   proceedings.

9         And as to a flight risk, I certainly would

10  conclude, based on the evidence I've seen, that

11  Ms. Handanovic has certainly made a good life for herself

12  and her son here in the U.S.  She has a strong network of

13  family and friends.  All of them have testified to her good

14  character and how she's a good mother.  All of the indicia

15  that she poses a low flight risk are present, with the

16  exception, of course, as the Government has pointed out,

17  that there's a potentially long sentence should she be

18  convicted of these crimes in Bosnia and Herzegovina.  It's

19  easy for her to flee across the border to Canada even with

20  electronic monitoring.  It's not a hundred percent

21  risk-free.

22        So there is some likelihood of flight here that I

23  have to address.  But I certainly agree it's very low in

24  this case, given the circumstances here.

25        But even if there's not much of a flight risk

1    here, there have to be special circumstances to support a

2    release decision.  And I don't see them present in this

3    case.

4          In the cases that have been cited in your

5    memorandum, Ms. Hay, I think the facts there were quite

6    different.  All of those case are quite distinguishable from

7    the case here, and I don't see any of them being what I call

8    all fours or in any way persuasive.

9          You're right that the proceedings here could be

10   lengthy and delayed before there may be an actual surrender

11   to the Bosnia/Herzegovina authorities.  You have some

12   important issues, perhaps, on appeal, and she may not have

13   any credit for time served in U.S. custody.

14         But I do agree with the Government that there's

15   not a strong likelihood that she's going to prevail on her

16   legal issues, and there's a Ninth Circuit decision that -- I

17   can give you the cite -- *The Matter of the Requested*

18   *Extradition of Kirby*, 106 F. 3d 855, Ninth Circuit, from

19   1997, which basically said the time spent in U.S. custody

20   was not credited against a sentence imposed is not a special

21   circumstance.

22         Her health issues could be a special circumstance

23   if it's a very severe health problem.  She clearly has

24   health issues, but she is receiving medications and

25   treatment while in custody.

1    Maybe the situation would be different if there

2  was a severe deterioration of her health in some way because

3  of custody.  I haven't seen that.  In fact, the contrary.

4  She seems to be doing well.  Maybe she's not getting the

5  same medications that she might have received before being

6  in custody.  That's not unusual.  A different dispensary,

7  different medications, but she's receiving treatment.  And

8  so I don't see the type of severe health problem here in

9  this case that would constitute a special circumstance of

10 any kind.

11    I acknowledge that being in custody obviously

12 presents difficulties with respect to her son, especially

13 with the father in Canada trying to obtain custody; but,

14 again, I -- the case law is pretty clear in cases cited by

15 the Government that basically a child's need for a parent,

16 depravation of a parent's love and support, simply don't

17 constitute special circumstances.  They exist for all

18 inmates; not just those who are being held in custody

19 because of extradition proceedings.

20    None of the other sort of factors that in other

21 cases have constituted special circumstances, as far as I

22 can tell from the evidence, are present in this case.  And

23 most of the factors that have been presented simply do not

24 constitute, at this point, special circumstances.

25    So based on my reading of §1834 for

1    post-certification extradition proceedings and based on the

2    evidence presented and the case law that governs what I deem

3    to be the special circumstances applicable to

4    precertification proceedings, I am denying the renewed

5    motion for release and will retain Ms. Handanovic in custody

6    pending extradition.

7            I'm certainly sympathetic to you in your

8    situation, Ms. Handanovic, but you need to understand that I

9    have to apply the law and I have to apply it to the best of

10   my ability.  And based on the law that I have to follow and

11   the evidence that's been presented, that's the conclusion

12   that I'm required to reach.

13           All right.  We're in recess.  Thank you.

14              (Hearing concluded at 11:20 a.m.)

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATE

2            I hereby certify that the foregoing is a true and

3    correct transcript from the stenographic record of the

4    proceedings in the foregoing matter.

5    */s/ Jill L. Erwin*                    *Date: 11/9/11*
     Jill. Erwin, RPR, CRR, CSR
6    OR CSR No. 98-0346

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25